**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, et al. | |
| Plaintiffs | |
| v. | Case No: 8:25-cv-3644-TDC |
| KASH PATEL, Director, Federal Bureau of Investigation, et al. | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................... 1

    I.      Statutory and regulatory background ...................................................................... 1

    II.     Factual background ................................................................................................ 2

    III.    Proceedings in this case ....................................................................................... 12

ARGUMENT ...................................................................................................................... 13

    I.      Applicable standards ............................................................................................ 13

            A.     Standards applicable to a motion for judgment on the pleadings ............ 13

            B.     Judicial review under the Administrative Procedure Act ......................... 15

    II.     The FBI and GSA selection decisions were unlawful because they violated
           express statutory directives. ................................................................................ 16

            A.     The FBI and GSA selection decisions each qualify as reviewable final
                 agency action under the APA. ................................................................. 16

            B.     The FBI and GSA selection decisions violated the statutory provisions
                 directing the GSA to select one of three specified sites. ........................... 17

            C.     The FBI had no authority to make any selection decision. ....................... 17

    III.    The July 1, 2025, FBI reprogramming decision was also unlawful. ................... 18

            A.     The FBI reprogramming decision qualifies as reviewable final agency
                 action. .................................................................................................... 18

            B.     The FBI reprogramming decision was unlawful because the sole reason
                 for the action was to implement the unlawful selection of the Ronald
                 Reagan Building. ..................................................................................... 18

            C.     The FBI reprogramming decision is additionally invalid because it
                 violated statutory restrictions on $323 million of the reprogrammed
                 amount. .................................................................................................. 20

            D.     The language in the January 2026 Department of Justice appropriations
                 statute only further restricted the FBI's ability to reprogram funds .......... 23

    IV.    The Court should vacate the challenged actions and enjoin their implementation.
            .............................................................................................................................. 25

CONCLUSION...................................................................................................................... 26

## TABLE OF AUTHORITIES

**CASES**

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   271 F.3d 262 (D.C. Cir. 2001) ............................................................... 15

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ............................................................................... 18

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
   144 S. Ct. 2440 (2024) .......................................................................... 25

*Deese v. Esper*,
   483 F. Supp. 3d 290 (D. Md. 2020) ...................................................... 15

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) .......................................................................... 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .......................................................................... 19

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
   707 F.3d 462 (4th Cir. 2013) ................................................................. 19

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ............................................................................... 25

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ............................................................................... 24

*Georgetown Univ. Hosp. v. Bowen*,
   821 F.2d 750 (D.C. Cir. 1987) ............................................................... 25

*Immigr. & Naturalization Serv. v. Chadha*,
   462 U.S. 919 (1983) ............................................................................... 21

*ImpactOffice, LLC v. Siniavsky*,
   Civil Action No. TDC-15-3481, Civil Action No. TDC-16-1851, 2017 WL
   1410773 (D. Md. Apr. 19, 2017) ........................................................... 14

*In re Dep't of Com. Off. of Inspector Gen.—Application of Reprogramming Notification
   Requirement*,
   B-330108, 2020 WL 7636149 (Comp. Gen. Dec. 30, 2020) ......................... 21, 22

*In re LTV Aerospace Corp.*,
   B-183851, 55 Comp. Gen. 307 (1975) ................................................... 21

*Indep. News, Inc. v. City of Charlotte*,
    568 F.3d 148 (4th Cir. 2009) ........................................................... 15

*Kenney v. Indep. Order of Foresters*,
    744 F.3d 901 (4th Cir. 2014) ........................................................... 14

*Khepera-Bey v. Santander Consumer USA, Inc.*,
    Civil No. WDQ-11-1269, 2012 WL 1965444 (D. Md. May 30, 2012) ............... 14

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ........................................................................ 18

*Last Best Beef, LLC v. Dudas*,
    506 F.3d 333 (4th Cir. 2007) ........................................................... 24

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ........................................................................ 20

*Massey v. Ojaniit*,
    759 F.3d 343 (4th Cir. 2014) ........................................................... 14

*Mayor & City Council of Baltimore v. Azar*,
    973 F.3d 258 (4th Cir. 2020) (en banc) ............................................ 25

*Me. Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020) .....................................................................11

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................... 19

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*,
    918 F.3d 353 (4th Cir. 2019) ........................................................... 26

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F.3d 546 (4th Cir. 1994) ............................................................. 26

*Navigators Ins. Co. v. Under Armour, Inc.*,
    165 F.4th 171 (4th Cir. 2026) ......................................................... 14

*Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*,
    Civil Action No. ELH-16-1015, 2017 WL 3189446 (D. Md. July 27, 2017) ....... 16

*Roe v. U.S. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ........................................................... 26

*Salazar v. Ramah Navajo Ch.*,
    567 U.S. 182 (2012) ........................................................................ 20

*Saul Holdings Ltd. P'ship v. SeraCare Life Scis., Inc.*,
    Civil Action No. TDC-14-1444, 2014 WL 6791457 (D. Md. Nov. 25, 2014)...... 14

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ................................................................................................ 19

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    909 F.3d 635 (4th Cir. 2018) ............................................................................... 25

*Strawser v. Atkins*,
    290 F.3d 720 (4th Cir. 2002) ............................................................................... 24

*Strigliabotti v. Franklin Res., Inc.*,
    398 F. Supp. 2d 1094 (N.D. Cal. 2005) .............................................................. 15

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) .............................................................................................. 16

*United States v. Garcia*,
    855 F.3d 615 (4th Cir. 2017) ................................................................................. 3

*United States v. Stewart*,
    311 U.S. 60 (1940) ................................................................................................ 21

## CONSTITUTIONAL PROVISIONS

U.S. Const, art. I, § 9, cl. 7 ....................................................................................... 20

## FEDERAL STATUTES

31 U.S.C. § 1301(a) ................................................................................................... 20

31 U.S.C. § 1532 ........................................................................................................ 21

40 U.S.C. §§ 3301–3318 .............................................................................................. 2

    40 U.S.C. § 3303(c)(1) .......................................................................................... 2

    40 U.S.C. § 3303(d) ............................................................................................... 2

    40 U.S.C. § 3307(b) ........................................................................................... 5, 6

Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 ..................... 13, 15, 16, 17

    5 U.S.C. § 704 ............................................................................................ 16, 17

    5 U.S.C. § 706(2) ........................................................................................ 15, 25

    5 U.S.C. § 706(2)(A) ............................................................................... 13, 17, 18

5 U.S.C. § 706(2)(C) ................................................................................ 17, 18

Commerce, Justice, Science; Energy and Water Development; and Interior and
    Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5
    .................................................................................................. 12, 23, 24

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015) .. 4, 9

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 ............. passim

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49 ............. passim

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022)
    ...................................................................................................... passim

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 ............... 22, 23

Declaratory Judgment Act, 28 U.S.C. § 2201 ................................................. 25

Full-Year Continuing Appropriations Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 ............ 23

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 ..... 8, 9

**FEDERAL RULES**

Fed. R. Civ. P. 12(c) .............................................................................. 13, 15

Fed. R. Civ. P. 56(f)(3) ................................................................................ 15

**OTHER AUTHORITIES**

172 Cong. Rec. S202 (daily ed. Jan. 14, 2026) .................................................. 12

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
    (2012) .......................................................................................... 22

Gen. Servs. Admin., The Site Selection Guide ................................................... 2

Gov't Accountability Off., *Principles of Federal Appropriations Law* (4th ed., 2016 rev.)
    .................................................................................................. 10, 11, 20

## PRELIMINARY STATEMENT

In 2023, the U.S. General Services Administration (GSA) selected a site in Greenbelt, Maryland, for a new consolidated headquarters for the Federal Bureau of Investigation (FBI). The decision followed more than a decade of deliberation and a multiyear process directed by statute and conducted in close collaboration with state and local leaders in Maryland and Prince George's County. In July 2025, however, the FBI and the GSA abruptly announced that they had selected a new site, the Ronald Reagan Building in Washington, D.C., and took steps to redirect funding that Congress had set aside for the Greenbelt project.

The selection of the Ronald Reagan Building violated explicit statutory directives that required the GSA to choose one of three specified sites in Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia. And because the selection of the Ronald Reagan Building was unlawful, it was likewise unlawful for the FBI to shift funds from the Greenbelt project to support the selection of the Ronald Reagan Building. In addition, the FBI's decision to shift funds violated statutory restrictions tying a portion of the funds to the Greenbelt project.

These statutory violations by the FBI and the GSA have unfairly and unlawfully harmed plaintiffs State of Maryland and Prince George's County, who advocated for the Greenbelt project through the process that Congress directed. The plaintiffs ask the Court to bring the defendant agencies and the headquarters project back in line with the requirements that Congress imposed.

The Court should award judgment on the pleadings in favor of the plaintiffs.

## BACKGROUND

### I.     Statutory and regulatory background

The General Services Administration manages the real estate needs of federal agencies, including acquisition of real estate for use by federal agencies and design, construction, and

maintenance of federal real estate assets. *See* Compl. for Declaratory and Injunctive Relief ¶ 12, ECF No. 1; Defs.' Answer to Pls.' Compl. ¶ 12, ECF No. 9. These activities are governed by statutory requirements codified at 40 U.S.C. §§ 3301–3318.

Decisions about where to locate federal facilities have a range of profound effects on states and localities and their economies. Accordingly, federal law and policy have for decades required close consultation with state and local entities. For example, the statutes governing site selection direct the GSA to distribute public buildings "equitably throughout the United States," *id.* § 3303(d), and require the GSA to engage with state and local leaders, *id.* § 3306(c)(1). The Site Selection Guide published by the GSA recognizes that "[f]ederal projects have an enduring impact on the community at large and on the immediate neighborhood" and "[f]ederal investment in each facility can enhance local efforts for economic development." Gen. Servs. Admin., The Site Selection Guide at 14. As discussed in the next section, Congress has also prescribed requirements specific to the FBI headquarters project that is the subject of this lawsuit, and the funding provided for that project.

## II.     Factual background[1]

The federal government has been working for more than a decade to develop a new headquarters complex for the FBI to replace its aging facility in the J. Edgar Hoover Building in Washington, D.C. Compl. ¶ 2; Answer ¶ 2.

In December 2011, the Senate Committee on Environment and Public Works adopted a resolution directing the GSA Administrator to proceed with plans for a new consolidated FBI

---

[1] This section relates only facts that are proper to consider on a motion for judgment on the pleadings: matters alleged in the plaintiffs' complaint and admitted in the defendants' answer, matters contained in uncontested documents attached to the plaintiffs' complaint, and matters subject to judicial notice. *See infra* pp. 13–15. The plaintiffs' complaint contains a more expansive account of the facts leading up to this case.

headquarters facility. The resolution identified several considerations the Committee deemed important based on its review of a report that had been submitted by the FBI. These considerations included that the site would be "to the maximum extent feasible" within 2 miles of a Metro rail station and within 2.5 miles of the Capital Beltway, that the property would be federally owned, and that the facility would meet certain security standards. *See* Compl. Ex. 1 at 1 (S. Comm. on Env't & Pub. Works, 112th Cong., Committee Resolution: Federal Bureau of Investigation Consolidated Headquarters, National Capital Region (Dec. 8, 2011)), *discussed in* Compl. ¶ 17.

In 2013, the GSA published a Request for Expressions of Interest soliciting potential sites for a new FBI headquarters complex. Compl. ¶ 18; Answer ¶ 18. In 2014, the GSA convened a panel to review responses to the request and develop a short list of potential sites. The panel considered a range of potential sites in the District of Columbia, Maryland, and Virginia. The field included sites proposed in response to the Request for Expressions of Interest as well as additional sites separately identified by project staff, and it included a mix of privately owned sites and sites already in the control of the GSA or other federal agencies. *See* Ex. 1 at J.R. 4–13 (Gen. Servs. Admin., Federal Bureau of Investigation Headquarters Consolidation, Site Identification and Evaluation: Approving Official's Decision (2014), https://www.gsa.gov /system/files/2013%20FBI%20Headquarters%20Site%20Identification%20and%20Evaluation %20Approving%20Officials%20Decision_Redacted%20%281%29.pdf).[2]

In 2014, the GSA approved a short list of three sites in Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia. Compl. ¶ 19; Answer ¶ 19. None of the potential sites

---

[2] Documents posted on federal agency websites are subject to judicial notice. *See, e.g.*, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017). A court accordingly may consider such documents on a motion for judgment on the pleadings. *See infra* pp. 13–15.

identified in the District of Columbia made the short list. The panel had identified two sites that were already owned by the federal government and were controlled by the GSA, but only one of them—the Springfield, Virginia, site—made the short list. The approving official rejected the other GSA-controlled site, in Suitland, Maryland, citing the challenges involved in converting an existing federal facility to meet the FBI's security and other needs. *See* Ex. 1 at J.R. 6–7.

In the Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015), Congress provided $1.6 billion in the Federal Buildings Fund administered by the GSA, specifying in statutory text that "$75,000,000 shall be for construction management and oversight activities, and other project support costs, for the FBI Headquarters Consolidation." *Id.* div. E, tit. V, 129 Stat. at 2452.[3]

In 2016, the GSA submitted a prospectus to Congress outlining a plan to develop a new headquarters on one of the three sites on the short list developed in 2014. *See* Ex. 2 at J.R. 124 (Gen. Servs. Admin., Prospectus—Construction: FBI Headquarters Consolidation, National Capital Region, Prospectus No. PNCR-FBI-NCR17 [hereinafter FY 2017 Prospectus], https://www.gsa.gov/system/files/FY2017_National_Capital_Region_FBI_Headquarters_Consolidation.pdf). The GSA and the FBI sought $1.4 billion in funding for the project. Ex. 2 at J.R. 125. The prospectus noted that, at the time, FBI personnel and resources were dispersed among 14 locations throughout the National Capital Region, and that "dispersion and fragmentation" hindered FBI's mission because it "diverts time and resources, hampers coordination, decreases flexibility, and impedes the FBI's ability to rapidly respond to ever changing, asymmetric threats." Ex. 2 at J.R. 125. The GSA noted that the J. Edgar Hoover Building and the FBI's other

---

[3] The pertinent provisions of the public laws cited in this memorandum are reproduced in the attached Appendix of Appropriations Provisions.

existing facilities were inadequate "to support today's FBI mission that includes an increased emphasis on national security." Ex. 2 at J.R. 126. The GSA proposed a new headquarters to permit consolidation of multiple facilities into a single facility that would meet current information technology, security, and resiliency standards. Ex. 2 at J.R. 125–26.

In the Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, Congress provided $420,178,000 to the FBI for construction expenses, specifying in statutory text that "$323,000,000 shall be for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region." *Id.* div. B, tit. II, 131 Stat. at 197–98. In the same appropriations act, Congress provided $200,000,000 in the GSA's Federal Buildings Fund, designated through statutory text "for construction and acquisition" associated with the "National Capital Region, FBI Headquarters Consolidation." *Id.* div. E, tit. V, 131 Stat. at 357.

In July 2017, the GSA and the FBI announced they were canceling the headquarters project because Congress had not approved enough funding to complete the project. But the agencies stated that the cancellation of the project "[did] not lessen the need for a new FBI headquarters," and "GSA and FBI [would] continue to work together to address the space requirements of the FBI." Compl. ¶ 22; Answer ¶ 22.

In the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, Congress directed the Director of the FBI to work with the Administrator of the GSA to prepare and deliver to four congressional committees, within 180 days, "a report on the construction of a new headquarters for the Federal Bureau of Investigation in the National Capital Region" meeting the requirements of 40 U.S.C. § 3307(b). Consolidated Appropriations Act, 2022, div. B, § 534, 136 Stat. at 151. That statute required the Administrator of the GSA to transmit to Congress a prospectus providing details of a proposed project, including the main outlines of the

proposal, a summary of costs, and a statement that other suitable spaces are not already available to the government. *See* 40 U.S.C. § 3307(b). In the same appropriations act, Congress directed that the Administrator of the GSA "shall select a site from one of the three listed in the General Services Administration Fiscal Year 2017 PNCR-FBI-NCR17 prospectus [the FY 2017 Prospectus] for a new fully consolidated Federal Bureau of Investigations (FBI) headquarters. Such decision shall be made in as expeditious manner as possible." Consolidated Appropriations Act, 2022, div. E, § 530(a), 136 Stat. at 276. The "three listed" sites were the Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia, sites that had been placed on a short list in 2014 and discussed in the FY 2017 Prospectus. *See* Ex. 2 at J.R. 124.

In May 2022, the GSA met with Maryland and Prince George's County to discuss the site selection process and hear from the State and County about their sites. Compl. ¶ 26; Answer ¶ 26. Maryland and Prince George's County also provided the GSA with a presentation on the two Maryland sites. The presentation highlighted advantages of the Maryland sites for the FBI and anticipated benefits to the region. Compl. ¶ 27; Answer ¶ 27.

The Governor of Maryland and the County Executive of Prince George's County submitted letters dated September 16, 2022, describing financial commitments for off-site improvements. These financial commitments included $250 million from Maryland for the cost of transportation infrastructure mitigation measures for either the Greenbelt or Landover site, and $107 million from Prince George's County for the cost of constructing a parking garage and consolidated transit facilities at the Greenbelt site. Compl. ¶ 30; Answer ¶ 30.

In September 2022, the GSA provided a briefing on the criteria and evaluation process for site selection to state and county government stakeholders. Also during September 2022, the GSA published a Site Selection Plan, which it updated with administrative updates in November

2022. On October 7, 2022, the Governor of Maryland and the County Executive of Prince George's County submitted additional information to the GSA in support of the Greenbelt and Landover sites. Compl. ¶ 31; Answer ¶ 31.

In the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022), Congress provided $375,000,000 in the GSA's Federal Buildings Fund for "Federal Bureau of Investigation Headquarters Consolidation." *Id.* div. E, tit. V, 136 Stat. at 4682. The Act contained a provision setting additional detailed requirements for selection of a site:

> SEC. 527. The Administrator of the General Services Administration shall select a site from one of the three listed in the General Services Administration (GSA) Fiscal Year 2017 PNCR-FBI-NCR17 prospectus [the FY 2017 Prospectus] for a new fully consolidated Federal Bureau of Investigation (FBI) headquarters.
>
> In considering the September 2022 and amended November 2022 GSA Site Selection Plan for the FBI Suburban Headquarters, not later than 90 days after enactment of this Act, prior to any action by the GSA site selection panel for the new Federal FBI headquarters, the GSA Administrator shall conduct separate and detailed consultations with individuals representing the sites from the State of Maryland and Commonwealth of Virginia to further consider perspectives related to mission requirements, sustainable siting and equity, and evaluate the viability of the GSA's Site Selection Criteria for the FBI Headquarters to ensure it is consistent with Congressional intent as expressed in the resolution of the Committee on Environment and Public Works of the Senate (112th Congress), adopted December 8, 2011 and further described in the General Services Administration Fiscal Year 2017 PNCR-FBI-NCR17 prospectus. Following those consultations, the Administrator shall proceed with the site selection process.

*Id.* div. E, § 527, 136 Stat. at 4687.

The GSA conducted the required consultation with individuals representing each of the Maryland and Virginia sites during March 2023. Compl. ¶ 33; Answer ¶ 33. In July 2023, the GSA issued a second amendment to the Site Selection Plan, establishing the final criteria for selection. The GSA also named GSA Public Buildings Service Commissioner Nina Albert as Site Selection Authority, the official authorized to make the final selection decision. Compl. ¶ 34; Answer ¶ 34. Maryland and Prince George's County provided additional information in support

7

of their proposed sites. Compl. ¶ 35; Answer ¶ 35. A panel composed of three government employees evaluated the potential sites in light of the selection criteria and, in August 2023, delivered a consensus report to the Site Selection Authority. Compl. ¶ 36; Answer ¶ 36.

On September 30, 2023, the Site Selection Authority, Ms. Albert, delivered a final Site Selection Decision. *See* Compl. Ex. 2 (Gen. Servs. Admin., Site Selection Decision (Sept. 30, 2023)). The Site Selection Authority selected the Greenbelt, Maryland, site and explained the choice in a detailed written decision spanning 38 pages. The decision highlighted key advantages that the Greenbelt site offered for transit accessibility, schedule certainty, opportunities for positive impact through sustainable and equitable development, and cost to taxpayers. *See* Compl. Ex. 2 at 37. On November 9, 2023, the GSA publicly announced the selection of the Greenbelt site and its intent to move forward with site acquisition. Compl. ¶ 38; Answer ¶ 38.

Congress continued setting aside funding for the project. In the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, Congress set aside $200,000,000 in the GSA's Federal Buildings Fund for "construction and acquisition" associated with the "National Capital Region: Federal Bureau of Investigation Headquarters Consolidation." *Id.* div. B, tit. V, 138 Stat. at 552.

In March 2024, in accordance with the requirements of the Consolidated Appropriations Act, 2022, the GSA submitted a prospectus report for the Greenbelt site to congressional oversight committees. Compl. ¶ 40; Answer ¶ 40.

In all, the total funds appropriated and designated for the Greenbelt headquarters through statutory text since 2016 amount to $850 million in the GSA's Federal Buildings Fund and $323 million to the Department of Justice:

| | General Services Administration (Federal Buildings Fund) | Department of Justice (Construction) |
|---|---|---|
| Consolidated Appropriations Act, 2016 | $ 75,000,000 | |
| Consolidated Appropriations Act, 2017 | $200,000,000 | $323,000,000 |
| Consolidated Appropriations Act, 2023 | $375,000,000 | |
| Further Consolidated Appropriations Act, 2024 | $200,000,000 | |

The Greenbelt FBI headquarters project thus grew out of more than a decade of deliberation, planning, and collaboration with Congress and state and local authorities. In July 2025, however, the FBI and the GSA announced they were casting all that aside and were embarking on a new plan. On July 1, 2025, the FBI and the GSA each issued a press release announcing "the selection of the Ronald Reagan Building complex in Washington, D.C., as the new location for FBI headquarters." Compl. Exs. 3, 4. The announcements stated:

> The [FBI and the GSA's] announcement follows nearly two decades of attempts to find the needed space to meet the FBI's mission and workforce requirements. Previous efforts focused on constructing a new suburban campus, which would have cost the taxpayers billions of dollars and would have taken years to construct. In support of the administration's goal to optimize the federal real-estate portfolio, the GSA and FBI identified an existing federal property. The Ronald Reagan Building complex provides a world-class facility that supports the FBI's critical mission and saves money for taxpayers.

Compl. Ex. 3 at 1 (Press Release, FBI, New FBI Headquarters in Washington, D.C. (July 1, 2025)); *see also* Compl. Ex. 4 at 1 (Press Release, Gen. Servs. Admin., FBI Announces New Headquarters in Washington, DC (July 1, 2025)) (substantially identical text).

The Ronald Reagan Building was not one of the three sites that Congress had directed the GSA to choose from in the Consolidated Appropriations Act, 2022, and the Consolidated

Appropriations Act, 2023. The July 2025 announcements did not even mention the September 2023 selection decision, much less explain why the GSA was discarding the decision. The agencies' July 2025 announcements did not discuss the selection criteria established in the Site Selection Plan or the Site Selection Authority's detailed analysis of those factors in the 2023 selection decision, *see supra* p. 8. The July 2025 announcements also did not address the considerations that the Consolidated Appropriations Act, 2023, identified for the GSA to explore in consultations with state and local representatives, *see supra* p. 7 ("mission requirements, sustainable siting and equity"). And they did not discuss the December 2011 committee resolution or the FY 2017 Prospectus that were referenced in the Consolidated Appropriations Act, 2023. *See supra* p. 7; Compl. Exs. 3–4.

The July 2025 announcements have put in doubt Maryland's ability to negotiate a transaction with the GSA for property interests in land owned by Maryland at the Greenbelt site. *See* Compl. ¶ 59; Answer ¶ 59. The FBI and the GSA also have taken or proposed to take further steps to divert funding intended for the FBI Greenbelt project to support installing the FBI at the Ronald Reagan Building instead. By letter dated July 1, 2025, the FBI provided notice that it intended to reprogram $555 million of existing FBI funding "to relocate to, renovate, build-out, and furnish an existing, Federally owned building in Washington, D.C., to serve as the new FBI HQ in the NCR." Compl. Ex. 5 at 2 (U.S. Dep't of Just., Report of Reprogramming Action—FY 2025 (July 1, 2025)). "Reprogramming" is a decision by a federal agency to apply appropriated funds within a particular account to a different program or activity other than what was contemplated at the time the funds were appropriated. *See generally* Gov't Accountability Off., *Principles of Federal Appropriations Law*, ch. 2, § B.7.b, at 2-43 to -47 (4th ed., 2016 rev.)

[hereinafter *GAO Red Book*].[4] The FBI's notice stated, "While security and renovation costs are still being assessed, the FBI and the GSA have determined the Ronald Reagan building Complex (RRBC) at 1300 Pennsylvania Avenue NW is the best option in Washington, D.C. for the headquarters." The $555 million included $323 million that had been appropriated in the Consolidated Appropriations Act, 2017, and designated for the FBI headquarters project through statutory text. *See* Compl. Ex. 5 at 1; *see also supra* p. 5.

By letter dated September 19, 2025, addressed to leadership of the Senate Committee on Appropriations, the Senate Subcommittee on Financial Services and General Government, the House Committee on Appropriations, and the House Subcommittee on Financial Services and General Government, the GSA requested authority to "transfer $843,769,886 appropriated to the Federal Buildings Fund (FBF) for the Federal Bureau of Investigation (FBI) Headquarters Consolidation from the FBF's construction and acquisition account to the FBF's major repairs and alterations account." Compl. Ex. 6 at 1 (Letter from Michael J. Rigas, Gen. Servs. Admin., to Hon. Susan Collins et al. (Sept. 19, 2025)). A "transfer" is an action through which an agency shifts funds from one appropriation to another. *See generally GAO Red Book*, ch. 2, § B.7.a, at 2-38 to -43. Transfer is distinguished from reprogramming in that transfer entails moving funds from one appropriation account to another, whereas reprogramming entails shifting of funds within an appropriation account. The GSA's letter stated, "In April 2025, GSA and FBI determined that the existing Ronald Reagan Building (RRB) could be renovated and altered to meet FBI's headquarters needs at a lower cost and in a shorter timeframe than construction of a new facility." Compl. Ex. 6 at 2. The GSA stated that it was seeking approval of the transfer

---

[4] The "Red Book" published by the GAO has been recognized as an authoritative treatise on federal appropriations law, including by the Supreme Court. *See, e.g.*, *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) (citing the Red Book).

"[t]o support the relocation of FBI into the RRB and to fund the necessary major repairs and alterations." Compl. Ex. 6 at 2. The GSA indicated that it "will not financially obligate the Government using the above-referenced appropriations until the Committees grant their approval of GSA's transfer requests." Compl. Ex. 6 at 3.

On January 23, 2026, after the filing of this case, the President signed into law the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5. A provision within this law provides as follows:

> SEC. 222. Any remaining unobligated balances from amounts originally made available under the heading "Federal Bureau of Investigation—Construction" in the Department of Justice Appropriations Act, 2016 (title II of division B of Public Law 114–113) or in the Department of Justice Appropriations Act, 2017 (title II of division B of Public Law 115–31) for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region that were subsequently reprogrammed pursuant to a notification received by the Committees on Appropriations from the Assistant Attorney General for Administration on July 1, 2025, may not be further obligated until the Federal Bureau of Investigation submits to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed architectural and engineering plan for the Federal Bureau of Investigation's new headquarters building for review: *Provided,* That classified portions of the architectural and engineering plan shall be submitted through a classified annex.

*Id.* div. A, tit. II, § 222, 140 Stat. at 40. This provision, advanced by Maryland's senior Senator, Chris Van Hollen, *see* 172 Cong. Rec. S202 (daily ed. Jan. 14, 2026) (statement of Sen. Chris Van Hollen), did not include language overriding any previously enacted statutory requirement relating to the FBI headquarters project.

## III.    Proceedings in this case

Plaintiffs State of Maryland and Prince George's County filed this case November 6, 2025, challenging (1) the FBI's July 2025 selection of the Ronald Reagan Building; (2) the GSA's July 2025 selection of the Ronald Reagan Building; and (3) the FBI's July 2025 attempt to

"reprogram" $555 million of existing FBI funding. *See* Compl. ¶¶ 45, 53, 62–78 and Exs. 3–5.[5] The complaint asserts claims against the FBI, the Department of Justice, the GSA, and four agency officials under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 and several alternative sources of authority.

The defendants filed their answer on January 16, 2026.

The claims in the plaintiffs' complaint are divided into six counts. Counts I, II, and III assert that the challenged actions are unlawful because they violated statutory directives. *See* Compl. ¶¶ 62–71. Counts IV, V, and VI assert that the challenged actions are unlawful because they were arbitrary and capricious under § 706(2)(A) of the APA, 5 U.S.C. § 706(2)(A). Compl. ¶¶ 72–78. Each count of the complaint in turn includes multiple arguments. This motion seeks judgment in favor of the plaintiffs based on arguments contained in Counts I, II, III, and VI. While this motion does not address all of the grounds discussed in the complaint, it raises grounds that are sufficient to support relief against all three challenged actions and thus sufficient to resolve the case.

## ARGUMENT

## I.   Applicable standards

### A.   Standards applicable to a motion for judgment on the pleadings

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A court considering such a motion considers "the allegations raised in the parties' pleadings" and, in

---

[5] The plaintiffs have not asserted claims directly challenging the GSA's September 19, 2025, request for authority to transfer funds, *see supra* pp. 11–12, because the GSA has stated that it will not proceed with such a transfer without approval from certain congressional committees. But the plaintiffs are seeking relief barring the defendants from implementing the selection decisions, which would necessarily prevent the GSA from proceeding with the transfer.

addition, "may take judicial notice of matters of public record and may consider documents attached to the pleadings and to the parties' motions as long as the documents are authentic and integral to the pleadings." *Navigators Ins. Co. v. Under Armour, Inc.*, 165 F.4th 171, 180 n.9 (4th Cir. 2026) (citing *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014)), *petition for reh'g filed*, No. 25-1068 (4th Cir. Feb. 3, 2026). "[T]he court assumes the facts alleged by the nonmoving party to be true and draws all reasonable factual inferences in its favor, and judgment is appropriate only if the moving party establishes that no genuine issue of material fact remains to be resolved and that the party is entitled to judgment as a matter of law." *ImpactOffice, LLC v. Siniavsky*, Civil Action No. TDC-15-3481, Civil Action No. TDC-16-1851, 2017 WL 1410773, at *3 (D. Md. Apr. 19, 2017). This is similar to the standard for summary judgment under Rule 56. *See Saul Holdings Ltd. P'ship v. SeraCare Life Scis., Inc.*, Civil Action No. TDC-14-1444, 2014 WL 6791457, at *2 (D. Md. Nov. 25, 2014).

In this case, the defendants are the nonmoving parties, so the Court generally must assume that matters denied by the defendants are false and must consider the undisputed facts in the light most favorable to the defendants. But the Court is "not obliged to accept" denials or averments by the defendants "that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" *Massey*, 759 F.3d at 353 (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)). In addition, when an allegation in the complaint pertains to the contents of a document, and the defendants' response states that the document "speaks for itself," the response may be treated as admitting the plaintiffs' allegations regarding the authenticity and contents of the document. *See Kenney v. Indep. Order of Foresters*, 744 F.3d 901, 904 n.2 (4th Cir. 2014); *Khepera-Bey v.*

14

*Santander Consumer USA, Inc.*, Civil No. WDQ-11-1269, 2012 WL 1965444, at *5 (D. Md. May 30, 2012).

This motion seeks a judgment resolving the entire case in favor of the plaintiffs. But if the Court were to conclude that the motion is justified only in part, it can issue partial judgment on a portion of the plaintiffs' claims. It is widely accepted that a court may issue partial judgment on the pleadings under Rule 12(c). *See, e.g.*, *Indep. News, Inc. v. City of Charlotte*, 568 F.3d 148, 157 (4th Cir. 2009) (affirming grant of partial judgment on the pleadings); *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1097 (N.D. Cal. 2005) ("[I]t is common to apply Rule 12(c) to individual causes of action."). The Court alternatively could grant partial summary judgment under Rule 56(f)(3), which authorizes a court to grant summary judgment (including partial summary judgment) without a motion so long as the parties have had reasonable notice and an opportunity to respond. The briefing of this motion provides adequate notice and opportunity to respond.

### B.    Judicial review under the Administrative Procedure Act

The Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, authorizes judicial review of the actions of federal agencies and officers. A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).

A claim for judicial review under the APA is typically resolved on summary judgment based on the record of the materials that were before the agency at the time of the challenged action. *Deese v. Esper*, 483 F. Supp. 3d 290, 303–04 (D. Md. 2020). But a claim that an agency action violated statutory requirements can be resolved without production of the administrative record for the action. *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262,

266–67 (D.C. Cir. 2001); *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, Civil

Action No. ELH-16-1015, 2017 WL 3189446, at *20 (D. Md. July 27, 2017). Such a claim

therefore can properly be resolved on a motion for judgment on the pleadings.

## II.    The FBI and GSA selection decisions were unlawful because they violated express statutory directives.

### A.    The FBI and GSA selection decisions each qualify as reviewable final agency action under the APA.

The APA authorizes review of "final" agency action. 5 U.S.C. § 704. To qualify as final,

an agency action must meet two requirements: "First, the action must mark the consummation of

the agency's decisionmaking process—it must not be of a merely tentative or interlocutory

nature. And second, the action must be one by which rights or obligations have been determined,

or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578

U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The Supreme

Court has held that courts should take a "'pragmatic' approach" when assessing finality. *Id.* at

599.

The FBI and GSA decisions selecting the Ronald Reagan Building each qualified as final

under this standard. They stated conclusive decisions by the respective agencies, and they had

legal consequences in that they purported to determine where the FBI headquarters project would

be located (and where it would not be located). Indeed, a November 2023 memorandum by the

General Counsel of the GSA stated that a decision seeking to nullify the selection of Greenbelt

and reopen the selection process would be reviewable under the APA. Ex. 3 at J.R. 134–35

(Memorandum from Alex DeMots, Gen. Couns., Gen. Servs. Admin., to Robin Carnahan,

Adm'r, Gen. Servs. Admin. (Nov. 3, 2023), https://www.gsa.gov/system/files/Enclosure_Legal

%20Review%20Memorandum.pdf) ("Reopening the process after the issuance of a final [Site

Selection Decision] would be subject to review under the Administrative Procedure[] Act, which would require a legally sufficient reason to start over." (footnote omitted)).

In addition, the APA specifies that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. So even if the selection decisions were not final, they would still be reviewable in this suit because they led up to the FBI reprogramming action challenged in this suit.

### B.    The FBI and GSA selection decisions violated the statutory provisions directing the GSA to select one of three specified sites.

The FBI and GSA selection decisions were unlawful because they violated statutory directives requiring the GSA to select one of three specified sites for the FBI headquarters project. *See* Compl. ¶¶ 64.c, 67.b (Counts I, II).

The Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, and the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022), each directed the GSA to select a site "from one of the three listed in the General Services Administration Fiscal Year 2017 PNCR-FBI-NCR17 prospectus." Consolidated Appropriations Act, 2022, div. E, § 530(a), 136 Stat. at 276; Consolidated Appropriations Act, 2023, div. E, § 527, 136 Stat. at 4687. These were the sites in Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia. *See* Ex. 2 at J.R. 124. The statutes did not give discretion to the GSA to select a different site. The FBI and GSA selection decisions thereby contravened explicit statutory directives and are unlawful under the APA, 5 U.S.C. § 706(2)(A), (C).

### C.    The FBI had no authority to make any selection decision.

The FBI selection decision is also invalid because the FBI lacked authority to make any selection decision. *See* Compl. ¶ 64.a (Count I). Congress authorized and directed the GSA, not

the FBI, to select the site. *See* Consolidated Appropriations Act, 2022, div. E, § 530(a), 136 Stat. at 276 ("The Administrator of the General Services Administration shall select a site . . . ."); Consolidated Appropriations Act, 2023, div. E, § 527, 136 Stat. at 4687 (same).

Federal agencies' "power to act and how they are to act are authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The FBI had no authority to select a site for the headquarters project or to override the selection of the Greenbelt site, and the FBI's decision purporting to select the Ronald Reagan Building was unlawful, *see* 5 U.S.C. § 706(2)(A), (C).

**III.     The July 1, 2025, FBI reprogramming decision was also unlawful.**

**A.     The FBI reprogramming decision qualifies as reviewable final agency action.**

The FBI's July 1, 2025, decision to redirect $555 million in existing funding through "reprogramming," Compl. Ex. 5, also qualifies as reviewable final agency action under the standards discussed in section II.A above, *see supra* p. 16. The reprogramming action states the conclusive position of the Department of Justice. And it purports to engender legal consequences in that it purports to permit the FBI to obligate and spend funds in ways it otherwise could not.

**B.     The FBI reprogramming decision was unlawful because the sole reason for the action was to implement the unlawful selection of the Ronald Reagan Building.**

The FBI purported to reprogram $555 million of existing funding originally intended for the FBI headquarters project. *See* Compl. Ex. 5 at 1–2. The FBI reprogramming decision was unlawful with respect to the entire $555 million amount because the sole reason for the reprogramming decision was to implement the unlawful selection of the Ronald Reagan Building. *See* Compl. Ex. 5 at 2; *see also* Compl. ¶ 78 (Count VI).

A court reviewing agency action may consider only the reasons the agency provided for the action at the time it took the action. Consequently, if the court finds that the only reasons the agency provided for the action are unlawful or improper, the court must set aside the action, even if the agency conceivably might have been able to take the same action for other, valid reasons. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("To ascertain the precise basis of [the SEC's] determination, we must look to the Commission's opinion. . . . The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–10 (2020) (holding that the defendant agency could not "rely upon reasons absent from its original decision" to justify its action); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019) (holding that the agency's action was invalid because the "sole stated reason" for the action was invalid); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (declining to uphold agency action for which the agency "submitted no reasons at all," even though the petitioners advanced plausible reasons for the action); *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467–68 (4th Cir. 2013) (holding that the district court erred in upholding agency action after finding that the explanation provided by the agency at the time of its action was inadequate).

In this case, the only reason the FBI gave for its decision to reprogram the $555 million in funds was to implement the unlawful selection of the Ronald Reagan Building. *See* Compl. Ex. 5 at 2 (stating that the purpose of the reprogramming was "to relocate to, renovate, build-out, and furnish an existing, Federally owned building in Washington, D.C., to serve as the new FBI HQ in the NCR" at "the Ronald Reagan building Complex (RRBC) at 1300 Pennsylvania Avenue NW"). That reason is improper, so the entire reprogramming decision must be set aside.

**C.** **The FBI reprogramming decision is additionally invalid because it violated statutory restrictions on $323 million of the reprogrammed amount.**

With respect to a portion of the $555 million amount—the $323 million provided by the Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135—the FBI's attempt to reprogram funds was unlawful for an additional, separate reason: The statute specified that the funds could be used only for construction of "the new Federal Bureau of Investigation consolidated headquarters facility," *id.* div. B, tit. II, 131 Stat. at 197–98, and that restriction cannot be set aside through reprogramming. *See* Compl. ¶ 70 (Count III).

The Constitution vests Congress with the power of the purse, and funds may be expended from the Treasury only with an appropriation from Congress. U.S. Const, art. I, § 9, cl. 7; *see GAO Red Book* ch. 2, § A.2, at 2-3. Federal law generally prohibits the use of appropriated funds for purposes other than the purposes Congress has specified in the statutory text. 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); *see also Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes . . . ."); *Salazar v. Ramah Navajo Ch.*, 567 U.S. 182, 200 (2012) ("An agency's discretion to spend appropriated funds is cabined . . . by the 'text of the appropriation' . . . ." (quoting *Int'l Union, UAW v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984))).

Under certain circumstances, an agency may apply appropriated funds within a particular account to a different program or activity other than what was contemplated at the time the funds were appropriated. This is called "reprogramming." *See generally GAO Red Book*, ch. 2, § B.7.b, at 2-43 to -47. But an agency cannot reprogram funds in a way that conflicts with conditions or restrictions that were attached to the original funds through statutory text (and not, for example,

merely reflected in legislative history or an agency budget request). *See* 31 U.S.C. § 1532 ("subject to the same limitations provided by the law appropriating the amount"); *In re LTV Aerospace Corp.*, B-183851, 55 Comp. Gen. 307, 318 (1975) (explaining that agencies often retain "executive flexibility to shift around funds within a particular lump-sum appropriation account" through reprogramming, but do not have that flexibility when Congress "impose[s] a legally binding restriction . . . by means of explicit statutory language"), *quoted in Vigil*, 508 U.S. at 192–93; *In re Dep't of Com. Off. of Inspector Gen.—Application of Reprogramming Notification Requirement*, B-330108, 2020 WL 7636149, at *3 (Comp. Gen. Dec. 23, 2020) (explaining that reprogramming permits spending that "departs from the amounts specified in the relevant *non-statutory documents* but in a manner that is otherwise consistent with law" (emphasis added)). Undoing restrictions imposed by statutory text requires a further statutory enactment. *See Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 954–55 (1983) (noting that Congress may undo its own earlier actions only through "bicameral passage followed by presentment to the President").

The operative text in the Consolidated Appropriations Act, 2017, stated: "$323,000,000 shall be for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region." Consolidated Appropriations Act, 2017, div. B, tit. II, 131 Stat. at 197–98. The $323 million therefore was designated for the FBI headquarters project through statutory text. That restriction cannot be undone through reprogramming. Moreover, the $323 million in funding is subject to the additional statutory restrictions that the later Consolidated Appropriations Act, 2022, and Consolidated Appropriations Act, 2023, attached to the same FBI headquarters project. *See United States v. Stewart*, 311 U.S. 60, 64 (1940) (explaining that "all acts *in pari materia* are to be taken together, as if they were one law," and applying the principle

to the interpretation of two statutes that were enacted at different times but addressed the same object (quoting *United States v. Freeman*, 44 U.S. (3 How.) 556, 564 (1845))); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252–53 (2012). That includes the requirement that the GSA select one of the three specified sites in Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia.

The FBI purported to rely on "Section 505 of Division C of the Consolidated Appropriations Act, 2024 (P.L. 118-42), as continued by the Full-Year Continuing Appropriations Act, 2025 (Division A, P.L. 119-4)," as authority for its reprogramming action. Compl. Ex. 5 at 2. But the cited provisions do not support the FBI's action. The first cited provision, section 505 of the Consolidated Appropriations Act, 2024, specified that "[n]one of the funds . . . provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 2024 . . . shall be available for obligation or expenditure through a reprogramming of funds that" met any of eight enumerated conditions, "unless the House and Senate Committees on Appropriations are notified 15 days in advance of such reprogramming of funds." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. C, § 505, 138 Stat. 25, 167. When it specified that no funds may be reprogrammed "unless" congressional committees were notified, this provision only *narrowed* the FBI's ability to reprogram funds, by making congressional notification a necessary condition for reprogramming. *See In re Dep't of Com. Off. of Inspector Gen.—Application of Reprogramming Notification Requirement*, 2020 WL 7636149, at *2–3 (interpreting a virtually identical provision in the Consolidated Appropriations Act, 2018, and describing it as a "notification requirement" when an agency seeks to depart from "non-statutory" spending conditions). It did not expand the FBI's authority to reprogram funds, and it did not make committee notification a sufficient condition

for reprogramming. As discussed above, an agency's authority to bypass restrictions on funding ordinarily extends only to restrictions that are imposed by explanatory text or text in a budget request. The FBI has no authority to bypass restrictions imposed by statutory text.

As for the second statute cited by the FBI, the Full-Year Continuing Appropriations Act, 2025, that Act simply continued the funding authority and conditions that had been specified in the Consolidated Appropriations Act, 2024. *See* Full-Year Continuing Appropriations Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(2), 1105, 139 Stat. 9, 10–12 (continuing "the requirements, authorities, conditions, limitations, and other provisions of" earlier appropriations provisions, including division C of the Consolidated Appropriations Act, 2024).

### D.    The language in the January 2026 Department of Justice appropriations statute only further restricted the FBI's ability to reprogram funds.

The Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5, creates an additional congressional reporting requirement for the FBI headquarters project. It provides that the FBI cannot further obligate funds appropriated for the "new [FBI] consolidated headquarters facility in the National Capital Region" until it submits a "contracted and completed architectural and engineering plan" for the new headquarters building to the House of Representatives and Senate Appropriations Committees for review. *Id.* div. A, tit. II, § 222, 140 Stat. at 40. By requiring the FBI to submit this plan, Congress has only further restricted the FBI's ability to reprogram funds.

As with other statutory requirements for agencies to submit information about the FBI headquarters to congressional committees, this reporting requirement is a necessary but not sufficient condition for the FBI to further obligate funds for the new headquarters building. *See supra* pp. 22–23. It does not grant any authority, nor does it reference any specific building or site; rather, it requires only that the FBI submit a plan for "the Federal Bureau of Investigation's

new headquarters building." Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, div. A, tit. II, § 222, 140 Stat. at 40.

A party seeking to argue that a later statute impliedly repeals an earlier statute "faces a stout uphill climb," given the "'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' pre-existing law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (alterations in original). "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing '"a clearly expressed congressional intention"' that such a result should follow." *Id.*

Under that standard, section 222 cannot be read as overriding the requirements discussed in section III.C of this memorandum restricting the use of the $323 million amount to the headquarters project that had been directed by Congress. It also cannot be read as overriding the provisions discussed in sections II.B and .C above regulating the site selection process.

There is no "irreconcilable conflict[]," *Epic Sys. Corp.*, 584 U.S. at 511, between section 222 and those earlier-enacted statutory requirements. There is no reason why the FBI and the GSA could not comply with both the earlier-enacted requirements and the new requirement to submit an architectural and engineering plan. That sets this case apart from *Strawser v. Atkins*, 290 F.3d 720 (4th Cir. 2002), and *Last Best Beef, LLC v. Dudas*, 506 F.3d 333 (4th Cir. 2007), in which the Fourth Circuit interpreted later-enacted appropriations provisions as modifying earlier-enacted statutes. In each of those cases, the court found there was no other plausible way to read the statutes. *Strawser*, 290 F.3d at 733–34 (interpreting the later statute as establishing "a specific, discrete exception" to the earlier statute because the statutes could not "otherwise be reconciled"); *Last Best Beef, LLC*, 506 F.3d at 339 ("The conclusion that Congress intended to

enact a discrete and narrow exception . . . is unavoidable."). Here, as discussed above, the newly enacted provision does not clearly conflict with the earlier-enacted provisions; the provisions are completely consistent with each other.

## IV.    The Court should vacate the challenged actions and enjoin their implementation.

The Court should award relief in the form of declaratory relief, vacatur of the challenged actions, and a permanent injunction.

The Court should declare the challenged actions unlawful based on § 706 of the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201.

The Court also should set aside and vacate the challenged actions, which is the typical remedy for agency action found "legally deficient." 5 U.S.C. § 706(2); *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 655 (4th Cir. 2018); *see also Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460–61 (2024) (Kavanaugh, J., concurring). This will have the effect of reinstating the Greenbelt site as the selected site. *See Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987) ("[T]he effect of invalidating an agency rule is to '*reinstat[e]* the rules previously in force.'" (second alteration in original) (quoting *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (per curiam))), *aff'd on other grounds*, 488 U.S. 204 (1988).

The Court also should award a permanent injunction against implementation of the challenged actions. To obtain a permanent injunction, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *accord Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258, 274 (4th Cir.

2020) (en banc), *cert. granted*, 141 S. Ct. 1369, *and cert. dismissed*, 141 S. Ct. 2170 (2021), *and cert. dismissed*, 141 S. Ct. 2618 (2021).

Here, the nullification of the selection of the Greenbelt site and the diversion of funding away from the Greenbelt headquarters project amount to irreparable injury. They deprive the plaintiffs of long-term economic benefits that are not readily measurable, and the plaintiffs have no damages remedy against the United States. *See, e.g.*, *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (noting that damages that are "difficult to ascertain" can amount to irreparable harm); *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("[E]conomic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation."). The balance of equities and public interest factors also favor a permanent injunction, because the defendants have no legitimate interest in proceeding with unlawful actions. *Roe v. U.S. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (upholding a determination that the public interest favored adherence to law and stated policies).

Accordingly, the Court should vacate the challenged actions and enter a permanent injunction preventing any implementation of any of the challenged actions, including any obligation or disbursement of funds designated for the Greenbelt FBI headquarters project (including funds previously provided to the FBI or the GSA) for other purposes.

## CONCLUSION

For the reasons above, the Court should enter judgment for the plaintiffs.

Date: February 17, 2026

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ JAMES C. LUH
JAMES C. LUH (D. Md. Bar No. 31776)
ADAM KIRSCHNER (D. Md. Bar No. 31767)
YASMIN DAGNE (D. Md. Bar No. 32016)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

Attorneys for State of Maryland

ANTHONY D. JONES (D. Md. Bar No. 31954)
Prince George's County Attorney

/s/ ANDREW J. MURRAY
ANDREW J. MURRAY (D. Md. Bar No. 10511)
(signed by James C. Luh with permission of Andrew J. Murray)
Associate County Attorney
Prince George's County Office of Law
1301 McCormick Drive, Suite 4100
Largo, MD 20774
(301) 952-5225
ajmurray@co.pg.md.us

Attorneys for Prince George's County

27