**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, et al., | |
| Plaintiff, | |
| v. | Civil Action No. 8:25-3644 |
| KASH PATEL, et al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS AND CROSS-MOTION MOTION**
**FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................... 1

**FACTUAL & PROCEDURAL BACKGROUND** ......................................................... 5

    2016 Appropriations Act............................................................................................ 7

    2017 Appropriations Act............................................................................................ 8

    2018 Evaluations...................................................................................................... 10

    2022 Appropriations.................................................................................................11

    2023 Appropriations Act.......................................................................................... 12

    2024 Appropriations Act and GSA's 2024 Prospectus........................................... 13

    FBI's Presence in the National Capital Region....................................................... 15

    Reprogramming FBI Funds & Subsequent Congressional Action .......................... 17

**LEGAL STANDARD**.................................................................................................... 19

**ARGUMENT**................................................................................................................. 20

    I.    Plaintiffs' Alleged Injuries Are Unlikely to be Redressed by a Favorable
        Ruling......................................................................................................... 20

    II.   Plaintiff's FBI's Reprogramming Notice Does Not Constitute Final Agency
        Action, and Was Lawful in Any Event ...................................................... 22

    III.  Congress Ratified the FBI's Reprogramming Notice and Pivot to Reagan in the
        2026 Appropriations Act............................................................................ 26

**CONCLUSION** ............................................................................................................. 30

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Affinity Living Grp., LLC v. StarStone Specialty Ins. Co.*,
  959 F.3d 634 (4th Cir. 2020) ................................................................................ 20

*Bierman Fam. Farm, LLC v. United Farm Fam. Ins. Co.*,
  265 F. Supp. 3d 633 (D. Md. 2017) ...................................................................... 19

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) .............................................................................................. 20

*El Paso County v. Trump*,
  982 F.3d 332 (5th Cir. 2020) .......................................................................... 21, 22

*Ex parte Endo*,
  323 U.S. 283 (1944) .......................................................................................... 26, 27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000) .............................................................................................. 20

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ............................................................................... 26

*Hearst Radio, Inc. v. FCC*,
  167 F.2d 225 (D.C. Cir. 1948) ............................................................................. 23

*Ibarra v. United States*,
  120 F.3d 472 (4th Cir. 1997) ............................................................................... 19

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) ............................................................................. 23

*INS v. Chada*,
  462 U.S. 919 (1983) .............................................................................................. 12

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .............................................................................................. 23

*Navigators Ins. Co. v. Under Armour, Inc.*,
  165 F.4th 171 (4th Cir. 2026) .............................................................................. 20

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ................................................................................................ 23

iii

*Posadas v. Nat'l City Bank of N.Y.*,
    296 U.S. 497 (1936)......................................................................................................... 28

*Robertson v. Seattle Audubon Soc'y*,
    503 U.S. 429 (1992)......................................................................................................... 28

*South CarolinaS.C. Wildlife Fed'n v. Limehouse*,
    549 F.3d 324 (4th Cir. 2008).......................................................................................... 20

*The Last Best Beef, LLC v. Dudas*,
    506 F.3d 333 (4th Cir. 2007).......................................................................................... 28

*United States*,
    316 F.3d 1259 (Fed. Cir. 2002)...................................................................................... 26

*Vermont Agency of Natural Resources v. United States,*
    529 U.S. 765 (2000)......................................................................................................... 20

*Vill. of Bald Head Island v. Army Corp of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013)........................................................................................... 23

**Statutes**

5 U.S.C. § 551............................................................................................................................ 22

40 U.S.C. § 584....................................................................................................................... 5, 25

40 U.S.C. § 3307..............................................................................................................5, 6, 11, 12

40 U.S.C. §§ 3301-3318 ............................................................................................................... 5

40 U.S.C. § 3307........................................................................................................................ 18

2024 Appropriations Act,
    Pub. L. No 118-42, div. C, § 505, 138 Stat. 25 ........................................................... 25

Commerce, Justice, Science; Energy and Water Development; and Interior and Environment
    Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5 (2026) .......................... 18

Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 ..................... 8, 18, 27

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 49.................................................................................11

Consolidated Appropriations Act, 2023,
    Pub. L. No. 117-328, 136 Stat. 4459 (2022).............................................................. 12

Financial Services & General Government Appropriations Act, 2016,
    Pub. L. No. 114-113, div. E, tit. V, 129 Stat. 2242 (2015)............................ 7, 18, 27

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, div. B, tit. V, 138 Stat. 460 (2024)............................................................ 13

**INTRODUCTION**

The Federal Bureau of Investigation's ("FBI") Washington, D.C. headquarters facility, the J. Edgar Hoover Building ("Hoover" or "Hoover Building"), is falling apart. Considerable portions of the facility are unusable, and it no longer meets the FBI's mission needs. FBI personnel in the National Capital Region ("NCR") have been and remain scattered across more than a dozen facilities. Along with the General Services Administration ("GSA"), FBI has been seeking a viable alternative to Hoover for a consolidated FBI headquarters in the NCR for more than a decade. But real estate in D.C. Metro area is pricey, and Congress has not appropriated the requisite billions of dollars needed to buy the land for a new FBI headquarters and to construct a facility that meets FBI's operational and security needs.

Recognizing this political reality, the FBI and GSA (collectively, "Defendants") have for more than a decade pursued various options. Beginning in 2011, Defendants sought to finance a new FBI headquarters with the value of Hoover, thereby lessening the need for congressional funding. At that time, the FBI contemplated a facility adequate to accommodate 11,000 FBI personnel. Using a "swap-exchange," private parties would agree to provide both the land for a new FBI headquarters as well as financing for construction using an agreed-upon valuation of Hoover. Upon the completion of construction, Defendants would take title of the new facility in exchange for title of Hoover. In furtherance of this strategy, in 2014 GSA approved a short list of three sites in the Washington, D.C. metro area: Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia. In 2016, GSA submitted this short list to Congress as part of a prospectus that Congress subsequently approved. The following year, however, the FBI and GSA abandoned this project, noting both the lack of sufficient congressional appropriations and the difficulty of finding parties willing to value Hoover at a level sufficient to make the transaction viable.

Congress thereafter directed Defendants to evaluate other options, and Defendants began to explore a plan to demolish Hoover and rebuild the facility in its existing location. This "raze and replace" option would have cost more than $3 billion and was never authorized or funded by Congress.

In 2022, Congress directed GSA to select a site for FBI headquarters from the 2016 short list, which GSA did in 2023. What Congress did not do—and what Congress has never done—was give GSA or FBI a way to pay for it. Nor did Congress prelude subsequent consideration of other options. Today, a new-construction headquarters facility would cost slightly less than $5 billion. Congress has provided roughly a quarter of that amount: Since 2011, Congress has appropriated less than $1.2 billion collectively to Defendants for FBI headquarters relocation purposes. The fundamental impediment therefore remains: Defendants lack sufficient funds to relocate to any of the short list sites.

Moreover, Congress has soured on Greenbelt in particular. In July 2024, the pertinent congressional committees panned GSA's proposal to move forward with the Greenbelt site, calling GSA's determination "inadequate" and "ill-defined," and criticizing GSA's failure to "take into account the current requirements of the FBI." Congress again sent GSA back to the drawing board, instructing GSA to consider alternative locations that may better meet the FBI's current mission needs. True to its word, Congress has neither approved GSA's proposal to move forward with the Greenbelt site nor appropriated to either GSA or FBI sufficient funds for FBI headquarters relocation.

Since Defendants' efforts to relocate FBI headquarters began, the FBI's personnel footprint in the broader D.C. area has decreased substantially with the relocation of NCR-based personnel to other FBI facilities elsewhere, chiefly Huntsville, Alabama. Whereas the FBI in 2011

2

contemplated a headquarters that could accommodate 11,000 personnel, the FBI today requires a facility for just 6,000. Due to the reduction in NCR positions and the departures of existing tenants in early 2025, a new possibility arose—the Ronald Reagan Building and International Trade Center ("Reagan" or "Reagan Building"). This location fits the bill: FBI and GSA agreed that this location can be modified to meet FBI's operational and security needs, and its downtown D.C. location is consistent with Congress's appropriations of funds "for a consolidated headquarters in the National Capital Region." And unlike any new-construction option, a move to an existing federally-owned facility is possible with existing appropriations. GSA estimates that the cost to relocate FBI headquarters from Hoover to Reagan is $1.4 billion, more than $3 billion less than the commensurate cost to move to Greenbelt or other new-construction site in the NCR.

In July 2025, both GSA and FBI publicly announced the selection of the Reagan Building, and FBI notified Congress of its intent to reprogram $555 million of appropriated funds towards a renovation of Reagan. Shortly thereafter, in October and December 2025, the pertinent congressional committees approved GSA's 2025 prospectus proposing the FBI's move to Reagan. In its January 2026 appropriations legislation, Congress acknowledged this reprogramming, and instructed the FBI to submit a "contracted and completed" architectural and engineering plan before "further obligat[ing]" funds now earmarked for Reagan.

The State of Maryland and Prince George's County (collectively "Plaintiffs") ask this Court to block FBI's move and vacate its reprogramming notice. But Plaintiffs do not and cannot explain why this judicial intervention would benefit them. Congress has never appropriated even a fraction of the money necessary for FBI to build a new facility in the NCR, nor has Congress approved GSA's 2024 proposal to proceed with the Greenbelt site. To the contrary, the pertinent congressional committees expressly directed GSA to look elsewhere, which it did in selecting

3

Reagan.  The practical upshot is that judicial vacatur of the contemplated move to Reagan and FBI's related reprogramming notice does not put FBI back on course to go to Greenbelt, it simply keeps FBI in the Hoover Building indefinitely.  Plaintiffs' requested vacatur would not redress their alleged injuries, all of which are traceable to the construction of a new FBI Headquarters in Greenbelt.  Accordingly, Plaintiffs lack Article III standing to pursue this lawsuit.

Plaintiffs maintain that none of this fiscal or political reality counts.  To Plaintiffs, all that matters is Congress's 2022 directive to GSA to select a site from the short list that included Greenbelt—a directive that Plaintiffs maintain precludes both Defendants' selection of Reagan and the FBI's reprogramming of funds that Congress appropriated in 2017 to the FBI.  The problem with this theory is that the 2022 Appropriations Act did not restrict FBI's reprogramming authority; it said nothing at all about FBI-appropriated funds.  Nor did it otherwise restrict GSA's statutory authority to decide the appropriate location for federal offices.  Congress has seen fit to provide separate FBI headquarters-related appropriations to the FBI and GSA at separate times and in separate amounts, and Congress has placed different conditions—or not—on those various appropriations and how a given appropriation could be reprogrammed or transferred.  Plaintiffs' attempt to elevate language applicable only to GSA and apply it to the FBI is therefore unavailing.

Even if the 2022 appropriations language once had the limiting force that Plaintiffs claim, Congress subsequently ratified Defendants' pivot to Reagan and related reprogramming by its recent appropriations legislation.  Following committee approval of the GSA prospectus for Reagan in late 2025, Congress expressly recognized FBI's July 2025 reprogramming notice in the text of the 2026 Appropriations Act and authorized the submission of an architectural and engineering plan in preparation for the move to Reagan using the reprogrammed funds.  Congress has therefore spoken with sufficient clarity to vitiate whatever vitality its prior directive might have

4

had.  For these reasons, Plaintiffs' motion for judgment on the pleadings should be denied, and Defendants' cross-motion should be granted.

## FACTUAL & PROCEDURAL BACKGROUND

The FBI has occupied its current headquarters in the Hoover Building since 1974.  The federal government has recognized for many years that the Hoover Building is inadequate to meet the FBI's current needs.  Compl. ¶ 16, ECF No. 1; Answer ¶ 16, ECF No. 9.  For more than a decade, FBI has worked to relocate its headquarters away from the aging Hoover facility to a location that meets the agency's needs.  Compl. ¶ 2; Answer ¶ 2.

GSA manages the federal government's real estate portfolio, including the acquisition of real estate for use by federal agencies.  GSA has statutory authority to "assign or reassign space for an executive agency in any Federal Government-owned or leased building."  40 U.S.C. § 584(a).  GSA also oversees the design and construction of new facilities for use by federal agencies, and well as the renovation and repair of existing federal facilities.  Compl. ¶ 12; Answer ¶ 12.  By law, GSA must work closely with Congress and certain statutorily-enumerated congressional committees in order to accomplish its mission.  *See generally* 40 U.S.C. §§ 3301-3318.  Any appropriation in excess of $3.961 million "to construct, alter, or acquire any building to be used as a public building" . . . "may be made only if the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives adopt resolutions approving the purpose for which the appropriation is made." 40 U.S.C. § 3307(a)(1).[1]  "To secure consideration for the approval referred to in [§ 3307(a)], the

---

[1] The statutory amount of $1.5 million has been adjusted for inflation.  *See* Annual prospectus thresholds, Gen. Servs. Admin. (Sep. 3, 2025), Exhibit 4, J.R. 136-37, *available at* https://www.gsa.gov/real-estate/capital-investment-and-leasing-prospectus-library/annual-prospectus-thresholds.

Administrator of [GSA] shall transmit to Congress a prospectus of the proposed facility," which shall include information and details on a range of the proposed project for which GSA is seeking congressional appropriation of funds.  40 U.S.C. § 3307(b) (enumerating required contents of prospectus).

After reviewing a plan submitted by the FBI on August 26, 2011,[2] the Senate Committee on Environmental and Public Works ("EPW") adopted a resolution in December 2011 directing GSA to proceed with the plan for a new consolidated FBI headquarters facility on federally-owned land using a private sector lease transaction.  This resolution specified that the site would be, "to the maximum extent feasible," within two miles of a Metro rail station and within 2.5 miles of the Capital Beltway, that the property would be federally owned, and that the facility would meet Interagency Security Committee Level V security standards.  *See* S. Comm. on Env't & Pub. Works, 112th Cong., Committee Resolution: Federal Bureau of Investigation Consolidated Headquarters, National Capital Region (Dec. 8, 2011) [2011 EPW Resolution][3]; Compl. ¶ 17.  The FBI's plan referenced in the 2011 Resolution stated that, "[m]oreover, if the consolidation were implemented using the recommended public/private partnership (PPP) strategy, no additional appropriations for construction would be required."  Exhibit 5 at J.R. 207.  In other words, the original plan, as submitted and approved by Senate EPW, envisioned private sector (*i.e.*, non-appropriations) financing.

Thereafter, in 2013, the GSA published a Request for Expressions of Interest soliciting potential sites for a new, privately funded FBI headquarters complex.  Compl. ¶ 18; Answer ¶ 18.

---

[2] *See* Exhibit 6 J.R. 138-205 [FBI 2011 Plan].
[3] *See* Exhibit 5 J.R. 206-308.  The 2011 EPW Resolution is available at: https://www.govinfo.gov/content/pkg/CPRT-112SPRT36280/pdf/CPRT-112SPRT36280.pdf

In 2014, the GSA approved a short list of three potential sites in Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia. Compl. ¶ 19; Answer ¶ 19.

2016 Appropriations Act

In the Consolidated Appropriations Act, 2016 ("2016 Appropriations Act"), of the $1.6 billion in the Federal Buildings Fund administered by the GSA, Congress only provided "$75,000,000. . .for construction management and oversight activities, and other project support costs, for the FBI Headquarters Consolidation." Financial Services & General Government Appropriations Act, 2016, Pub. L. No. 114-113, div. E, tit. V, 129 Stat. 2242, 2423, 2452 (2015). Compl. ¶ 20; Answer ¶ 20. On February 8, 2016, GSA submitted to Congress a prospectus ("FY 2017 Prospectus")[4] seeking authorization for $759 million included in the FY 2017 Presidential Budget Request for the construction of "FBI Headquarters in the National Capital Region." Compl. ¶ 21; Answer ¶ 21. The proposed project included a requirement that GSA to convey title to the Hoover Building "in exchange for a newly constructed FBI Headquarters facility. . . ." Exhibit 7 J.R. 310. Pursuant to this so-called "swap-exchange" transaction, a portion of the project would be paid by leveraging the monetary value of the existing Hoover Building as part of a real estate exchange, which would reduce the need for additional congressional appropriations. This prospectus contemplated a facility that would accommodate approximately 11,000 personnel. Id. at 309. The FY 2017 Prospectus further noted that, at the time, FBI personnel and resources were dispersed among 14 locations throughout the NCR, and that this "dispersion and fragmentation" hindered FBI's mission because it "diverts time and resources, hampers coordination, decreases,

---

[4] See Exhibit 7 J.R. 309-315. The FY 2017 prospectus is available at:
https://www.gsa.gov/system/files/FY2017_National_Capital_Region_FBI_Headquarters_Consolidation.pdf ()

flexibility, and impedes the FBI's ability to rapidly respond to ever changing, asymmetric threats." *Id.* at 311.  The GSA noted that the Hoover Building and the FBI's other existing facilities were inadequate "to support today's FBI mission that includes an increased emphasis on national security." *Id.* at 312.  The GSA proposed a new headquarters to permit consolidation of multiple facilities into a single facility that would meet current information technology, security, and resiliency standards. *Id.*

In Section 210 of the 2016 Appropriations Act, Congress noted that "[t]he notification thresholds and procedures set forth in section 505 of this Act shall apply to deviations from the amounts designated for specific activities in this Act and in the explanatory statement described in section 4 (in the matter preceding division A of this consolidated Act), and to any use of deobligated balances of funds provided under this title in previous years."  129 Stat. at 2312.

2017 Appropriations Act

In the Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 ("2017 Appropriations Act"), Congress provided $420,178,000 to the FBI for construction expenses, specifying in statutory text that "$323,000,000 shall be for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region." *Id.* div. B, tit. II, 131 Stat. at 197-98.  In the same appropriations act, Congress provided $200,000,000 in the GSA's Federal Buildings Fund, designated "for construction and acquisition" associated with the "National Capital Region, FBI Headquarters Consolidation." *Id.* div. E, tit. V, 131 Stat. at 357.  In Section 219 of the 2017 Appropriations Act, Congress noted that "[i]n addition to any other transfer authority available to the Department of Justice, for fiscal years 2017 to 2022, unobligated balances available in the Department of Justice Working Capital Fund . . . may be transferred to the 'Federal Bureau of Investigation, Construction' account, to remain available until expended

8

for the new Federal Bureau of Investigation Headquarters in the National Capital Region." 131 Stat. at 211. The 2017 Appropriations Act further contemplated both transfer and reprogramming requests in relation to the FBI headquarters consolidation project. As relevant here, the 2017 Appropriations Act stated that "any transfer pursuant to [Section 219] shall be treated as a reprogramming under Section 505 of [the 2017 Appropriations Act]." *Id.*

In July 2017, the GSA and the FBI announced they were canceling the headquarters project because Congress had not approved enough funding to complete the project. But the agencies stated that the cancellation of the project "[did] not lessen the need for a new FBI headquarters," and "GSA and FBI [would] continue to work together to address the space requirements of the FBI." Compl. ¶ 22; Answer ¶ 22. Following the cancellation, at an August 2, 2017 Senate EPW committee hearing, Government Accountability Office ("GAO") officials addressed GSA's reservations about the effectiveness and viability of GSA's swap-exchange strategy generally, as well as the now-abandoned Hoover Building swap-exchange in particular. GAO noted that GSA had enjoyed only "limited . . . success[] completing swap exchange transactions," noting (among other factors) a lack of adequate private investor valuations.[5] GAO informed EPW that "upfront funding is the best way to ensure recognition of commitments made in budgeting decisions," but also that "upfront funding for large acquisitions such as the Hoover Building replacement can be challenging." Wise Statement at 7.

---

[5] See Exhibit 8 J.R. 316-29 (Statement of Dave Wise, Director, Government Accountability Office, Physical Infrastructure (Senate EPW Committee Hearing, August 2, 2017)) [Wise Statement]. The Wise Statement is available at https://www.gao.gov/products/gao-17-783t

2018 Evaluations

At an August 2, 2017 hearing, EPW committee members directed GSA and FBI to come up with a new plan.[6]  Inadequate funding, however, continued to hamper options: As of the August 2017 EPW hearing, Congress had appropriated only $523M out of appropriations requests from GSA and FBI collectively totaling $1.4B.  *See* Statement of Michael Gelber, Acting Pub. Building Serv. Comm'r, GSA (Senate EPW Committee Hearing, August 2, 2017) [Gelber Statement].[7] Following Congress's passage of the 2017 Appropriations Act, FBI and GSA determined that there was a substantial budget shortfall: In order for FBI to relocate and build a new consolidated FBI headquarters in the National Capital Region, FBI and GSA estimated at that time that the total cost for FBI to relocate to a newly constructed consolidated facility would require Congress to appropriate an additional $2 billion.  *See* Statement of Daniel Mathews, Comm'r, Pub. Building Serv., GSA (Senate EPW Committee Hearing, February 28, 2018) [Mathews Statement].[8] Although the committee did not dispute those cost estimates, it was "just not realistic" "[t]o put $2 billion in one year's appropriation for [FBI headquarters] building consolidation."[9]

Given the funding shortfall noted above, and consistent with the EPW committee directive to explore other options, FBI and GSA began exploring a plan to raze and replace the Hoover Building, which would necessitate the leasing of temporary spaces throughout the NCR during the demolition and rebuilding process.  In testimony at an EPW hearing on February 28, 2018, FBI

---

[6] *See* Exhibit 9 (August 2, 2017 EPW Hearing Transcript) *available at*1AFD2363D657CD22D64BAFBE70598FF16B020ED52C504C8727091A2D96C0C2B3.spw-080217.pdf

[7] *See* Exhibit 10 J.R. 335-37 (Gelber Statement).

[8] *See* Exhibit 11 J.R. 338-41 (Mathews Statement).

[9] *See* note 6, *supra*, at PDF 53.

estimated the total cost of this proposal would be approximately $3.3 billion.[10]  To fund this proposal, the FBI and GSA collectively would require $2.175 billion in additional appropriations.[11]

On July 10, 2018, GSA submitted to the Office of Management and Budget ("OMB") a draft prospectus proposing the demolition of the Hoover building and the construction of a new FBI headquarters at the same site.  This prospectus was never approved by OMB and never submitted to Congress.[12]  Consequently, no such appropriation was forthcoming.

<u>2022 Appropriations</u>

In the Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49 ("2022 Appropriations Act"), Congress directed the Director of the FBI to work with the Administrator of the GSA to prepare and deliver to four congressional committees, within 180 days, "a report on the construction of a new headquarters for the Federal Bureau of Investigation in the National Capital Region" meeting the requirements of 40 U.S.C. § 3307(b).  2022 Appropriations Act, 136 Stat. at 151.  In the same appropriations act, Congress directed that the Administrator of the GSA "shall select a site from one of the three listed in the [the FY 2017 Prospectus] for a new fully consolidated Federal Bureau of Investigations (FBI) headquarters."  136 Stat. at 276.  Congress also required submission of a prospectus for the selected site in accordance with 40 U.S.C. § 3307(b) detailing "all the costs associated with site acquisition, design, management, and inspection, and a description of all buildings and infrastructure needed to complete the project." *Id.*  However, the budgeting shortfall remained: the 2022 Appropriations Act did not provide either GSA or FBI additional funds for the FBI headquarters consolidation project.

---

[10] *See* Exhibit 11 at 340.
[11] *See* Exhibit 12 J.R. 342-423 at 345, 411 (February 28, 2018 EPW Hearing Transcript).
[12] *See* Exhibit 13 J.R. 424-99 at 493.

2023 Appropriations Act

In the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 (2022) ("2023 Appropriations Act"), Congress provided $375,000,000 in the GSA's Federal Buildings Fund for "Federal Bureau of Investigation Headquarters Consolidation." *Id.* div. E, tit. V, 136 Stat. at 4682. The 2023 Appropriations Act also repeated the same direction from the previous year that "[t]he Administrator of the General Services Administration shall select a site from one of the three listed in the General Services Administration [FY 2017 Prospectus] for a new fully consolidated Federal Bureau of Investigation (FBI) headquarters." In doing so, Congress also expressly recognized GSA's authority to transfer funds, specifying that "[f]unds in the Federal Buildings Fund made available for fiscal year 2023 for Federal Buildings Fund activities may be transferred between such activities" provided that the transfer was (1) "necessary to meet program requirements"; and (2) "approved in advance by the Committees on Appropriations of the House of Representatives and the Senate."[13]  136 Stat. at 4686.

On September 30, 2023, the GSA Site Selection Authority delivered a final Site Selection Decision. Compl. ¶ 37; Answer ¶ 37. *See* Compl., Ex. 2, ECF No. 1-2 (Gen. Servs. Admin., Site Selection Decision (Sept. 30, 2023)). In the Site Selection Decision document, the Site Selection Authority official explained that the Site Selection panel unanimously recommended Springfield, Virginia for the new FBI headquarters location, but that the Site Selection Authority instead selected Greenbelt.[14]  On November 9, 2023, the GSA publicly announced the selection of the

[13] For present purposes, Defendants assume without conceding that this committee ratification requirement is constitutional following *INS v. Chada*, 462 U.S. 919 (1983).
[14] *See* Exhibit 14 J.R. 500-538, at 513 "Site Selection Decision: FBI Headquarters Suburban Campus National Capital Region."

Greenbelt site and its intent to begin the acquisition process for the site.  Compl. ¶ 38; Answer ¶ 38.  GSA's decision was quickly criticized by the FBI, GSA OIG, and members of Congress.[15]

2024 Appropriations Act and GSA's 2024 Prospectus

In the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. B, tit. V, 138 Stat. 460, 552 (2024) ("2024 Appropriations Act"), Congress set aside an additional $200,000,000 in the Federal Buildings Fund for "construction and acquisition" associated with the "National Capital Region: Federal Bureau of Investigation Headquarters Consolidation." Although Congress enacted this law on March 23, 2024, several months after GSA's November 2023 announcement of its selection of the Greenbelt site, Congress did not restrict or otherwise direct any of the funds appropriated to FBI.

In March 2024, in accordance with the 2022 Appropriations Act, the GSA submitted a prospectus for the Greenbelt site to congressional oversight committees.  Compl. ¶ 40; Answer ¶ 40.[16]  In this report, GSA explained that:

> Upon adoption of resolutions approving this document's plan [to locate the FBI at the Greenbelt site] by the Committee on Environment and Public Works of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives, GSA intends to expeditiously move forward with site acquisition, design, design related consulting services, management / oversight, and preliminary construction support activities, using GSA's existing balances of approximately $845 million.

*See* 2024 Prospectus at J.R. 1643.  Noting the President's FY 2024 and FY 2025 Budget Requests for an additional $3.5 billion in appropriations, GSA observed that construction costs had "escalated significantly" over the course of the FBI headquarters project.  2024 Prospectus at n.3

---

[15] *See, e.g.*, Exhibit 15, J.R. ** (FBI October 23, 2023 Letter to GSA); Exhibit 16, J.R. 642-45 (Turner October 22, 2023 Memo to GSA) (FBI); Exhibit 17, J.R. 646-50 (statements of members of Congress).
[16] *See* Exhibit 29, J.R. 1641-1648 (GSA 2024 Prospectus).

(J.R. 1642).  GSA further stated that the $3.5 billion request "may not capture the full cost of construction" as that "estimate does not include the costs of FBI's information technology (IT) and furniture, fixtures, and equipment (FF&E)."  *Id*.

By letter dated July 31, 2024, the Chairmen of the House Judiciary, Oversight, and Transportation & Infrastructure Committees noted concerns with the March 2024 prospectus.  The committees criticized the GSA's proposal as "inadequate [and] ill-defined," and as failing to "take into account the current requirements of the FBI."[17]  Letter from Sam Graves, Chairman, H. Comm. on Transp. & Infrastructure, Jim Jordan, Chairman, H. Judiciary Comm., & James Comer, H. Comm. on Oversight and Accountability, to Robin Carnahan, Adm'r, GSA (July 31, 2024).  The Chairmen instructed GSA to submit a prospectus that "considers alternative solutions on locations that may better meet the FBI's current mission."  *Id*.  Lastly, the letter stated that "[u]ntil such a prospectus is submitted and the concerns identified are addressed, the Transportation and Infrastructure Committee has insufficient information to call the prospectus up for Committee action."  *Id*.[18]  To date, the House Transportation and Infrastructure Committee has neither called the prospectus up for committee action nor approved GSA's Greenbelt plan.

Despite continued appropriations requests in the Presidential budget requests for both FY 2024[19] and FY 2025,[20] neither the FBI nor GSA received funding sufficient to build a suburban headquarters facility in Greenbelt, Maryland.  Congress appropriated no funds to FBI for headquarters purposes in the 2024 Appropriations Act.  As noted, Congress appropriated just $200 million in FY 2024 to GSA's Federal Building Fund for "construction and acquisition" associated

---

[17] *See* Exhibit 20, J.R. at 662.
[18] *Id.* The House Committee on Transportation and Infrastructure has jurisdiction over GSA prospectus submissions.
[19] *See* Exhibit 21, J.R. 663-1087 (President's FY 2024 Budget Request).
[20] *See* Exhibit 22, J.R. 1088-1537 (President's FY 2025 Budget Request).

with the "National Capital Region: Federal Bureau of Investigation Headquarters Consolidation." 138 Stat. at 552. Cost estimates far exceeded applicable congressional appropriations: By 2025, estimates for the cost to build a new FBI headquarters at the Greenbelt were $3.5 billion in additional appropriations, on top of the $1.4 billion that Congress already appropriated.[21] Accordingly, the President's FY 2025 budget request sought $3.5 billion for a consolidated headquarters,[22] but Congress appropriated no additional funds to either GSA or FBI in the FY 2025 budget legislation (which Congress enacted via continuing resolution).

Since inception of the FBI headquarters consolidation project more than a decade ago, the building and technical infrastructure of the Hoover facility have continued to deteriorate. FBI estimates that it spends $43 million annually to lease space in the NCR and to maintain and at least $10 million to maintain the Hoover facility (exclusive of significant one-time repairs).[23]

<u>FBI's Presence in the National Capital Region</u>

Over this same period, the FBI has reduced its NCR footprint substantially. The FBI is transferring over 2,000 positions to Huntsville, Alabama, with an additional 500 positions transitioning over the next four years. *Compare* FY 2017 Prospectus (discussing need for headquarters facility that could accommodate 11,000 personnel) *with* Mathews Statement (noting that, as of 2018, FBI planned to locate 8,300 personnel in a consolidated headquarters facility). In addition, the FBI in January 2025 elected to reassign over 900 NCR (largely HQ) positions to FBI field offices, and decided to allocate an additional 500 positions to Huntsville.[24] These significant HQ staffing changes, taken together, mean that FBI's current needs in the NCR require a facility

---

[21] *See* Exhibit 21, J.R. 663-1087; *id.* at 723.
[22] *See* Exhibit 22 at J.R. 1150.
[23] *See* Exhibit 24 J.R. 1603-07, at 1607 (itemizing costs attendant to delay).
[24] *See* Exhibit 25 J.R. 1608 (noting relocation of "more than 1,000 positions out of Washington, D.C.").

that can accommodate approximately 6,000 FBI personnel—slightly more than half the personnel that FBI in 2011 anticipated that its new headquarters would need to accommodate.[25]

Available Space at the Reagan Building in Washington D.C.

Given the multi-billion dollar funding gap required for a new-construction facility, the lack of congressional approval of GSA's 2024 Prospectus, and the 2024 congressional committee directive to "consider[] alternative solutions on locations," FBI and GSA in early 2025 began to explore alternatives to Greenbelt. GSA reviewed its real estate portfolio for potential downtown options that could accommodate the FBI's needs. By the spring of 2025, a unique situation presented itself—the United States Agency for International Development ("USAID") vacated its space in the Reagan Building, and a major existing Reagan tenant at that time, the Environmental Protection Agency ("EPA"), was already scheduled to move out.[26] The departures of USAID and EPA, combined with existing vacancies at the Regan Building, presented a potential solution that had not been an option to that point.

GSA and FBI determined that the space was large enough to accommodate its needs for NCR-based FBI personnel, and the central downtown location was optimal based on its proximity to downtown law enforcement and other governmental partners. On cost, GSA estimated that the anticipated renovation and moving costs to move the FBI headquarters from Hoover to Reagan would be approximately $1.4 billion, substantially less than the corresponding $5 billion estimated

---

[25] *See* https://federalnewsnetwork.com/wp-content/uploads/2018/02/EPW20Presentation_Final_20180212.pdf (noting anticipated relocation to Alabama, West Virginia, and Idaho of 2,306 of 8,300 FBI positions then-located in NCR) (slide 6).

[26] *See* Exhibit 27 J.R. 1632-33 (USAID); Exhibit 28 J.R. 1634-1636 (EPA).

cost to acquire and build a new headquarters campus in Greenbelt, Maryland and to move the FBI out of Hoover to Greenbelt.[27]

Reprogramming FBI Funds & Subsequent Congressional Action

By letter dated July 1, 2025, the Department of Justice provided notice that the FBI intended to reprogram $555 million of existing, previously appropriated FBI funding in order "to relocate to, renovate, build-out, and furnish an existing, Federally owned building in Washington, D.C., to serve as the new FBI HQ in the NCR"—the Reagan Building. *See* Compl., Ex. 5 at 4, ECF No. 1-5 (U.S. Dep't. of Just., Report of Reprogramming Action—FY 2025 (July 1, 2025)) ("FBI Reprogramming Notice") (Exhibit 35 at J.R. 1754). This reprogramming notice included, but was not limited to, the $323 million appropriated by Congress to the FBI in the 2017 Appropriations Act for purposes of the FBI's National Capital Region headquarters project. *See id.*

On September 19, 2025, GSA sent a letter to the House and Senate Appropriations Committees requesting "expedited approval from the [House and Senate] Committees on Appropriations to transfer $843,769,886 appropriated to the Federal Buildings Fund (FBF) for the Federal Bureau of Investigation (FBI) Headquarters Consolidation from the FBF's construction and acquisition account to the FBF's major repairs and alterations account." *See* Compl., Ex. 6 at 2, ECF No. 1-6 (GSA Transfer Request to House and Senate Appropriations Committee Chairs and Ranking Members (Sep. 19, 2025)). The letter went on to state that "[c]onsistent with this request, and in accordance with [40 U.S.C. §§ 3307], GSA is submitting for consideration by the

---

[27] *See* Exhibit 18 J.R. 655 n.8 (GSA 2025 Prospectus); Exhibit 30 J.R. 1652 *available at* https://rollcall.com/2025/10/29/senate-panel-approves-step-on-new-fbi-headquarters-plan/ (noting GSA conversations with congressional committees indicating FBI and GSA planned to fund move to Reagan with existing appropriations, provided GSA transfer request is approved).

House Committee on Transportation and Infrastructure and the Senate Committee on Environment and Public Works a prospectus on this proposed repair and alteration project . . . ." *Id.*[28] In October 2025, Senate EPW adopted a resolution approving the September 2025 prospectus for the Ronald Reagan Building.[29] This prospectus estimated that the total cost to relocate FBI Headquarters from Hoover to Reagan would be $1.4 billion.[30] In December 2025, House Transportation and Infrastructure Committee adopted a resolution approving the September 2025 prospectus for the Ronald Reagan Building.[31]

On January 23, 2026, the President signed into law the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5 ("2026 Appropriations Act"). Section 222 of the 2026 Appropriations Act referenced the FBI's July 1, 2025 reprogramming notice, and stated as follows:

> Any remaining unobligated balances from amounts originally made available under the heading "Federal Bureau of Investigation—Construction" in the Department of Justice Appropriations Act, 2016 (title II of division B of Public Law 114–113) or in the Department of Justice Appropriations Act, 2017 (title II of division B of Public Law 115–31) for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region that were subsequently reprogrammed pursuant to a notification received by the Committees on Appropriations from the Assistant Attorney General for Administration on July 1, 2025, may not be further obligated until the Federal Bureau of Investigation submits to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed architectural and engineering plan for the Federal Bureau of Investigation's new headquarters building for review: *Provided,* That classified portions of the architectural and engineering plan shall be submitted through a classified annex.

*Id.* div. A, tit. II, § 222, 140 Stat. at 40.

---

[28] To date, the Senate Appropriations Committee has approved the transfer request, s*ee* Exhibit 32 J.R. 1652, but the parallel request to the House Appropriations Committee remains pending.
[29] *See* Exhibit 23 J.R. at 1581-82 (Oct. 29, 2025 Senate EPW Business Meeting Transcript).
[30] *See* Exhibit 18 at J.R. 655 n.8.
[31] *See* Exhibit 31 J.R. 1651 (House committee resolution approving move to Reagan).

The 2026 Appropriations Act did not address GSA's pending transfer request for the $834 million.

** ** **

Plaintiffs filed their Complaint in this case on November 6, 2025.  Plaintiffs challenge (1) the FBI's July 2025 selection of the Reagan Building; (2) the GSA's July 2025 selection of the Reagan Building; and (3) the FBI's July 2025 notice informing Congress that it intended to reprogram $555 million of existing FBI funding.  Defendants filed their Answer on January 16, 2026.  By motion dated February 17, 2026, Plaintiffs sought judgment on the pleadings on four of the six counts in their Complaint—Counts I, II, III, and VI.  Counts I and II challenge as unlawful FBI and GSA's respective July 1, 2025 selections of the Reagan Building as the new FBI headquarters location; Counts III and VI challenge FBI's July 1, 2025 reprogramming notice as contrary to law and as arbitrary and capricious, respectively.  Pls'. Br. at 13.  Defendants hereby oppose and cross-move for judgment on the pleadings on all counts.

## **LEGAL STANDARD**

A Rule 12(c) motion for judgment on the pleadings is decided under the same standard as a motion to dismiss under Rule 12(b)(6)." *Bierman Fam. Farm, LLC v. United Farm Fam. Ins. Co.*, 265 F. Supp. 3d 633, 637 n.5 (D. Md. 2017).  In assessing such a motion, then, the court must "construe the facts and reasonable inferences derived therefrom in the light most favorable to the [non-moving party]." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Here, Defendants have opposed Plaintiffs' motion for judgment on the pleadings and cross-moved for judgment on the pleadings.  "[O]n cross-motions for judgment on the pleadings, [the court] accept[s] the facts alleged by the non-moving party as true and draws all reasonable factual inferences in favor of the non-moving party.  [The Court] review[s] the motions separately,

19

applying this standard to both motions." *Navigators Ins. Co. v. Under Armour, Inc.,* 165 F.4th 171, 180 n.9 (4th Cir. 2026) (citing *Affinity Living Grp., LLC v. StarStone Specialty Ins. Co.*, 959 F.3d 634, 639 (4th Cir. 2020)). The Court also "may take judicial notice of matters of public record and may consider documents attached to the pleadings and to the parties' motions as long as the documents are authentic and integral to the pleadings." *Id.*

## **ARGUMENT**

I.  <u>Plaintiffs' Alleged Injuries Are Unlikely to be Redressed by a Favorable Ruling</u>

Plaintiffs bear the burden to demonstrate Article III standing, of which redressability is an "essential" element. *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008). To establish redressability, "a plaintiff must show a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Vt. Agency of Nat'l Res. v. United States,* 529 U.S. 765, 771 (2000). The Supreme Court has emphasized that speculation is insufficient to establish redressability. *See DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 344 (2006) (stating that plaintiff's argument for "redressability requires speculat[ion]" about the actions of non-party legislators and this "sort of speculation" cannot support standing); *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000) (stating that "merely speculative" evidence will not support redressability).

Plaintiffs here ask the Court to vacate and declare unlawful (i) Defendants' July 1, 2025 selection of Reagan as the new FBI headquarters location (Count I—FBI; Count II—GSA); and (ii) FBI's July 1, 2025 reprogramming notice (Counts III and VI). This relief, Plaintiffs claim, "will have the effect of reinstating Greenbelt as the selected site," which in turn will restore to "plaintiffs [ ] the long-term economic benefits" of having the FBI headquarters located in Greenbelt. Pls'. Br. at 25.

This is beyond speculative.  In light of Congress's decades-long failure to appropriate funds sufficient for any new-construction NCR facility as a replacement for Hoover, and the congressional pushback on the Greenbelt site in particular, Plaintiffs' proffered downstream economic benefits are wishful thinking.  As noted earlier, congressional committees overseeing the FBI headquarters move have refused even to consider GSA's 2024 prospectus proposing Greenbelt, and expressly instructed GSA and FBI to consider other alternatives.  *See* page 14, *supra*.  And of greater importance, and notwithstanding repeated presidential budget requests, Congress has repeatedly declined to appropriate funds sufficient for the construction of a new FBI headquarters facility in the NCR, whether in Greenbelt or elsewhere.

Instead, what Congress has done is sanction the FBI's preparatory work for its contemplated move to Reagan.  Although vacatur would prevent the FBI from obligating the reprogrammed funds towards a renovation of or a move to the Reagan Building, it would not compel any specific prospective agency action.  And it certainly would not compel the FBI to obligate the reprogrammed funds towards the Greenbelt site.  Given the current political and fiscal realities, there are only two realistic potential outcomes: (1) Defendants continue towards an eventual move from Hoover to Reagan; or (2) Defendants remain in the Hoover facility indefinitely.  Either way, it is not "substantially likel[y]" that FBI will pivot back to Greenbelt.

The lack of redressability in this case is supported by the Fifth Circuit's decision in *El Paso County v. Trump*, 982 F.3d 332 (5th Cir. 2020), which involved another challenge to agency reprogramming.  In *El Paso County*, the Fifth Circuit concluded that Plaintiffs lacked standing to challenge DoD-funded border barrier projects.  The County challenged a decision by DoD to reprogram $20 million originally allocated for a road construction project at Fort Bliss to border wall construction.  *See id.* at 337.  The County argued that cancellation of the road project harmed

21

its local economy and it sought an injunction prohibiting DoD from spending the challenged funds on the border wall. *See id.* at 338. The Fifth Circuit concluded that the County "fail[ed] to demonstrate that the injury is redressable by a favorable decision in this case." *Id.* at 341. For the County to receive the economic benefit of the roads project, the Fifth Circuit observed that DoD "would have to proceed with the $20 million Fort Bliss project." *Id.* However, "enjoining the Government from spending the diverted funds on border wall construction does not necessarily result in the Government's use of those funds on the Fort Bliss project." *Id.* Redressability was lacking because El Paso County could not show it was "likely that the DoD would exercise its discretion to go forward with the Fort Bliss project if the Government were enjoined from spending the diverted funds on border wall construction." *Id.* at 341-42 (stating that "it is speculative as to whether the Fort Bliss project would proceed"). The same result should obtain here. Maryland has not established that vacating the plans for relocating the FBI to the Reagan Building (located less than a half-a mile from Hoover) would mean the FBI and GSA would instead be obliged to move the Bureau to Greenbelt. Indeed, in the face of a multi-million dollar shortfall in Congressional appropriations, it would be fiscally irresponsible for FBI and GSA to do so.

II.    <u>Plaintiff's FBI's Reprogramming Notice Does Not Constitute Final Agency Action, and Was Lawful in Any Event</u>

The FBI's reprogramming of funds is not final agency action subject to review under the APA. The Supreme Court has stressed that an agency action for APA purposes is limited to the set of "circumscribed, discrete agency actions" delineated in 5 U.S.C. § 551(13), which defines "action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). Indeed, the APA's definition of "action" is "not so all-encompassing as to authorize [courts] to exercise judicial review [over] everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*,

22

372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)).  As the Fourth Circuit has explained, "[t]he term 'action' as used in the APA is a term of art that does not include all conduct" and instead focuses on an agency's determination of rights and obligations."  *Vill. of Bald Head Island v. Army Corp of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).

FBI's reprogramming $555 million does not meet this standard.  Reprogramming is simply "the shifting of funds from one object to another within an appropriation."  *See* Government Accountability Office, Principles of Federal Appropriations Law at 2-30 (4th ed., 2016 rev.) (GAO Red Book), Exhibit 33, J.R. at 1657-1715.  It is an exercise of an "agency's responsibility to manage its funds" and adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at J.R. 1715 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)).  It is neither a "rule, order, license" or the equivalent thereof that determines the legal rights and obligations of anyone.  *Id.*  Rather, it is an internal budgeting action utilized by agencies to effectively manage funds efficiently and effectively.  Accordingly, it is not the type of final agency action that is susceptible to judicial review under the APA.

On the merits, the FBI's reprogramming was consistent with all applicable statutory restrictions that Congress imposed on funds appropriated to FBI.  Although Plaintiffs concede that the FBI does have authority to reprogram funds, *see* Pls.' Br. at 20-21, they argue that the FBI's July 1, 2025 reprogramming notice exceeded the scope of that authority.  Plaintiffs maintain that the 2017, 2022, and 2023 Appropriations Acts, taken together, preclude the FBI from reprogramming the congressionally-appropriated funds for the FBI headquarters project for use in connection with any location other than Springfield, Virginia; Landover, Maryland, or Greenbelt, Maryland.  *See* Pls.' Br. at 21 ("The operative text in the [2017 Appropriations Act] stated:

23

"$323,000,000 shall be for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region. . . . This appropriation "is subject to the additional statutory restrictions that the later [2022 and 2023 Appropriations Acts] attached to the same FBI headquarters."). According to Plaintiffs, the FBI's reprogramming request is void *ab initio* because it "conflicts with conditions and restrictions that were attached to the original funds through statutory text . . .. " *Id.* at 20.

Inasmuch as the FBI's reprogramming notice shifted funds that Congress appropriated in 2016 and 2017 towards the FBI's relocation to "an existing, federally owned building in Washington, D.C.," the FBI's reprogramming is consistent with the 2017 Appropriations Act, which appropriated to FBI funds for "the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region."  2017 Appropriations Act, 131 Stat. 135, 197-98.  The later-enacted location restriction provisions in the 2022 and 2023 Acts specifying that that the GSA Administrator "shall select a site from one of the three listed in the [2017 GSA Prospectus]" and provide a prospectus for that site—with which GSA complied—pertain only to GSA.[32]  *See* 2022 Appropriations Act, 136 Stat. at 276.  Neither of these acts appropriated any funds to FBI nor placed any conditions on any funds Congress had previously appropriated to FBI. Nor did Congress otherwise constrain GSA's statutory authority to "assign or reassign space for an executive agency in any Federal Government-owned or leased building."  40 U.S.C. § 584(a). As evidenced by the 2017 Appropriations Act, Congress knows how to place conditions on funds that it appropriated to FBI for headquarters relocation purposes when it wishes to.

---

[32] Although Plaintiffs have challenged as arbitrary and capricious GSA's decision to pivot from Greenbelt to Reagan, *see* Compl., Count V, they have not sought judgment on the pleadings on that basis.

24

Plaintiffs' argument, then, is that congressional directives to one agency (GSA) in one set of statutes (the 2022 and 2023 Appropriations Act provisions regarding location selection) constrain the statutory reprogramming flexibility enumerated in a *subsequent* statute (Section 505 of the 2024 Appropriations Act, on which the FBI relied) regarding funds Congress previously appropriated to a to a *different* agency (FBI). Plaintiffs unsurprisingly offer no authority for that novel proposition. The pertinent statutory reprogramming provision—Section 505 of the 2024 Appropriations Act—requires only that an agency seeking to "obligat[e] or expend[] funds" that fell under any of eight enumerated categories first notify the House and Senate Committee on Appropriations 15 days in advance of any reprogramming. *See* 2024 Appropriations Act, Pub. L. No 118-42, div. C, § 505, 138 Stat. 25, 167. Plaintiffs correctly concede that the FBI's reprogramming notice fulfilled this statutory requirement. *See* Pls.' Br. at 22, ECF No. 18-1 (noting Section 505's requirements for reprogramming); FBI Reprogramming Notice, Exhibit 35 at J.R. at 1753. As noted, the only other pertinent statutory limitation on reprogramming the funds subject to the FBI's July 1, 2025 notice is that the funds "shall be for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region." 2017 Appropriations Act, 131 Stat. 135, 197–98.[33] This means, for example, that the FBI could not reprogram these funds in order to consolidate FBI space in New York (outside the NCR) or to renovate the FBI's existing Quantico, Virginia training facility (inside the NCR but not for headquarters consolidation). As noted previously, the FBI's reprogramming of funds to facilitate

---

[33] The only restrictions in the 2016 and the 2017 Appropriations Acts only require that FBI-headquarters related funds be expended towards a new headquarters in the NCR. *See* 2016 Appropriations Act, 129 Stat. at 2452 ("$75,000,000 shall be for construction management and oversight activities, and other project support costs, for the FBI Headquarters Consolidation."); 2017 Appropriations Act, 131 Stat. at 197-98 ("$323,000,000 shall be for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region.").

the FBI headquarters relocation to "an existing, federally owned building in Washington, D.C." inarguably meets this requirement. FBI Reprogramming Notice, Exhibit 35 at J.R. at 1753.

Moreover, even if the FBI was so constrained, it may be that it would instead opt to locate its new headquarters in Springfield, Virginia, the original panel recommendation. Even assuming the Court could lift the reprogramming, it does not follow that Greenbelt would be selected.

III.    Congress Ratified the FBI's Reprogramming Notice and Pivot to Reagan in the 2026 Appropriations Act

Even if the Court were to conclude that FBI lacked the statutory authority to reprogram the $323 million provided by the 2017 Appropriations Act at the time of the July 2025 reprogramming notice, Congress ratified this reprogramming in the 2026 Appropriations Act. The Supreme Court has recognized that "Congress may of course do by ratification what it might have authorized. And ratification may be effected through appropriation acts." *Ex parte Endo*, 323 U.S. 283, 304 n.24 (1944) (internal citations omitted); *accord Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 n.7 (D.C. Cir. 2006) ("Congress may ratify an agency action through appropriation acts." (citing *Chism v. United States*, 316 F.3d 1259, 1289 (Fed. Cir. 2002)).

Moreover, Congress has since expressly forbidden the FBI from taking any additional actions to obligate such funds absent further review and evaluation by the relevant congressional committees. In Section 222 of the 2026 Appropriations Act, Congress expressly noted the FBI's reprogramming notice:

> Any remaining unobligated balances from amounts originally made available under the heading "Federal Bureau of Investigation—Construction" in the Department of Justice Appropriations Act, 2016 (title II of division B of Public Law 114–113) or in the Department of Justice Appropriations Act, 2017 (title II of division B of Public Law 115–31) for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region that were subsequently reprogrammed pursuant to a notification received by the Committees on Appropriations from the Assistant Attorney General for Administration on July 1, 2025, may not be further obligated until the Federal Bureau of Investigation submits

26

> to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed architectural and engineering plan for the Federal Bureau of Investigation's new headquarters building for review.

140 Stat. at 40.  In two ways, the language that Congress used "'plainly show[s' Congress's] purpose to bestow" the FBI with the authority to reprogram funds (i) formerly appropriated for "the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region" to (ii) the FBI's forthcoming relocation from Hoover to the Reagan Building.  *Ex parte Endo*, 323 U.S. at 304 n.24.  One, Congress recognized that the $323 million that it appropriated in the 2016 and 2017 Acts had been "subsequently reprogrammed."  Congress's use of the past tense "reprogrammed" makes clear that Congress assented to the FBI's reprogramming request and did not wish to overturn it.  Of course, if Congress believed (i) that the FBI's reprogramming request exceeded its statutory authority, or (ii) was inconsistent with Congress's current wishes, it could have said so.

Two, not only did Congress not overturn or otherwise disapprove of the FBI's reprogramming request, it required the FBI to "submit[] to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed architectural and engineering plan for the Federal Bureau of Investigation's new headquarters building" prior to "further obligat[ing]" funds encompassed by the FBI's reprogramming request.  140 Stat. at 40. This less restrictive condition regarding the completion of preparatory work (an architectural and engineering plan) for the FBI to move to Reagan necessarily implies congressional approval of that forthcoming move once this statutory pre-condition has been met.  In other words, Congress enacted legislation that expressly conditioned the use of the reprogrammed funds to pay for a move to Reagan on receipt of planning information about how those funds would be used.  Far from infringing on the separation of powers, the FBI's reprogramming action and Congress's response

27

illustrates a constructive dialogue between the Executive and Legislative Branches of over the use of public funds.  The express references in the 2026 Appropriations Act show that Congress has spoken with the requisite clarity needed to ratify the determination to relocate FBI headquarters to the Reagan Building.

Plaintiffs insist that the locational directive in the 2022 and 2023 Appropriations Acts— which Plaintiffs maintain restricts FBI's reprogramming flexibility to the three sites (Greenbelt, Springfield, and Landover)—retains continued vitality notwithstanding the 2026 Act, but they never explain why.  "While the canon of statutory interpretation disfavoring implied repeals in appropriations bills is strong, it is still just a canon of interpretation.  It is not an absolute rule." *The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 338 (4th Cir. 2007).  And in any event, the canon has no application here because this case does not involve a situation where Congress attempted to "amend substantive law in an appropriations statute."  *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992).  As explained below, because the earlier directives in the 2022 and 2023 Appropriations Acts conflicts with the more recent requirements in the 2026 Appropriations Act, the latter controls.  *Dudas*, 506 F.3d at 339 ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one." (quoting *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936)).

Although Plaintiffs assert that "[t]here is no reason why the FBI and the GSA could not comply with the both earlier-enacted [statutory] requirements and the new requirement to submit an architectural and engineering plan," Pls.' Br. at 24, this is only true if one ignores, as Plaintiffs do, both the text of Section 222 as well as the factual context in which Congress enacted the 2026 Appropriations Act.  In a single sentence, Congress both (i) noted the July 1, 2025 reprogramming request; and (ii) established statutory prerequisites before FBI could "further obligate[]" the

28

reprogrammed funds. Plaintiffs bifurcate these two intertwined aspects of Section 222's text. Plaintiffs make no attempt to address the statutory text as a whole, instead ignoring the reprogramming language by simply presuming its continued illegality.

Two undisputed and indisputable facts are central to ratification: One, Congress was aware of the July 1, 2025 reprogramming notice—it expressly referenced the reprogramming in Section 222. Two, Congress linked the FBI's "further obligat[ion]" of the reprogrammed funds to a submission of architectural and engineering plans. There is no mystery about the building for which Congress directed the FBI to submit architectural and structural plans: the FBI had previously and publicly announced its plans to relocate its headquarters to the Reagan Building. *See* Compl., Ex. 3, ECF No. 1-3 (Press Release, FBI, New FBI Headquarters in Washington, D.C. (July 1, 2025)); *accord* Exhibit 34, Compl., Ex. 4 (Press Release, Gen. Servs. Admin., FBI Announces New Headquarters in Washington, DC (July 1, 2025)).

Plaintiffs' bifurcation of the FBI's reprogramming request from the architectural and engineering plan submission requirement also leads to several absurd results at odds with the plain language of the statute. Plaintiffs do not explain why, if Congress disagreed with the FBI's decision to pivot to Regan, it would have sanctioned the preparation of architectural and engineering report in preparation for a move that would flout congressional desire. And if Congress did in fact intend for the FBI to submit an architectural and engineering plan for a site *besides Reagan* (as Plaintiffs claim), why would Congress make the submission of such plan the prerequisite for authority to unlock funds now reprogrammed *for Reagan*? Nor do Plaintiffs explain why Congress would have conditioned the FBI's further obligation of reprogrammed funds on the submission of an architectural and engineering plan for the Greenbelt site, which—the reprogramming notice makes clear—the FBI does not intend to build.

Although Section 222 did not "reference any specific building or site," Pls'. Br. at 23, this omission hardly helps Plaintiffs.  As noted, Congress was well aware of the FBI's intention to relocate to the Reagan Building at the time it enacted the 2026 Appropriations Act.  Not only did congressional committees receive the reprogramming notice more than six months before then, *see* FBI Reprogramming Notice, Exhibit 35, the pertinent congressional committees in late 2025 approved the GSA prospectus, in which GSA detailed the FBI's forthcoming move to the Reagan Building.[34]  At any rate, the reprogramming notice pertained to "an existing, federally owned building in Washington, D.C."—a facility that definitionally is not located in Greenbelt, Maryland (or either of the other short-list sites).  Accordingly, even if the 2022 and 2023 Appropriations Acts formerly constrained FBI's authority to reprogram funds, Congress subsequently abrogated that requirement by subsequent statute and ratified the FBI's decision by directing the completion of preparatory work attendant to the FBI's forthcoming relocation to the Reagan Building.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Judgment on the Pleadings and grant Defendants' Motion for Judgment on the Pleadings.

Dated: March 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW WARDEN
Assistant Branch Director
Federal Programs Branch

---

[34] *See* Exhibits 31-32 (noting Senate and House committee approvals of forthcoming move to Reagan Building).

/s/ C. *Lee Reeves, II*
C. LEE REEVES, II
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-0773
Facsimile: (202) 616-8460
Lee.Reeves2@usdoj.gov
*Counsel for Defendants*

31