**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| STATE OF MARYLAND, *et al.,*<br><br>Plaintiff,<br><br>v.<br><br>KASH PATEL, Director, Federal Bureau of Investigation, *et al.,*<br><br>Defendant. | No. 8:25-cv-3644-TDC |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR
<u>JUDGMENT ON THE PLEADINGS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 5

I.      Plaintiffs Have Failed to Carry Their Burden to Demonstrate Redressability ................... 5

II.     The FBI Reprogramming Was Neither Final Agency Action Nor Unlawful ..................... 11

III.    Congress Has Ratified Defendants' Pivot to Reagan ........................................................ 12

CONCLUSION ............................................................................................................ 16

i

## TABLE OF AUTHORITIES

**Cases**

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989)........................................................................................ 7

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)........................................................................................ 7

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000)........................................................................................ 6

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)........................................................................................11

*Reed v. Goertz*,
  598 U.S. 230 (2023)........................................................................................ 10

*S.C. Wildlife Fed'n v. Limehouse*,
  549 F.3d 324 (4th Cir. 2008)........................................................................ 9

*Sierra Club v. State Water Control Board*,
  898 F.3d 383 (4th Cir. 2018)........................................................................ 10

*Sierra Club v. United States Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018)..................................................................... 6, 10

*Taubman Realty Grp. Ltd. P'ship v. Mineta*,
  320 F.3d 475 (4th Cir. 2003)........................................................................ 6

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
  529 U.S. 765 (2000)................................................................................... 6, 10

*Watt v. Energy Action Educational Foundation*,
  454 U.S. 151 (1981)....................................................................................... 10

*Wilderness Soc. v. Norton*,
  434 F.3d 584 (D.C. Cir. 2006)..................................................................... 8

**Statutes**

40 U.S.C. § 3307.......................................................................... 2, 4, 10, 14

40 U.S.C. §§ 3301-3318 ...................................................................... 13

**Administrative & Executive Materials**

Commerce, Justice, Science; Energy and Water Development; and Interior and Environment
   Appropriations Act, 2026,
   Pub. L. No. 119-74, div. A, tit. II, 140 Stat. 5, 22 ............................................................... *passim*

Consolidated Appropriations Act, 2016,
   Pub. L. No. 114-113, div. B, tit. II, 129 Stat. 2242, 2301 (2015)............................................. 12

Consolidated Appropriations Act, 2017,
   Pub. L. No. 115-31, div. B, tit. II, 131 Stat. 135, 197 ............................................................... 4

Consolidated Appropriations Act, 2022,
   Pub. L. No. 117-103, div. B, tit. II, 136 Stat. 49, 118 ............................................................... 3

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328,div. B, tit. II, 136 Stat. 4459, 4526 ....................................................... 3, 15

**Other Authorities**

Government Accountability Office, *Principles of Federal Appropriations Law*,
   (4th ed., 2016 rev.) ................................................................................................................. 3, 15

**INTRODUCTION**

Plaintiffs, the Federal Bureau of Investigation (FBI), the General Services Administration (GSA), and Congress all agree on two things: The FBI needs a new headquarters facility, and it lacks funds sufficient to relocate to any new-construction facility anywhere in the National Capital Region (NCR). This appropriations shortfall—which now is approximately $3.5 billion and climbing—has long been and remains the fiscal elephant in the room. Over the last two decades, the GSA and FBI (collectively Defendants) have explored numerous options in consultation with Congress. Although the strategies have varied over time—from pursuit of a "swap-transfer" transaction, to a "raze and replace" of the J. Edgar Hoover Building (Hoover), to a new-construction facility at one of three potential locations in Maryland and Virginia—the lack of adequate appropriations has bedeviled them all.

In 2022, Congress directed the GSA to choose from one of three site locations that the GSA had identified in 2017 as potential FBI headquarters relocation sites and to present a proposed construction plan for congressional review. The GSA did so, selecting Greenbelt, Maryland as the future location for FBI headquarters. Consistent with both its statutory obligations and the longstanding dialogue between the Legislative and Executive branches regarding the GSA's management of federal property, the GSA submitted a prospectus for the Greenbelt site to congressional oversight committees in March 2024. GSA's prospectus observed that construction costs had "escalated significantly" over the course of the FBI headquarters project, and flagged the $3.5 billion appropriations shortfall.

GSA's prospectus landed with a thud. By letter dated July 31, 2024, the Chairmen of the House Committees for Transportation & Infrastructure, Judiciary, and Oversight, jointly criticized the GSA's Greenbelt proposal as "inadequate [and] ill-defined," and as failing to "take into account the current requirements of the FBI." The Chairmen further instructed the GSA to submit a

1

prospectus that "considers alternative solutions on locations that may better meet the FBI's current mission." Lastly, the letter stated that "[u]ntil such a prospectus is submitted and the concerns identified are addressed, the Transportation and Infrastructure Committee [T&I][1] has insufficient information to call the prospectus up for Committee action." This response ended any realistic prospect of the Greenbelt project becoming a reality because, pursuant to 40 U.S.C. § 3307, the Greenbelt project could not proceed unless it received approval from the House T&I Committee. Almost two years later, the GSA's Greenbelt proposal remains on ice. Congress has never approved the Greenbelt prospectus, nor has it appropriated a single additional dollar for FBI headquarters since receiving it.

Consistent with the congressional directive to consider locational alternatives to Greenbelt, and mindful of the tens of millions of dollars that Defendants must spend every year that the FBI headquarters quagmire remains unresolved, the GSA returned to the drawing board in the fall of 2024. Approximately six months later, in the spring of 2025, a new option presented itself for the first time—the Ronald Reagan Building in downtown D.C. (Reagan or Reagan Building). The departure of existing Reagan tenants and the FBI's reduced NCR personnel footprint, taken together, made the Reagan Building feasible in a way that it was not almost a decade earlier when the GSA formulated its short list of potential sites for an FBI headquarters facility with almost double the personnel capacity of what it now needs. Perhaps most significant of all, Reagan has something that neither Greenbelt nor any other new-construction site can offer—a substantially lower price tag. The GSA's September 2025 prospectus estimated that a relocation from Hoover to Reagan would be possible with existing funding, and both the FBI and GSA have taken parallel steps to this effect to shift prior appropriations toward the contemplated move to Reagan. House

---

[1] T&I has jurisdiction over GSA prospectus submissions.

2

and Senate committees approved the GSA's prospectus in late 2025, and in January 2026 Congress by statute acknowledged FBI's reprogramming notice and sanctioned the preparation of a structural and engineering report attendant to the FBI's move from Hoover to Reagan.

Despite this, the State of Maryland and Prince George's County (collectively Plaintiffs) sued. Although Plaintiffs' purpose in bringing litigation may well be to regain their claimed "chance" to obtain downstream economic benefits from having the FBI headquarters in Greenbelt, that assuredly will not be the litigation's effect. Plaintiffs' lawsuit cannot bridge the multi-billion dollar shortfall that for decades has been the predominant impediment to any new-construction facility. Nor will a favorable judicial opinion do anything to remove the vociferous congressional opposition specific to Greenbelt. Because Plaintiffs cannot show a ruling in their favor would actually cause the FBI's headquarters to relocate to Maryland, they cannot establish the redressability element of standing. Under binding Supreme Court precedent, Plaintiffs are not "substantially likely" to "personally [] benefit in a tangible way" from a judicial decision enjoining FBI's contemplated move to Reagan.

Plaintiffs do not seriously attempt to argue otherwise. Their brief does not so much as mention the $3.5 billion appropriations shortfall. Nor does it address the icy reception that the Greenbelt proposal received in Congress. Although Plaintiffs suggest that Greenbelt "could easily regain momentum," ECF 20 at 5, their wishful thinking is far too slender a reed to support Article III jurisdiction. And it blinks at reality: Two decades of insufficient appropriations and recent, strident congressional opposition to Greenbelt in particular stand in collective opposition to Plaintiffs' conjecture.

The fiscal and political reality against them, Plaintiffs dig in. To Plaintiffs, nothing before or since the 2022 and 2023 Appropriations Acts matters. But they ignore that neither statute required anything of FBI. In pertinent part, these statutes required the GSA to select a prospective

3

headquarters site from the short list it presented to Congress in 2017, and thereafter to present a prospectus detailing its choice to Congress in accordance with 40 U.S.C. § 3307(b).  GSA did both. Plaintiffs similarly say nothing about what happened after the GSA fulfilled its statutory obligations.  As noted, Congress refused to approve the Greenbelt prospectus as required by § 3307, and it has declined to appropriate a single additional dollar for FBI headquarters relocation purposes since receiving that prospectus over two years ago despite continued budget requests.

What Congress did do was tell the GSA to look elsewhere.  The GSA complied, and in early 2025 identified the Reagan Building as a potential relocation site.  In contrast to their avulsive reaction to the GSA's Greenbelt proposal, congressional oversight committees swiftly embraced the Reagan prospectus.  Shortly thereafter, in January 2026, Congress expressly noted the FBI's reprogramming notice and green-lit the preparation of a structural and engineering plan for Reagan.  Taken together, these events leave no doubt that Congress wanted Defendants to continue to explore the Reagan Building as a potential solution to a heretofore intractable problem.

After almost two decades, this is where the FBI's search for a new headquarters now stands. FBI is in the process of completing the preparatory work that Congress recently authorized by statute.  This is but the latest chapter in a longstanding, ongoing dialogue between the Legislative and Executive branches.  There is no compelling reason for the Judicial Branch to add itself to the mix.  Plaintiffs have neither shown how keeping the FBI in Hoover would likely benefit them nor how Defendants have failed to comply with any statutory requirement.  Plaintiffs nonetheless ask this Court not just to be the first tribunal to find any agency reprogramming anywhere to be final agency action, but furthermore to enjoin the FBI's reprogramming here notwithstanding Congress's clear, recent engagement on and direction regarding the same.

Plaintiffs purport to rely on Defendants' supposed failure to respect congressional directives, but it is Plaintiffs who are trying to upend Congress's considered judgment.  The 2026

4

Appropriations Act is the latest reflection of congressional intent. Enacted less than three months ago, and in the immediate aftermath of congressional approvals of the Reagan prospectus, Congress likes what it has seen to this point. However, consistent with its continuing oversight role, Congress has directed the FBI to provide additional information regarding its plans for Reagan before it will allow the FBI to "further obligat[e]" its reprogrammed funds. The FBI is in the process of complying with Congress's instruction. What has transpired to this point has properly been the province of the political branches. Going forward should be no different. This Court should grant Defendants' Motion for Judgment on the Pleadings and dismiss Plaintiffs' Complaint in its entirety.

## ARGUMENT

I.    <u>Plaintiffs Have Failed to Carry Their Burden to Demonstrate Redressability</u>

Plaintiffs' alleged injuries are unlikely to be remedied by a favorable ruling for at least two reasons: (1) Congress's longstanding failure to appropriate more than a fraction of the approximately $5 billion it would cost to relocate FBI headquarters from Hoover to any new-construction facility in the NCR; and (2) Congress's opposition to the GSA's 2024 prospectus outlining the proposed move to Greenbelt and express directive to consider locational alternatives. Mem. in Supp. of Defs.' Opp'n to Pls.' Mot. for J. on the Pldgs. & in Supp. of Defs.' Mot. for J. on the Pldgs., ECF 19-1 at 14-16, 21 (ECF 19-1). Put differently, Congress has never appropriated funds remotely sufficient to facilitate the FBI's relocation from Hoover to any new headquarters facility, and Congress has made clear that it will not authorize the GSA to proceed at the Greenbelt site in particular. Given these current fiscal and political realities, redressability is lacking because Plaintiffs cannot show that it is "substantially likely" that they "personally would benefit in a tangible way from the court's intervention." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 771 (2000); *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th

Cir. 2018) (citation omitted).  The likely effect of a favorable judicial ruling would be to remand FBI headquarters to Hoover, not to re-pivot to Greenbelt.

Plaintiffs do not dispute any of these headwinds, nor could they.  Plaintiffs instead ask this Court to ignore them, arguing that "[t]he Court should resist defendants' invitation to declare that Congress will never provide funding to complete the project."  Pls.' Comb. Opp'n to Defs. Mot. for J. on the Pldgs. & Reply in Supp. of Pls.' Mot. for J. on the Pldgs., ECF 20, at 4-5 (ECF 20). This inverts the burden.  Defendants are not required to negate standing by establishing what Congress will "never" do (and are thus not seeking any such declaration).  Rather, Supreme Court and Fourth Circuit precedent make clear that Plaintiffs cannot demonstrate it is "substantially likely" they would benefit from this Court's intervention based on what Congress conceivably could (but almost certainly will not) do in the future.  Although Plaintiffs insist that a favorable judicial ruling would "restore plaintiffs' *chance* of obtaining the immediate and longer-term economic benefits they stand to gain from the Greenbelt project," ECF 20 at 2 (emphasis added), a "chance" does not cut it for standing purposes.  *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) (redressability requires that "it is likely rather than just conjectural that the asserted injury in fact will be redressed by a [favorable] decision") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 180-81 (2000)).

In other words, Plaintiffs cannot demonstrate standing by clinging to a "chance" that is inexorably bound up with future congressional action—action that Plaintiffs do not and cannot know by entities (namely, Congress and congressional committees) not before this court.  An injury's redressability is impermissibly speculative when it "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

6

*DaimlerChrysler Corp. v. Cuno* similarly rejected this exact sort of speculative redressability. 547 U.S. 332 (2006). In *Cuno*, the challengers were Ohio individual taxpayers who sued to enjoin state and local tax incentives that were only available to qualifying businesses. The loss of this business tax revenue, the challengers argued, had to be recouped from higher taxes borne by the challengers, and so judicial invalidation of the business tax credit would benefit individual taxpayers by broadening the tax base and thereby lessening the challengers' tax burden. Rejecting challengers' predicted reduction of their tax burden as insufficient, the Supreme Court held that challengers' argument "establishing redressability requires speculating that abolishing the challenged credit will redound to the benefit of the taxpayer because legislators will pass along the supposed increased revenue in the form of tax reductions." *Cuno*, 547 U.S. at 344.

In *Cuno*, the Supreme Court determined that redressability was absent because it was unwilling to presume the alleged injury (higher taxes paid by individuals taxpayers) would be remedied—whether in whole or in part—by the Ohio legislature returning increased tax proceeds (if the challenged business tax exemption were judicially enjoined) to all taxpayers in the form of lower tax rates. Although Plaintiffs here claim that the relief that they seek here is "far more closely tied to the benefits" than in *Cuno*, ECF 20 at 7-8, that alleged nexus does not make Plaintiffs' hoped-for economic benefits any less speculative. In *Cuno*, the Supreme Court refused to countenance speculation about future legislative activity where there was no record evidence indicating whether the Ohio legislature might refund excess taxes.

Plaintiffs' standing arguments are even weaker, because here there is extensive evidence pertinent to the likelihood of redressability—all of it unfavorable to Plaintiffs. There is a decade-plus long history of "independent actors" (namely, Congress) repeatedly rebuffing appropriations requests sufficient to fund a new-construction site. Not only that, Congress has more recently expressed both (i) its displeasure with GSA's selection of and prospectus regarding Greenbelt; and

7

(ii) its approval of the FBI's forthcoming move to Reagan.  *See* pages 5-6, *supra*.  Unlike *Cuno*, then, the speculation required here is not even on a blank slate.  Plaintiffs ask this Court to disregard an extensive history of congressional action unfavorable to new-construction sites in general and to the Greenbelt site in particular.  *See, e.g., The Wilderness Soc. v. Norton*, 434 F.3d 584, 593 (D.C. Cir. 2006) (holding that the likelihood of redress was "too attenuated" to confer standing where congressional action was required to redress plaintiff's harm).  Even if making a political determination about whether Congress is "substantially likely" to appropriate $3.5 billion in additional funding for a new construction site in Greenbelt could ever be appropriate, the Court would at least need to consider what Congress has chosen *not* to do for the last two decades despite repeated budget requests, and what it *did* do in response to the GSA's Greenbelt prospectus.

Plaintiffs' speculation that "the project could easily regain momentum—the new headquarters is badly needed. . . ," *id.* at 5, changes nothing.  The elevation of hope over two decades of experience does not and cannot change the standing calculus.  For redressability purposes, and notwithstanding Plaintiffs' several references to "the project," *see id.* at 4-5, this is not a case about "the [FBI Headquarters] project" generally.  It is about "the project" (or lack thereof) *in Greenbelt.*  Plaintiffs offer no reason for optimism for a Greenbelt site in light of congressional refusal to approve the GSA's 2024 Greenbelt prospectus and express direction that Defendants consider other locational options.  Plaintiffs' hoped-for congressional momentum already exists now—just not for the location Plaintiffs would like.  The pertinent House and Senate committees have in late 2025 approved prospectuses for the relocation to Reagan, and Congress shortly thereafter authorized now-ongoing preparatory work for the FBI's impending move.  *See* ECF 19-1 at 17-18.

Again, Plaintiffs bear the burden to show that an order vacating Defendants' decision to pivot to the Reagan Building would make it "substantially likel[y]" that Plaintiffs will receive their

hoped-for downstream economic benefits from an FBI re-pivot to Greenbelt. *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008). They have not. In light of the undisputed headwinds against any new-construction site—and against Greenbelt in particular—any arguable "chance" that Plaintiffs may have falls well short of "the substantial likelihood" threshold recognized by the Supreme Court and the Fourth Circuit.

Plaintiffs tacitly concede Greenbelt's infeasibility, suggesting that "the Greenbelt project does not need to be fully funded and completed for [Plaintiffs] to benefit [because] the GSA could take steps to move the project forward with the funding that is already available." ECF 20 at 5.[2] GSA has no legal obligation to press forward with a project that Congress has not funded, particularly here where Congress has given powerful indicia by—both by what it has done (*i.e.*, nixing the Greenbelt prospectus) and by what it has declined to do (*i.e.*, appropriate sufficient funds for any new construction site) that it is unwilling to approve sufficient funds for a site in Greenbelt. It would be fiscally and politically irrational for Defendants to forge ahead on a project that Congress expressly declined to approve and for which there is now a multi-billion dollar shortfall. From a policy standpoint, the GSA going it alone would contravene longstanding agency policies to work collaboratively with congressional oversight committees. *See* note 3, *infra*. And from a legal standpoint, Plaintiffs themselves have touted the singular importance of adhering to the 2022 Appropriations Act, which contemplates that same collaborative process. *See* 136 Stat.

---

[2] Although Plaintiffs speculate that they stand to benefit economically from easement negotiations at the Greenbelt site that have not happened, *see* ECF 20 at 5 (citing Compl., ¶ 59), they fail to explain why. The contemplated easement negotiations related to property owned by Maryland that "consists almost entirely of woodlands and wetlands," would have remained undeveloped as a security buffer for the buildings and related facilities making up the headquarters location (*e.g.*, main building, parking, central utility plant, truck screening facility) if the FBI were to relocate to Greenbelt—all of which would be built and located on land that Maryland does not own. *See* Ex. 37, J.R. 1759-1760, at 1759.

at 276 (requiring the submission of a prospectus for the selected site in accordance with 40 U.S.C. § 3307(b)).

Unable to make any headway on the facts, Plaintiffs spend much of their brief nibbling at the "substantial likelihood" standard. At the outset, Plaintiffs mischaracterize Defendants' redressability argument. According to Plaintiffs, Defendants argue that redressability is lacking "because it is not certain that Greenbelt headquarters project will proceed even if the Court rules for plaintiffs." ECF 20 at 3. Plaintiffs go on to cite numerous cases to explain what the redressability standard is *not*—for example, that Plaintiffs need not show that they are "certain to gain a meaningful benefit from a favorable ruling." *See* ECF 20 at 3-4 (collecting cases). But Defendants have never argued that court relief must "absolutely ensure" that Plaintiffs will receive the downstream economic benefits they claim. *Id.* at 3 (citing *Watt v. Energy Action Educational Foundation*, 454 U.S. 151 (1981) as rejecting the certainty standard).

Again, what Defendants have argued is that Plaintiffs have not and cannot show that it is "substantially likely" that Plaintiffs "personally would benefit in a tangible way from the court's intervention" because the likely—indeed, virtually certain—effect of a favorable judicial ruling would be to consign FBI headquarters to Hoover, not to pivot back Greenbelt. *Vt. Agency of Nat. Res.,* 529 U.S. at 771; *Sierra Club*, 899 F.3d at 284 (citation omitted). There are at least 3.5 billion reasons why "the practical consequence" of a favorable ruling would *not* "'amount to a significant increase in the likelihood'" that Plaintiffs obtain the return to Greenbelt they seek. ECF 20 at 3 (quoting *Reed v. Goertz*, 598 U.S. 230, 234 (2023)). Nor is Court intervention necessary to give Plaintiffs an opportunity to present their case for ultimate relief, as it was in *Sierra Club v. State Water Control Board*, 898 F.3d 383 (4th Cir. 2018). Plaintiffs remain free to lobby Congress that Greenbelt is the best alternative to Hoover, and to convince Congress to appropriate funds sufficient to facilitate that move. A favorable judicial decision is neither necessary nor sufficient

10

to impel Congress to do either.  Because Plaintiffs have failed to demonstrate a "substantial likelihood" that a favorable judicial opinion would do anything more than keep the FBI headquarters at Hoover indefinitely, redressability is lacking.

II.    The FBI Reprogramming Was Neither Final Agency Action Nor Unlawful

Reprogramming is simply "the shifting of funds from one object to another within an appropriation."  *See* Government Accountability Office, Principles of Federal Appropriations Law at 2-30 (4th ed., 2016 rev.) (GAO Red Book), Ex. 33, J.R. at 1657-1715.  Although Plaintiffs assert otherwise, *see* ECF 20 at 13, reprogramming does not determine the legal rights and obligations of anyone.  *Id.* at J.R. 1715 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)).  Plaintiffs point to no case in which a court determined that an agency reprogramming of funds constituted final agency action within the meaning of the Administrative Procedure Act, and for good reason. Reprogramming is an internal budgeting action utilized by agencies to effectively manage funds. Final agency action occurs when an agency enters a binding contract for goods or services or when it expends funds (assuming legal rights and obligations are determined as a result), not when it moves funds from one column in a budget spreadsheet to another.

Plaintiffs' assertion that Defendants do not contest that "the sole reason for the reprogramming decision was to implement the unlawful selection of the Ronald Reagan Building" does not bear on whether the reprogramming constitutes final agency action, and is wrong in any event.  ECF 20 at 14.  Of course, the FBI's reprogramming was in furtherance of Defendants' pivot to Reagan.  But that reprogramming was not unlawful.  For the reasons explained at length in their opening brief as well as in this reply, the FBI's reprogramming notice complied with all applicable statutory requirements.  *See* ECF 19-1 at 23-26; *supra* at 3-4.

III.    <u>Congress Has Ratified Defendants' Pivot to Reagan</u>

Even if the Court were to conclude that FBI lacked the statutory authority to reprogram the $323 million provided by the 2017 Appropriations Act at the time of the July 2025 reprogramming notice, Congress ratified this reprogramming in two places in the 2026 Appropriations Act.  First, Congress recognized that funds it appropriated to FBI in the 2016 and 2017 Appropriations Acts had been "subsequently reprogrammed."  Congress's use of the past tense "reprogrammed" makes clear that Congress assented to the FBI's reprogramming request and did not wish to overturn it. Indeed, the main purpose of a reprogramming notice is to allow lawmakers to oversee how agencies are using public funds and to maintain control over Congress's "power of the purse." Congress thus could have prevented the FBI from using any reprogrammed funds for the Reagan move by imposing an outright prohibition in the 2026 Act, but Congress elected not to do so.

Second, the 2026 Appropriations Act required the FBI to "submit[] to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed structural and engineering plan for the Federal Bureau of Investigation's new headquarters building" prior to "further obligat[ing]" funds encompassed by the FBI's reprogramming request. 140 Stat. at 40.  This less restrictive condition authorizing the completion of preparatory work for the FBI to move to Reagan reflects congressional openness to that forthcoming move once this statutory pre-condition has been met.   Relatedly, Defendants illustrated how Plaintiffs' interpretation of the 2026 Appropriations Act both disregarded the text of the Act and would lead to absurd results.  *See* ECF 19-1 at 28-30.

Plaintiffs fail to engage with Defendants' textual argument based on Congress's use of "subsequently reprogrammed."  Instead, Plaintiffs merely declare that because Defendants' burden to show that the 2026 Appropriations Act ratified FBI's July 2025 reprogramming is a "heavy"

12

one, ECF 20 at 8, Defendants' ratification arguments fail. Plaintiffs have simply assumed their conclusion, not explained why it is correct.

Plaintiffs' response to the statutorily-authorized structural and engineering plan fares no better. Plaintiffs largely fail to address Defendants' contention that Plaintiffs' interpretation of the 2026 Appropriations Act would lead to absurd results. Plaintiffs respond only that Congress would not have "require[d] submission of these plans 'for review' . . . if it had already decided to approve the Ronald Reagan building plan." ECF 20 at 9 (quoting 2026 Appropriations Act). But Defendants have never argued that the reprogramming notice would or should end the long-running dialogue between Defendants and Congress regarding the FBI headquarters. Rather, it represents a recent communication in a decade characterized by changes in plans, all of which involved—and continue to involve—dialogue between the Legislative and Executive branches. Congress's acknowledgement of the reprogramming and instruction regarding the submission of a plan for congressional review is but the latest interaction between the political branches.

Congress's request for additional information in the 2026 Appropriations Act is materially similar to the inter-branch interactions that follow the GSA's capital and leasing prospectus process generally, including Greenbelt. When the GSA moves forward with a prospectus-level project, it is but one facet of a broader statutorily-enumerated engagement between the Legislative and Executive branches regarding federal property management. *See generally* 40 U.S.C. §§ 3301-3318. As part of this inter-branch colloquy, Congress can take whatever action it sees fit. In Greenbelt's case, following the GSA's submission of its April 2024 prospectus, congressional committees responded by pointedly expressing their displeasure with the GSA's decision and refusing to approve the prospectus. The GSA heeded the congressional admonition to pursue

13

alternatives to Greenbelt.[3]  Absent approval of the relevant congressional committees, funding at the level required for the new FBI headquarters is not authorized.  *See* 40 U.S.C. § 3307(a). Congressional reaction to GSA's Reagan proposal was more positive.  Following committee approvals of the GSA's Reagan prospectus, Congress indicated that it wanted Defendants to submit a preparatory report for congressional review before unlocking the FBI's reprogrammed funds. The point here is not to predict how future interactions between the Executive and Legislative branches might go, or to forecast what those interactions might portend for the future of the FBI headquarters.  Rather, it is to illustrate that Plaintiffs' textual rejoinder to Defendants' ratification argument is premised on a conception of congressional oversight that is demonstrably false.

Plaintiffs' framing of Congress's approval options for Reagan as an all-or-nothing proposition is belied by the facts of this case.  Congress need not—and did not—choose either an unqualified endorsement that "fully clear[s] the way" for Defendants' to move to Reagan or an outright rejection of FBI's reprogramming notice.  ECF 20 at 9.  Congress instead chose a middle ground: It statutorily sanctioned a preparatory report necessary for the FBI to relocate to Reagan and required that that report be submitted for committee review.  As noted, this incremental approach is materially identical to how Congress proceeded when GSA selected Greenbelt.  There, consistent with Congress's oversight role and the longstanding inter-branch dialogue regarding FBI headquarters relocation, Congress reviewed additional information (the 2024 GSA prospectus (Ex. 29)) and then provided feedback (the July 31, 2024 congressional letter responding to GSA's prospectus (Ex. 20)).  It stands to reason that the same will happen here following Defendants' forthcoming submission of the Reagan-related report.

---

[3] The GSA's policy is to wait for oversight committees' approvals before obligating funding for a project for reasons of comity between the branches of government and the committees' continued interest in oversight over these projects.  *See* Ex. 38, J.R. 1761-1802, at 1784.

Congress's inaction to date on GSA's transfer request, and the fact that the 2026 Appropriations Act did not address the GSA's transfer request that was pending at the time, does not change the analysis. Noting that the $844 million that the GSA has sought to transfer attendant to Defendants' pivot to Reagan "accounts for the bulk of the total funding that Congress has provided for the development of a new FBI headquarters," Plaintiffs reason that Congress did not "intend[] to fully clear the way for the Ronald Reagan Building proposal" or else it "likely would have taken action to authorize" GSA's transfer. ECF 20 at 9. This argument, too, is based on the flawed premise that Congress's only oversight options are to approve or deny the FBI's contemplated move to Reagan in one fell swoop. Again, that is not what Congress did with Greenbelt. As Plaintiffs acknowledge, Congress supported GSA's selection of Greenbelt from a short list of sites that GSA presented in 2017, and this support continued through the GSA's October 2023 selection of Greenbelt. But as Plaintiffs fail to mention, that support dissipated by mid-2024 as soon as the GSA informed Congress of the particulars of the Greenbelt project—including its cost. In short, Congress supported the FBI's move to Greenbelt until it did not. Its oversight of the GSA reflects that shift in sentiment.

Accordingly, there is nothing irrational about Congress's delay in adjudicating the GSA's transfer request. One obvious possible explanation is that Defendants have not yet submitted the report that Congress authorized in January. A measured, incremental approach is consistent with a qualified optimism for the FBI's proposed move to Reagan. Congress likes what it has seen in the GSA prospectus enough to authorize preparatory work—in contrast to Greenbelt—but it wants to see more before loosening the purse strings on the bulk of the appropriated funds that would be used for relocation.

15

**CONCLUSION**

For the foregoing reasons, this Court should grant Defendants' Motion for Judgment on the Pleadings, Deny Plaintiffs' Motion for Judgment on the Pleadings, and dismiss Plaintiffs' Complaint in its entirety.

Dated: April 7, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director
Federal Programs Branch

*/s/ C. Lee Reeves, II*
C. LEE REEVES, II
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 616-0773
Facsimile: (202) 616-8460
Lee.Reeves2@usdoj.gov

*Counsel for Defendants*

16