# Exhibit 16

FBI New Suburban Headquarters Site Selection Concerns, Mem. from Brian C. Turner, Assoc. Deputy Dir., FBI, to Robin Carhahan, GSA Adm'r, (Sep. 22, 2023)



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, DC 20535-0001

MEMORANDUM FOR GENERAL SERVICES ADMINISTRATION ADMINISTRATOR
    ROBIN CARNAHAN

FROM:        Brian C. Turner *Brian C. Turner* 9/22/2023
             Associate Deputy Director
             Federal Bureau of Investigation

SUBJECT:     FBI New Suburban Headquarters Site Selection Concerns

The FBI has reviewed the FBI suburban headquarters Site Selection Decision (SSD) document that GSA provided on August 22, 2023, and amended on September 5, 2023. The FBI appreciates the opportunity to review the documents along with the Site Selection Panel Recommendation Report. Upon review of these documents, along with the GSA briefing of the decision on August 31, the FBI has concerns about the process leading to the GSA's site selection decision and is unable to concur with GSA's decision at this time. To be clear, the FBI remains committed to enthusiastically commence the next phase of the new headquarters project, *irrespective of the site that is selected*, provided the process that leads to the selected site is consistent with the published site selection plan and appropriately fair and transparent. In both of these areas, the FBI has concerns.

Over the past 18 months, the GSA, with support and consultation from the FBI, worked diligently to develop a site selection process that is fair and transparent, is grounded in GSA's best practices for site selection, and supports the key pillars of the new headquarters project to:

1. Fulfill FBI mission needs;
2. Meet the needs of the FBI workforce; and
3. Provide maximum value for taxpayers.

The FBI has been—and remains—committed to being a strong partner with GSA through this process. We have relied on GSA's expertise in real estate selection, including in the establishment of the original site selection plan. In the September 23, 2022, announcement of this plan, GSA stated, "GSA's site selection approach is based on best practices in public real estate acquisitions and its long-standing expertise in developing federal facilities." While the September 2022 site selection plan already adhered to site selection best practices based on this long-standing expertise, when the FY 2023 appropriation required the GSA to engage in detailed

1

J.R. 612

consultations with delegations led by elected officials from the State of Maryland and Commonwealth of Virginia, we worked with GSA to prepare for and take part in those discussions and assess the provided feedback.

As shared in the June 26, 2023, FBI memo to GSA, the FBI believed—and continues to believe—that the September 2022 plan "best balanced the many wide-ranging elements considered for optimal site selection." With that said, the FBI deferred to GSA's judgment and expertise on site selection criteria weighting changes, which were ultimately incorporated and published in the July 2023 site selection plan amendment. GSA and FBI jointly briefed the revised plan to the Maryland and Virginia delegations on July 14, 2023. In that briefing, the FBI attested to the fairness and transparency of the process *based on the premise that a site would be selected in full accord with the process as published.*

Unfortunately, the SSD does not adhere to the site selection plan's clear direction that subcriteria within each criterion are of equal importance. Equal subcriteria weighting was extensively discussed when the GSA and FBI worked together to develop the site selection plan, and the plan directly and repeatedly states, "subcriteria are of equal importance." However, the SSD report indicates that subcriteria were not treated equally. In the case of the Transportation Access criteria, the August 22 report states:

> "As a result, I determined that Subcriteria 2.a, 2.b, and 2.c were generally the most impactful to the daily quality of life of FBI employees, contractors, and visitors.
>
> Moreover, among Subcriteria 2.a, 2.b, and 2.c, I determined that relying more heavily on Subcriteria 2.a and 2.b was more relevant to assessing public transportation access to each site than relying on Subcriteria 2.c. because, based on DEIS data, Metrorail and commuter rail would be much more frequently used by FBI employees to get to any of the sites than bus service…
>
> …Having made that assessment, when focusing on the first two subcriteria, Greenbelt is the most advantageous site to the Government."

The site selection plan provides the Site Selection Authority (SSA) the ability "to consider any and all information in making a decision, including the full record of the Panel but also information, data, or other materials not considered or evaluated by the Panel" to determine the site that represents the best value to the government. However, the plan does not give the SSA discretion to change a clear directive in the plan that subcriteria are of equal importance. The September 5 version of the SSD reframes the rationale for how the overarching transportation criterion was rated, but the revised justification still argues that Subcriteria 2.a and 2.b. are of greater relative importance than 2.c and 2.d.[1]

---

[1] The Transportation Subcriteria are defined as follows:
2.a. The Walking Distance from the Site to a Station on the Metrorail System Operated by the Washington Metropolitan Area Transit Authority

2

J.R. 613

In communicating its requirements to GSA, the FBI had multiple conversations about the relative weighting of criteria and subcriteria, resulting in the four transportation subcriteria as reflected in the final site selection plan. GSA ultimately made the decision to have the site selection plan provide equal subcriteria weighting within a criterion. To afford one subcriterion greater importance than the other at this stage would be in contravention of the stated evaluation factors and therefore unreasonable.

The August 22 version of the SSD report included a similar concern with Criterion 3, Site Development Flexibility and Schedule Risk, which includes two subcriteria: 3.a.) site area and geometry and 3.b.) schedule risk. In the August 22 SSD decision, for subcriteria 3.a., the SSD assigns evaluations of blue, green, and yellow for the Landover, Springfield, and Greenbelt sites, highlighting the "site restrictions at Greenbelt are a significant and material differentiator on this subcriteria." However, the report promptly dismisses the importance of the 3.a. subcriteria altogether, stating that all three sites were previously deemed "viable" in prior evaluation, and therefore, all three sites are capable of accommodating future FBI growth.

In assigning an overall rating for Criteria 3, the SSD report essentially dismisses any distinction in size, geometry or the existence of wetlands limiting expansion, simply stating that prior evaluations found all three sites capable of handling FBI growth—effectively negating the purpose of the subcriteria. Stated another way, the panel found the differences in size and geometry significant—so significant that it resulted in a green overall rating for Greenbelt—yet in the SSD, it is not being afforded the same weight as the other subcriteria. While the edits in the September 5 version of the SSD reframe the rationale for the Criteria 3 decision, the August 22 report makes clear that the ultimate rating for Criteria 3 was predicated on an overall devaluation of the importance of site size and development flexibility.

This divergence from the site selection plan is exacerbated by the SSD's departure from the findings in the unanimous consensus panel report in multiple instances. This panel consisted of experts and technical advisors from both GSA and the FBI. Our understanding is that the GSA panel representatives were the best-of-the-best in the federal real estate profession with years of experience. While the site selection plan provides the SSA with the authority to arrive at different conclusions than the panel, past history indicates that in the overwhelming majority of instances, a panel's unanimous recommendation and the final SSA decision are aligned. The fact that the SSD contradicts the panel's unanimous recommendation in several critical ways is atypical. It is particularly concerning—especially considering the departures from the site selection plan outlined above—that each of the SSD's changes to Greenbelt's ratings uniformly led to increased scores compared to the panel recommendation. Meanwhile, each of the SSD's changes to Springfield's ratings led to decreased scores. The combination of these individual adjustments ultimately led to a change in the final decision from the panel's recommendation.

---

2.b. The Walking Distance from the Site to Virginia Railway Express (VRE) or the Maryland Area Regional Commuter (MARC)
2.c. Accessibility to Major Bus Line Stop(s)
2.d. The Site's Proximity to the Nearest Commercial Airport

3

To better understand the process by which these rating changes were made, the FBI requests additional clarification regarding the overarching approach on when the SSA deemed it necessary to break a criterion rating tie between sites versus another instance where the SSA created ties between sites. For example, in Criterion 2, the SSA elected to break the tie between Greenbelt and Springfield even though both had two green and two blue subcriteria ratings. However, for Criterion 4, the SSA allowed the tie to remain between Landover and Greenbelt. In the case of Criterion 2, the SSA used additional commuter data to break the tie, but in the case of Criterion 4, the SSA did not seek outside data to break the tie even though Landover and Greenbelt are distinct geographic regions with unique characteristics that could allow the SSA to differentiate which of the sites best supports the goals of promoting sustainable siting and advancing equity.

Compounding these concerns is GSA's decision to change the SSA late in the process. From a fairness and perception of bias perspective, the SSA's deviations from the panel recommendation were decidedly in favor of a site owned by the Washington Metropolitan Area Transit Authority (WMATA)–the SSA's prior employer. Given the SSA's prior employment, the reversal of the panel's recommendation creates the potential for a perception of bias or lack of objectivity, which was a non-issue for much of the lifespan of this project until GSA made the decision to change the SSA in July 2023 from the career National Capital Region (NCR) Regional Commissioner role to the politically appointed Public Buildings Service Commissioner role.

The FBI is eager for the suburban site selection to be finalized. However, of paramount concern for a project of this magnitude is that the process must be fair, transparent, and consistent with best practices. Your responses to our concerns, including specific questions to be provided under separate cover, pertaining to apparent inconsistencies with the site selection plan and the potential perception of bias are critically important for us to move forward together.

4