**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

STATE OF MARYLAND and
PRINCE GEORGE'S COUNTY,

Plaintiffs,

v.

KASH PATEL,
*Director, Federal Bureau of Investigation,*
TODD BLANCHE, *Acting Attorney General,*
JOLENE ANN LAURIA,
*Assistant Attorney General for Administration,*
EDWARD C. FORST, *Administrator, U.S. General Services Administration,*
FEDERAL BUREAU OF INVESTIGATION,
U.S. DEPARTMENT OF JUSTICE and
U.S. GENERAL SERVICES ADMINISTRATION,

Defendants.

Civil Action No. 25-3644-TDC

## MEMORANDUM OPINION

For over 50 years, the Federal Bureau of Investigation ("FBI"), a component agency of the United States Department of Justice, has been headquartered at the J. Edgar Hoover Building in Washington, D.C. Today, however, the Hoover Building has physically deteriorated and can no longer meet the FBI's staffing and security needs. Therefore, for almost 15 years, the federal government has worked to develop a new FBI headquarters that is capable of meeting the FBI's mission. Progress on this initiative has been delayed by disagreements over where this new headquarters should be located. In 2023, pursuant to a statutory mandate, the United States General Services Administration ("GSA") selected a location in Greenbelt, Maryland, within

Prince George's County, Maryland, as the site for a new, purpose-built FBI headquarters. However, on July 1, 2025, the FBI and the GSA announced that they had changed their minds, and that they instead planned to relocate the FBI headquarters to the existing Ronald Reagan Building ("Reagan Building") in Washington, D.C. They also took steps to reprogram, or redirect, previously appropriated funds to support the relocation to the Reagan Building. In response, the State of Maryland and Prince George's County have filed this lawsuit, which represents the next chapter in the FBI headquarters saga.

Specifically, Plaintiffs Maryland and Prince George's County have filed this civil action against Defendants FBI Director Kash Patel, Acting Attorney General Todd Blanche, Assistant Attorney General for Administration Jolene Ann Lauria, GSA Administrator Edward C. Forst, the FBI, the United States Department of Justice ("DOJ"), and the GSA, in which they allege that the selection of the Reagan Building by the FBI and the GSA, and the FBI's reprogramming of funds in support of the relocation of the FBI headquarters to the Reagan Building, were arbitrary and capricious and not in accordance with law, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, and that these decisions otherwise violated federal law. Both parties have filed Motions for Judgment on the Pleadings, which are fully briefed. The Court held a hearing on the Motions on June 17, 2026. For the reasons set forth below, Plaintiffs' Motion will be GRANTED, and Defendants' Motion will be DENIED.

## BACKGROUND

### I. Statutory and Regulatory Framework

Congress has tasked the GSA with managing the real estate requirements of federal agencies, which include the acquisition of real estate for use by federal agencies, as well as the design and construction of new facilities. The GSA is also generally responsible for the

maintenance, repair, and improvement of existing federal facilities. 40 U.S.C. §§ 582(a), 3301(a)(1)(B), 3305(b)(1)(A). Many of these GSA activities are governed by the statutory requirements codified at 40 U.S.C. §§ 3301–3319. Generally, Congress has mandated that only the GSA Administrator "may construct a public building," *id.* § 3302, and acquire land that is "consider[ed] necessary for use as sites, or additions to sites, for public buildings," *id.* § 3304(b). The GSA may also "demolish [an] existing building and use the site on which it is located for the site of [a] proposed public building," exchange a public building or site for another site on which to construct a public building, *id.* § 3305(a)(1), or "alter any public building," *id.* § 3305(b)(1)(A).

These statutes, however, impose certain restrictions on the GSA, including that the GSA may not "use any land as a site for a public building if the project has not been approved" by designated congressional committees pursuant to a specified process. *Id.* § 3305(a)(3). As part of this process, before an appropriation can be made to "construct, alter, or acquire any building to be used as a public building" which would involve a total expenditure in excess of a designated amount which is presently $3.961 million, the GSA must transmit a "prospectus of the proposed facility" to the United States Senate, Committee on Environment and Public Works ("Senate EPW Committee") and the United States House of Representatives, Committee on Transportation and Infrastructure ("House T&I Committee"), and both Committees must "adopt resolutions approving the purpose for which the appropriation is made." *Id.* § 3307(a)–(b); *see also* GSA Annual Prospectus Thresholds, Joint Record ("J.R.") 136, ECF No. 23.

## II. The Consolidated FBI Headquarters Project

The J. Edgar Hoover Building ("Hoover Building") in Washington, D.C. has served as the FBI's headquarters since 1974. However, as documented in a 2011 FBI Headquarters Consolidation Project Report ("the 2011 FBI Report"), the Hoover Building is "obsolete,

inefficient and expensive," and it is incapable of housing all of the FBI headquarters staff. J.R. 207. Rather, many of the FBI headquarters personnel work outside of the Hoover Building at leased locations in or near Washington, D.C., referred to as the National Capital Region ("NCR"). The FBI recognized that this dispersion of personnel "has created significant challenges in effectively managing the Bureau's 27 HQ Divisions and Offices." *Id.* In addition, the Hoover Building does not meet applicable security standards and has "the worst physical security of any Agency-level headquarters in the Intelligence Community or Department of Defense." *Id.* Accordingly, in the 2011 FBI Report, the FBI proposed that its headquarters elements should be consolidated into a single location in the NCR, which the FBI asserted would "achieve substantial cost savings, provide economic benefits, and improve efficiency, security, and sustainability." *Id.*

In December 2011, the Senate EPW Committee adopted a resolution which directed the GSA to proceed with plans for a new "consolidated FBI Headquarters facility." J.R. 195–96. The resolution authorized the GSA to pursue a "private sector lease transaction, on Federally owned land," J.R. 195, and referenced the 2011 FBI Report, which had proposed building the consolidated headquarters through a public-private partnership in which a private developer would finance the construction of the new headquarters on federal land, and then lease that facility back to the FBI for a certain term of years, after which the federal government would assume full ownership of the facility. The same report also recommended using the Hoover Building as part of a land exchange to fund the private development. The Senate EPW Committee resolution also specified that "to the maximum extent feasible . . . the consolidated FBI Headquarters facility shall be located within 2 miles from a Washington metro rail station and 2.5 miles from the National Capital Region Beltway" and should "provide for Interagency Security Committee Level V security." *Id.*

In 2013, the GSA published a "Request for Expressions of Interest" to solicit sites for the consolidated FBI headquarters facility. Compl. ¶ 18, ECF No. 1. In 2014, the GSA convened a panel to review the responses to the request and developed a short list consisting of three potential sites, which were located in Greenbelt, Maryland; Landover, Maryland; and Springfield, Virginia. Although the panel considered some sites in Washington, D.C., none made the short list.

On December 18, 2015, the Consolidated Appropriations Act of 2016 was enacted into law. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242 (2015) ("the 2016 Appropriations Act"). In that Act, Congress appropriated to the GSA "$75,000,000 . . . for construction management and oversight activities, and other project support costs, for the FBI Headquarters Consolidation." *Id.* at 2451–52. On February 8, 2016, the GSA submitted to Congress a Fiscal Year 2017 Prospectus for the Construction of the FBI Headquarters Consolidation ("the 2017 GSA Prospectus") which outlined a plan to develop the consolidated FBI headquarters facility at one of the 2014 short-list locations of Greenbelt, Landover, or Springfield. In that prospectus, the GSA stated that the "FBI is in urgent need of a consolidated Headquarters facility to support information sharing, collaboration, and integration of strategic priorities," and that the FBI's "dispersion and fragmentation" impeded "the FBI's ability to rapidly respond to ever changing, asymmetric threats." J.R. 125. The GSA proposed funding the project through previously enacted appropriations, the value gained from conveying title to the Hoover Building to the winning bidder, and an additional $1.4 billion in appropriations to the GSA and the FBI. Although the GSA considered modernizing and redeveloping the Hoover Building, it determined that such an undertaking would be cost prohibitive, and that the Hoover Building was not capable of meeting the square footage, security, and operational needs of the FBI.

On May 5, 2017, the Consolidated Appropriations Act of 2017 was enacted into law, in which Congress provided in the FBI's construction fund "$323,000,000 . . . for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region." Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 197–98 ("the 2017 Appropriations Act"). Congress also provided in the GSA's federal buildings fund "$200,000,000" for the "construction and acquisition" of the "National Capital Region, FBI Headquarters Consolidation." *Id.* at 356–57.

However, in July 2017, the GSA and the FBI announced that they were canceling the consolidated FBI headquarters project because Congress had not approved enough funding for it. Both agencies noted that a new FBI headquarters was still necessary and stated that they would continue to work together to address the FBI's space requirements. The next month, on August 2, 2017, the Senate EPW Committee held an oversight hearing with GSA and FBI officials, entitled "FBI Headquarters Consolidation Project – What Happened and What's Next," in which Michael Gelber, the GSA Acting Public Buildings Service Commissioner, testified that "GSA determined that moving forward without full funding would put the Government at risk for project cost escalations," and that both the GSA and the FBI were concerned about "the potential reduction in the value of the Hoover property, since developers were scheduled to receive the property once the new FBI consolidated headquarters [was] completed." J.R. 331, 349. Senators, however, expressed surprise and frustration over the cancellation of the project. Senator John Barrasso of Wyoming, the Chair of the EPW Committee, stated that "Senators should not have to find out about a decision of this magnitude by reading about it in The Washington Post," and Senator Tom Carper of Delaware, the Ranking Member of the Committee, stated that the decision was a "shock" to the three localities with sites on the short list, that it would have "a significant impact on the

region," and that he had "concerns . . . regarding the move by GSA to cancel the procurement process" ranging from "the lack of consultation with Congress, to the impacts on national security, to the excess cost" the decision would impose on the federal government. J.R. 333, 335–36. Senator Ben Cardin of Maryland, after referencing the selection process that identified the three potential sites, disagreed that the funding would not be available, noted that Congress had appropriated money for the consolidated FBI headquarters project in fiscal years 2016 and 2017, and asserted that the Appropriations Committees had "made it clear that they would provide the additional monies" needed to complete the project. J.R. 341–42.

Throughout the remainder of the first Trump Administration, the status of the consolidated FBI headquarters project remained uncertain. Although the GSA and the FBI submitted a revised plan to the Senate EPW Committee on February 12, 2018, which described the building of a consolidated FBI headquarters on the site of the Hoover Building, Congress did not appropriate further funds for the project, and an official prospectus was never submitted to Congress.

## III. The Greenbelt Site Selection

After a period of inaction, Congress took steps to revive the consolidated FBI headquarters project. Specifically, in the Consolidated Appropriations Act of 2022, enacted on March 15, 2022, Congress required the GSA and the FBI to submit to the House and Senate Appropriations Committees, the Senate EPW Committee, and the House T&I Committee a "report on the construction of a new headquarters for the Federal Bureau of Investigation in the National Capital Region" within 180 days. *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 151 ("the 2022 Appropriations Act"). The 2022 Appropriations Act also included a provision ("the 2022 Site Selection Provision") requiring that:

> The Administrator of the General Services Administration shall select a site from one of the three listed in the [2017 GSA Prospectus] for a new fully consolidated

> Federal Bureau of Investigation[] (FBI) headquarters. Such decision shall be made in as expeditious manner as possible.

*Id.* at 276. In the same section, the Act included a requirement that:

> Within 180 days of selecting a site, the General Services Administrator shall transmit to the Committees on Appropriations of the House of Representatives and the Senate, the Committee on Transportation and Infrastructure of the House of Representatives, and the Committee on Environment and Publics Works of the Senate, a report on the construction of a new headquarters for the FBI in the National Capital Region.

*Id.* The Act further required that the report be consistent with the requirements set forth in 40 U.S.C. § 3307(b), which generally apply to a prospectus submitted in relation to a proposed federal building project. *See id.*

Based on this statutory directive, the GSA undertook a site selection process between 2022 and 2023 among the three sites listed in the 2017 GSA Prospectus ("the short-list sites"). During this time period, Plaintiffs provided the GSA with additional information about the two Maryland sites under consideration and provided financial commitments for off-site improvements. In September 2022, the GSA published a Site Selection Plan and provided state and county government stakeholders with a briefing on the criteria and evaluation process it would use to select a site for the consolidated FBI headquarters. The Site Selection Plan created a site selection panel of three federal government employees who would submit a report to a Site Selection Authority ("SSA"), who was tasked with reviewing the panel's decision and making a final site selection decision. The GSA made administrative updates to the Site Selection Plan in November 2022.

Meanwhile, the Consolidated Appropriations Act of 2023 was enacted on December 29, 2022, through which Congress provided the GSA with an additional $375,000,000 for the "National Capital Region: Federal Bureau of Investigation Headquarters Consolidation." *See*

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4682 (2022) ("the 2023 Appropriations Act"). The 2023 Appropriations Act also included a provision ("the 2023 Site Selection Provision") requiring that:

> The Administrator of the General Services Administration shall select a site from one of the three listed in the [2017 GSA Prospectus] for a new fully consolidated Federal Bureau of Investigation (FBI) headquarters.

*Id.* at 4687. In addition, the Act mandated that the GSA undertake additional consultations with the stakeholders from Maryland and Virginia by requiring that:

> In considering the September 2022 and amended November 2022 GSA Site Selection Plan for the FBI Suburban Headquarters, not later than 90 days after enactment of this Act, prior to any action by the GSA site selection panel for the new Federal FBI headquarters, the GSA Administrator shall conduct separate and detailed consultations with individuals representing the sites from the State of Maryland and Commonwealth of Virginia to further consider perspectives related to mission requirements, sustainable siting and equity, and evaluate the viability of the GSA's Site Selection Criteria for the FBI Headquarters to ensure it is consistent with Congressional intent as expressed in the resolution of the [Senate EPW Committee] (112th Congress), adopted December 8, 2011 and further described in the [2017 GSA Prospectus]. Following those consultations, the Administrator shall proceed with the site selection process.

*Id.* The GSA conducted these required consultations during March 2023. In July 2023, the GSA issued a second amendment to the Site Selection Plan and named GSA Public Buildings Service Commissioner Nina Albert as the SSA.

On September 30, 2023, Albert issued a 38-page Site Selection Decision and "selected the Greenbelt site as the location for the Federal Bureau of Investigation Suburban Headquarters." J.R. 609. In doing so, Albert overruled the site selection panel, which had recommended that Albert select the Springfield, Virginia site. Albert stated that her determination constituted the GSA's "final determination." J.R. 574. In communications with the GSA, FBI officials questioned the site selection process and requested that the GSA select a new SSA and re-run the site selection process, but it also expressed a commitment to move forward with the project. On

November 9, 2023, the GSA publicly announced its selection of the Greenbelt site and its intent to move forward with the acquisition of the site.

Congress continued to provide additional funds for the consolidated FBI headquarters project, including $200,000,000 directed to the GSA for the "National Capital Region: Federal Bureau of Investigation Headquarters Consolidation" in the Further Consolidated Appropriations Act of 2024, enacted on March 23, 2024. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 552. On March 28, 2024, the GSA submitted a prospectus report for the Greenbelt site ("the Greenbelt Prospectus") to the Senate EPW Committee and the House T&I Committee, in accordance with the 2022 Appropriations Act. The GSA proposed that upon adoption of resolutions by these Committees approving the Greenbelt Prospectus, it would "expeditiously move forward with site acquisition, design, design related consulting services, management/oversight, and preliminary construction support activities, using the GSA's existing balances of approximately $845 million," and that the GSA would make requests for "construction and fit out activities" in future fiscal years, specifically through a $3.5 billion Federal Capital Revolving Fund. J.R. 1612–13.

On July 31, 2024, the Chairs of the House T&I Committee, the House Committee on the Judiciary, and the House Committee on Oversight and Accountability sent a letter to the GSA Administrator expressing concerns about the Site Selection Decision as well as the accuracy of certain information in the Greenbelt Prospectus. The letter noted that "the details in the current prospectus are nearly identical to the prospectus submitted in 2016—eight years ago—despite a reduction in staffing and changes in market conditions," and even though the FBI had more recently stated that it had a plan to move thousands of employees out of the NCR to Huntsville, Alabama. J.R. 630, 632. The letter concluded by stating:

> We believe that the current proposal for a new FBI headquarters is inadequate, ill-defined, and does not take into account the current requirements of the FBI. Accordingly, GSA should submit a prospectus that includes accurate and updated information on costs and scope and considers alternative solutions on locations that may better meet the FBI's current mission. Until such a prospectus is submitted and the concerns identified are addressed, the [House T&I Committee] has insufficient information to call the prospectus up for Committee action.

J.R. 632. To date, the Greenbelt Prospectus has not been approved by Congress. Further, despite requests for further funding for the consolidated FBI headquarters project, Congress has not appropriated such additional funding.

## IV. The Reagan Building Site Selection and Reprogramming

On July 1, 2025, the FBI and the GSA each issued a press release which "announced the selection of the Ronald Reagan Building complex in Washington, D.C. as the new location for FBI Headquarters." FBI Press Release at 1, Compl. Ex. 3, ECF No. 1-3; GSA Press Release at 1, Compl. Ex. 4, ECF No. 1-4. The agencies noted that there had been "nearly two decades of attempts to find the needed space to meet the FBI's mission and workforce requirements" and that "[p]revious efforts focused on constructing a new suburban campus." FBI Press Release at 1; GSA Press Release at 1. FBI Director Kash Patel stated that the move was "cost effective and resource efficient," and GSA Public Buildings Service Commissioner Michael Peters stated that the selection of the Reagan Building saves "billions of dollars on new construction." FBI Press Release at 1; GSA Press Release at 1. Neither announcement discussed the requirement in the 2022 and 2023 Site Selection Provisions, included in the 2022 and 2023 Appropriations Acts, that the GSA must select one of the three sites identified in the 2017 GSA Prospectus.

Also on July 1, 2025, the DOJ provided a written notice to Congress that the FBI intended to reprogram $555 million in previously appropriated FBI funds "to relocate to, renovate, build-out, and furnish an existing, Federally owned building in Washington, D.C., to serve as the new FBI HQ in the NCR." J.R. 1731, 1733. Of the $555 million to be reprogrammed, $180 million

was from the FBI's Construction account appropriated in the 2016 Appropriations Act, $323 million was from the FBI's Construction account appropriated in the 2017 Appropriations Act, and $52 million was from "no-year Salaries & Expenses (S&E) funding previously identified for design and preconstruction activities associated with the new HQ project." J.R. 1732.

On September 19, 2025, in a letter addressed to the chairs and ranking members of the Senate and House Committees on Appropriations and Subcommittees on Financial Services and General Government ("the GSA Transfer Request"), Acting GSA Administrator Michael J. Rigas requested expedited approval of a transfer of "$843,769,886 appropriated to the Federal Buildings Fund (FBF) for the Federal Bureau of Investigation (FBI) Headquarters Consolidation from the FBF's construction and acquisition account to the FBF's major repairs and alterations account." GSA Transfer Request at 1, Compl. Ex. 6, ECF No. 1-6. This transfer request was approved by the Senate Subcommittee on Financial Service and General Government on December 1, 2025, but to date it has not been approved by the House Appropriations Committee, so the transfer has not been effectuated.

In conjunction with the GSA Transfer Request, the GSA also submitted a prospectus to the Senate EPW Committee and House T&I Committee in which it proposed "the repair and alteration of the Ronald Reagan Building . . . to serve as a new consolidated Headquarters for the . . . Federal Bureau of Investigation" ("the Reagan Building Prospectus"). J.R. 621. The Reagan Building Prospectus stated that the "proposed project will repair, modify, reconfigure, and fit out the [Reagan Building], replacing the existing headquarters for FBI at the J. Edgar Hoover Building . . . allowing for the consolidation of existing FBI leases in the National Capital Region." *Id.* On October 29, 2025, the Senate EPW Committee approved the Reagan Building Prospectus

by a vote of 10 to 9. On December 18, 2025, the House T&I Committee adopted a resolution approving the Reagan Building Prospectus.

On January 23, 2026, the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act of 2026 was enacted into law. *See* Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, 140 Stat. 5 ("the 2026 Appropriations Act"). In that Act, Congress included the following provision ("the 2026 Appropriations Act Provision"):

> Any remaining unobligated balances from amounts originally made available under the heading "Federal Bureau of Investigation—Construction" in the Department of Justice Appropriations Act, 2016 (title II of division B of Public Law 114–113) or in the Department of Justice Appropriations Act, 2017 (title II of division B of Public Law 115–31) for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region that were subsequently reprogrammed pursuant to a notification received by the Committees on Appropriations from the Assistant Attorney General for Administration on July 1, 2025, may not be further obligated until the Federal Bureau of Investigation submits to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed architectural and engineering plan for the Federal Bureau of Investigation's new headquarters building for review: *Provided*, That classified portions of the architectural and engineering plan shall be submitted through a classified annex.

*Id.* at 40. To date, no such architectural and engineering plan has been submitted.

## V. Procedural History

On November 6, 2025, Plaintiffs filed the six-count Complaint in this case. In Count 1, Plaintiffs allege that the FBI's July 2025 selection of the Reagan Building ("the FBI Reagan Building Selection Decision") exceeded the FBI's statutory authority and violated statutory directives. In Count 2, Plaintiffs allege that the GSA's July 2025 selection of the Reagan Building ("the GSA Reagan Building Selection Decision") exceeded the GSA's statutory authority and violated statutory directives. In Count 3, Plaintiffs allege that the FBI's decision to reprogram the $323 million from the 2017 Appropriations Act as part of the overall reprogramming of $555

million referenced in the July 1, 2025 notice (the "FBI Reprogramming Decision") exceeded the FBI's statutory authority and violated statutory directives. In Counts 1 through 3, Plaintiffs seek relief under the APA because the challenged actions were "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2); the Mandamus Act, 28 U.S.C. § 1361; the Court's equitable authority; and the Declaratory Judgment Act, 28 U.S.C. § 2201(a). In Counts 4, 5, and 6, Plaintiffs challenge the FBI Reagan Building Selection Decision, the GSA Reagan Building Selection Decision, and the FBI Reprogramming Decision, respectively, as arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). Plaintiffs request that the Court hold unlawful, set aside, and vacate the challenged actions, enter a permanent injunction preventing the implementation of the challenged actions, enter a declaratory judgment that the challenged actions are unlawful and void, and award reasonable attorney's fees, costs, and expenses pursuant to 28 U.S.C. § 2412. On January 16, 2026, Defendants filed an Answer to the Complaint.

## DISCUSSION

In their Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c), Plaintiffs seek final judgment in their favor based on the arguments underlying Counts 1, 2, 3, and 6. Specifically, they assert that the FBI and GSA Reagan Building Selection Decisions (collectively, "the Reagan Building Selection Decision") violated statutory provisions, including the 2022 and 2023 Site Selection Provisions. They also assert that the FBI Reprogramming Decision was unlawful because the sole reason for that decision was to implement the unlawful Reagan Building Selection Decision and because it violated the statutory restriction in the 2017 Appropriations Act on the use of the $323 million appropriated that year for the consolidated FBI headquarters project.

In their Cross Motion for Judgment on the Pleadings, Defendants seek final judgment in their favor on all counts on the grounds that (1) Plaintiffs lack standing to assert their claims because they have not shown that their injuries are redressable by a favorable ruling; (2) Plaintiffs' claims relating to the FBI Reprogramming Decision fail because that decision did not constitute a final agency action for purposes of the APA and was otherwise lawful; and (3) Congress ratified the Reagan Building Selection Decision and the FBI Reprogramming Decision through the 2026 Appropriations Act Provision.

## I. Legal Standard

Federal Rule of Civil Procedure 12(c) provides that "a party may move for judgment on the pleadings" after the pleadings have been filed. Fed. R. Civ. P. 12(c). "The standard of review for Rule 12(c) motions is the same as that under Rule 12(b)(6)." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Thus, in resolving a Rule 12(c) motion on the basis of the underlying merits, the court assumes the facts alleged by the nonmoving party to be true and draws all reasonable factual inferences in its favor. *Affinity Living Grp., LLC v. StarStone Specialty Ins. Co.*, 959 F.3d 634, 639 (4th Cir. 2020). Judgment is appropriate only if the moving party establishes that no genuine issue of material fact remains to be resolved and that the party is entitled to judgment as a matter of law. *Deutsche Bank Nat'l Trust Co., v. Fegely*, 767 F. App'x 582, 583 (4th Cir. 2019). On cross motions for judgment on the pleadings, the court reviews the motions separately and applies the same legal standard to both motions. *Navigators Ins. Co. v. Under Armour, Inc.*, 165 F.4th 171, 180 n.9 (4th Cir. 2026).

On a Rule 12(c) motion, a court considers the pleadings, which consist of the complaint, the answer, and any written instruments attached to those filings, as well as any documents attached to the motion that are "integral to the complaint and authentic." *Occupy Columbia v.*

*Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). The court may "take judicial notice of matters of public record." *Navigators Ins. Co.*, 165 F.4th at 180–81 n.9. Here, the parties have submitted a Joint Record of exhibits relevant to the Motions, without objection from either side except as noted below. In evaluating the Motions, to the extent that the Court has considered exhibits in the Joint Record not separately attached to the pleadings, it has considered only those documents which are referenced in the Complaint and thus integral to it, or documents that are matters of public record for which it may take judicial notice. Although the Court agrees with Plaintiffs that Exhibits 27, 28, and 30 within the Joint Record, consisting of media reports, are not properly subject to judicial notice, the Court finds that consideration of these exhibits and their contents would not alter the outcome of the Court's resolution of the Motions.

## II. Redressability

The Court first addresses Defendants' argument that Plaintiffs lack standing to assert their claims. Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a

particular claim in order to consider the claim. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

Defendants do not contest that Plaintiffs have satisfied the injury and traceability elements necessary for standing. Rather, Defendants argue that Plaintiffs' alleged injuries would not be redressable by a favorable ruling of this Court. To establish redressability, Plaintiffs must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The "burden imposed by this requirement is not onerous." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). Plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Id.* (quoting *Sierra Club*, 899 F.3d at 284). "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'" *Id.* (quoting *Sierra Club*, 899 F.3d at 284). "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club*, 899 F.3d at 285. Where the requested relief is an ordering of a change in a legal status, redressability is established if there is a "significant increase in the likelihood" that the plaintiff "would obtain relief that directly redresses the injury suffered." *Reed v. Goertz*, 143 S. Ct. 955, 960 (2023); *Utah v. Evans*, 536 U.S. 452, 464 (2002).

In this case, Plaintiffs ask the Court to vacate, enjoin, and declare unlawful the Reagan Building Selection Decision, as well as the FBI Reprogramming Decision, and assert that such relief would provide redress for their injuries because it would "have the effect of reinstating the Greenbelt site as the selected site." Pls.' Mot. at 25, ECF No. 18-1. Plaintiffs' asserted injuries include harm to Maryland's proprietary interests, specifically to the value of a parcel of land owned

by Maryland that is adjacent to the Greenbelt site and for which Maryland was negotiating payment from the GSA in exchange for an easement or sale of the parcel, and harm to both Maryland and Prince George's County, particularly the loss of economic benefits such as the receipt of permitting fees and tax revenue that they would have received from the construction and operation of the consolidated FBI headquarters at the Greenbelt site.

Defendants argue that redressability cannot be established because even if the Court awards Plaintiffs their requested relief, it is "beyond speculative" that Plaintiffs will receive any downstream benefits from the Court's decision. Defs.' Mot. at 21, ECF No. 19-1. Defendants assert that a decision to vacate the challenged actions would not compel any specific prospective agency action, such as obligating the reprogrammed funds towards the Greenbelt site. Defendants also argue that while, in their view, Plaintiffs need the consolidated FBI headquarters to be built at the Greenbelt site in order to restore their lost economic benefits, it is not substantially likely that, even with a favorable court ruling, the FBI headquarters will be built at the Greenbelt site. As Defendants see it, Congress has never appropriated enough money to make the construction of the consolidated FBI headquarters project at the Greenbelt site a realistic outcome, and it is unlikely to appropriate the billions of dollars in additional funds necessary for the project to move forward. Further, Defendants note that there is presently political resistance within Congress to the Greenbelt site, as evidenced by Congress's failure to approve the Greenbelt Prospectus and the July 31, 2024 letter from three House Committee chairs expressing concerns about the Greenbelt Site Selection Decision. They therefore assert that a ruling that vacates the Reagan Building Selection Decision would most likely result in the FBI headquarters remaining at the Hoover Building indefinitely, rather than the construction of a consolidated FBI headquarters at the Greenbelt site, and thus would not redress Plaintiffs' injuries.

Defendants' arguments are unpersuasive for several reasons. First, they erroneously claim that Plaintiffs' injuries can be redressed only if the consolidated FBI headquarters is actually built at the Greenbelt site. The legal effect of vacating the Reagan Building Selection Decision and the FBI Reprogramming Decision would be to reinstate Greenbelt as the selected site for the consolidated FBI headquarters project. *See PJM Power Providers Grp. v. Fed. Energy Regul. Comm'n*, 88 F.4th 250, 265 (3d Cir. 2023) ("[V]acating or rescinding invalidly promulgated regulations has the effect of reinstating prior regulations." (quoting *Abington Mem'l Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984))); *Action on Smoking & Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (holding that "vacating or rescinding" a rule has "the effect of reinstating the rules previously in force"). Plaintiffs have plausibly alleged that with such a reinstatement, there would be a significant increase in the likelihood of redress for an injury even before there is any construction of a consolidated FBI headquarters at the Greenbelt site. Where Plaintiffs have plausibly alleged that the Reagan Building Selection Decision "impair[ed] the market value" of Maryland's parcel of land at or near the Greenbelt site, Compl. ¶ 59, the reinstatement of the Greenbelt site would likely have the practical effect of restoring value to that parcel, because it would reestablish a specific potential need for the use of that parcel, which no longer existed after the Reagan Building Selection Decision, that would necessarily have economic value. Notably, Plaintiffs need not show that there would be a large increase in the value of the parcel, just that some value would be restored. *See Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2135 (2025) (holding that even one dollar in economic benefit would satisfy the redressability component of Article III standing). As a result, the Court "would have ordered a change in a legal status" the "practical consequence" of which would be to significantly increase the likelihood that Plaintiffs would obtain relief redressing an injury, that is restoring or

increasing the value of the parcel, which is sufficient to demonstrate redressability. *Evans*, 536 U.S. at 464.

Second, even if the Court were to focus on the construction of the consolidated FBI headquarters at the Greenbelt site as the relief required to redress Plaintiffs' injuries, Plaintiffs need not show that it is certain that they will gain that ultimate relief. Here, reinstatement of the Greenbelt site as the formally selected site would significantly increase the likelihood that the project would move forward, including by removing "one obstacle" to the construction of the project at the Greenbelt site—the Reagan Building Selection Decision—which is sufficient to establish redressability. *Sierra Club*, 899 F.3d at 285. Further, Defendants fail to account for the specific legal standard applicable to circumstances under which, as here, a plaintiff primarily seeks the restoration of a lost opportunity to gain some other ultimate relief. The United States Court of Appeals for the Fourth Circuit has held that where a plaintiff seeks immediate relief from a federal court as necessary to restore a lost opportunity to obtain ultimate relief from a different entity, such as an administrative agency, redressability does not require a showing that the plaintiff will eventually obtain the ultimate relief sought, only that there is a "realistic possibility" that the plaintiff will obtain that ultimate relief. *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 401–02 & n.11 (4th Cir. 2018).

This principle was applied in *Townes v. Jarvis*, 577 F.3d 543, 547 (4th Cir. 2009), in which a Virginia state prisoner, Townes, brought a constitutional challenge to the Virginia Parole Board's determination that he was ineligible for consideration for discretionary parole. *See id.* at 546. The Fourth Circuit recognized that the immediate relief Townes sought to redress his injury, a rescission of the Parole Board's decision that he was ineligible so as to restore his opportunity to receive discretionary parole, may not result in Townes actually receiving parole because the Parole

Board retained absolute discretion over such decisions. *See id.* at 547, 549. Nevertheless, the court concluded that, to establish redressability, Townes was not required to show that a favorable ruling on the challenge to ineligibility would likely result in a grant of parole; rather, he was required to show only that such ultimate relief was a "realistic possibility" if the requested relief in the case was likely to redress his immediate injury: the lost opportunity to seek parole. *See id.* at 547–49.

In *Sierra Club v. State Water Control Board*, 898 F.3d 383 (4th Cir. 2018), in which opponents of a natural gas pipeline project sued a state agency to challenge its certification under the Clean Water Act that the construction of the pipeline would not degrade the state's water quality, the defendants argued that the plaintiffs lacked redressability because even if they were to prevail on the merits and have the state agency's certification vacated, they would still need to clear several additional hurdles to obtain the ultimate relief they sought, which was the imposition of more stringent certification conditions or the discontinuation of the pipeline project. *See id.* at 386, 400. The Fourth Circuit found that the plaintiffs had satisfied redressability because where their claim, by requesting the vacating of the challenged state agency's certification, sought to restore a lost opportunity to pursue their ultimate relief, they were required to show only that with a favorable ruling there was a "realistic possibility" that they would then obtain that ultimate relief. *See id.* at 401–02. Under that standard, the court found that, although upon a favorable ruling on the state agency's certification the plaintiffs still would not receive the ultimate relief unless they could convince the state agency to reinitiate review, have the agency either decline to reissue the certification or reissue the certification with stricter conditions, and then convince federal regulators to honor the state agency's decision, such hurdles were insufficient to "negate the 'realistic possibility'" that the plaintiffs would obtain their ultimate relief. *Id.* at 402.

This redressability principle applies here. Where Plaintiffs seek to undo the Reagan Building Selection Decision and the related FBI Reprogramming Decision, actions which if left in place would effectively prevent the establishment of a consolidated FBI headquarters at the Greenbelt site, they are seeking to restore a lost opportunity to gain that ultimate relief and the economic benefits that would come with it. In such an instance, Plaintiffs must first show that the vacating of the Reagan Building Selection Decision and the FBI Reprogramming Decision would likely restore that lost opportunity to pursue the ultimate relief of having the consolidated FBI headquarters built at the Greenbelt site. Plaintiffs have done so, because with those decisions vacated, the opportunity to have the headquarters built at the Greenbelt site would be restored in that the Greenbelt site would be reinstated as the selected site for the consolidated FBI headquarters project. *See PJM Power Providers Grp.*, 88 F.4th at 265; *Action on Smoking & Health*, 713 F.2d at 797. Plaintiffs could then re-engage with the GSA, the FBI, and the relevant congressional committees, including by seeking to address any concerns that were raised by the House T&I Committee and advocating for a revised prospectus to be submitted and approved.

At that point, as to the ultimate relief, Plaintiffs need only show that there is a "realistic possibility" that the consolidated FBI headquarters will be built at the Greenbelt site. *State Water Control Bd.*, 898 F.3d at 401–02; *Townes*, 577 F.3d at 547–49. If a court does not "know" that discretion will not be exercised to provide the ultimate relief sought, it should not conclude that there is no realistic possibility that such relief will be granted. *Townes*, 577 F.3d at 549. Here, there are no identified legal obstacles that would prevent the GSA and the relevant congressional committees from completing the steps necessary to have the consolidated FBI headquarters project proceed at the Greenbelt site; rather, the only applicable legal requirement, as set forth in the 2022 and 2023 Appropriations Acts, is that the GSA must select either the Greenbelt site or one of the

other two short-list sites for the consolidated FBI headquarters. As discussed above, the Fourth Circuit has found the "realistic possibility" standard to have been satisfied even when the agency in question had broad discretion on whether to grant the relief sought, *see id.* at 548–49, or when there were numerous decisions that had to break in the plaintiffs' favor before the ultimate relief could be achieved, *see State Water Control Bd.*, 898 F.3d at 400–02. Under these circumstances, the "realistic possibility" standard is readily met.

Although Defendants claim that the Greenbelt project is no longer viable based on their assessment of the political landscape, when analyzing redressability, it is not the Court's "role to engage 'in the speculative (if not impossible) task of predicting how an agency will exercise its discretion.'" *Id.* at 403 (quoting *Townes*, 577 F.3d at 548); *see Townes*, 577 F.3d at 549 (refusing to speculate on how the parole board would exercise its discretion). Yet that is exactly what Defendants invite the Court to do by citing political obstacles, such as the present lack of full funding and presence of political opposition within Congress, rather than legal obstacles, in arguing why the consolidated FBI headquarters is unlikely to be built in Greenbelt. Where the Fourth Circuit has emphasized that courts should resist such calls to engage in predictions and speculation, the Court will not do so here.

Even if it were proper to engage in the kind of speculative analysis suggested by Defendants, the present lack of full funding is neither a legal obstacle nor an insurmountable one, because there is no legal requirement that the consolidated FBI headquarters project be fully funded before the project can begin. In fact, where the Greenbelt Prospectus stated that "GSA intends to expeditiously move forward with site acquisition, design, design related consulting services, management/oversight, and preliminary construction support activities, using GSA's existing balances of approximately $845 million," the record shows that the GSA was prepared to

start its work at the Greenbelt site before Congress had appropriated all necessary funds. J.R. 1613. This is the same approach that Congress took with the U.S. Department of Homeland Security ("DHS") headquarters consolidation project at St. Elizabeths Hospital in Washington, D.C., on which construction began in 2009 while funding was appropriated in stages up to and including 2023. *See* U.S. Gov't Accountability Off., GAO-22-105970, DHS Headquarters Consolidation: Project Cost and Schedule Estimates Are Not Finalized 12 (2022); Gen. Servs. Admin., Prospectus–Construction DHS Consolidation at St. Elizabeths Washington, DC, Prospectus No. PDC-0001-WA23 13 (2022) (documenting the appropriations between fiscal year 2006 and 2016 for the St. Elizabeths Consolidation Project); 2023 Appropriations Act, 136 Stat. at 4682 (providing $252,963,000 for "DHS Consolidation at St. Elizabeths"). Indeed, at an earlier point in the discussions about the FBI consolidated headquarters, when the GSA canceled the project in 2017 due to an alleged lack of sufficient appropriated funds, members of the Senate EPW Committee disagreed with the argument that the lack of full funding prevented the project from moving forward and expressed a commitment to provide the funding in stages. J.R. 341–42, 403–04.

Likewise, even if the Court considers Defendants' arguments about political opposition within Congress, it finds that they vastly overstate the claim that Congress has "made clear that it will not authorize the GSA to proceed at the Greenbelt site in particular." Defs.' Reply at 5, ECF No. 21. While it is true that the Greenbelt Prospectus would still need to be approved by the Senate EPW and House T&I Committees, those committees have never rejected the Greenbelt Prospectus. The main piece of evidence for Defendants' claim is a letter from three House Committee chairs, only one of whom chairs a committee tasked with approving the Greenbelt Prospectus, which asked the GSA to provide more information and address their concerns regarding the Greenbelt

Prospectus. While the letter also requested information on "alternative solutions on locations that may better meet the FBI's current mission," there has been no legislation to undo the statutory mandate to select one of the three short-list sites or to impose a statutory requirement that the project be built elsewhere. J.R. 632. Such requests, on their face, do not constitute a decisive blow to the Greenbelt project, and there is no reason why the GSA would be unable to resubmit an updated prospectus with the requested information.

More broadly, this specific critique must be viewed in relation to the broader history of the consolidated FBI headquarters project. Dating back to 2011, there has been strong congressional support for the concept of a new suburban campus, as evidenced by the multiple appropriations specifically designated for such a project. When the GSA and the FBI, in 2017, sought to take a different approach of pulling back from the consolidated FBI headquarters project and proposing that the FBI headquarters remain at the Hoover Building, that approach was met with substantial criticism by the Senate EPW Committee, a lack of movement in that direction, and a return by Congress to the consolidated FBI headquarters project, as reflected in the specific statutory mandate in the 2022 and 2023 Site Selection Provisions that one of the three short-list sites, of which the Greenbelt site was one, must be selected. GSA even submitted the Greenbelt Prospectus in 2024. Thus, the recent statements in opposition to the specific details in the Greenbelt Prospectus not by the full Congress, but by certain House Committee chairs, reflect only a recent about-face, which based on prior history, is by no means permanent. Even the recent Senate EPW Committee resolution to approve the Reagan Building Prospectus, which passed by only a 10-9 vote, reflects a lack of a clear mandate to abandon the construction of a consolidated FBI headquarters project on a suburban campus. Accordingly, the Court cannot find that there is no realistic possibility that the consolidated FBI headquarters project will proceed at the Greenbelt

site, particularly given that the composition of the relevant congressional committees, and the priorities expressed by their members, are not static. The Court therefore finds that Plaintiffs have established redressability sufficient for Article III standing.

Defendants' citation to the out-of-circuit decision in *El Paso County v. Trump*, 982 F.3d 332 (5th Cir. 2020), does not alter the Court's conclusion. In *El Paso County*, the plaintiffs, including El Paso County, Texas, sued government defendants to challenge the reprogramming of United States Department of Defense ("DOD") funds in order to build a wall on the United States-Mexico border. *See id.* at 335–36. As part of the reprogramming, DOD redirected funds from 127 planned military construction projects, including a $20 million access road construction project at Fort Bliss, in El Paso County. *See id.* at 337. The County argued that it had standing because the access road construction project's cancellation would result in a reduction in its tax revenues. *See id.* at 338. The United States Court of Appeals for the Fifth Circuit concluded that the plaintiffs could not establish redressability because "enjoining the Government from spending the diverted funds on border wall construction does not necessarily result in the Government's use of those funds on the Fort Bliss project." *Id.* at 341. The court pointed out that the $20 million for the Fort Bliss project had been provided through a lump-sum appropriation, not an appropriation for the Fort Bliss project in particular, which meant that the defendants had discretion over which construction projects would receive the funds. *See id.* In turn, the court found that the County had not alleged any facts demonstrating that DOD would actually move forward with the Fort Bliss project if the court enjoined the use of the appropriated funds on the border wall project. *See id.*

Here, Congress did not appropriate funds for the consolidated FBI headquarters project only through a lump-sum appropriation. Instead, it has appropriated hundreds of millions of dollars, whether to the GSA or the FBI, specifically for the construction of that project. *See* 2016

Appropriations Act, 129 Stat. at 2451–52; 2017 Appropriations Act, 131 Stat. at 197–98, 356–57; 2023 Appropriations Act, 136 Stat. at 4682; Further Consolidated Appropriations Act, 2024, 138 Stat. at 552. In addition, while the plaintiffs in *El Paso County* did not allege any facts demonstrating that DOD was likely to exercise its discretion to move forward with the Fort Bliss project, *see El Paso Cnty.*, 982 F.3d at 341, Plaintiffs have shown that the GSA had specifically selected the Greenbelt site for the consolidated FBI headquarters project, and that the vacating of the Reagan Building Selection Decision and FBI Reprogramming Decision would both restore that decision and the specific direction in the 2022 and 2023 Site Selection Provisions that the funds be used for that specific project. Accordingly, the Court finds that *El Paso County*, which is not controlling authority, is materially distinguishable from this case, and that, consistent with the prevailing legal standard in the Fourth Circuit, Plaintiffs have demonstrated redressability. *See Evans*, 536 U.S. at 464; *State Water Control Bd.*, 898 F.3d at 401–02.

## III. Final Agency Action

Defendants also argue that Plaintiffs' APA challenges to the FBI Reprogramming Decision, as asserted in Counts 3 and 6, fail because a reprogramming does not constitute a final agency action under the APA. Under the APA, a "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. Because the APA waives sovereign immunity for challenges to such actions, a district court lacks subject matter jurisdiction to review steps taken by a federal agency that do not qualify as a final agency action. *See Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024).

The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

Two conditions must be satisfied for an agency action to be deemed "final": (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Notably, under the APA, there is a "'strong presumption' in favor of judicial review of agency action." *CASA de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 697 (4th Cir. 2019) (quoting *Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 316 (4th Cir. 2008)). Accordingly, the United States Supreme Court has instructed that courts take a "'pragmatic' approach" to the finality inquiry. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

Defendants do not dispute that the FBI Reprogramming Decision meets the first requirement, in that it marked the consummation of the agency's decisionmaking process. Rather, as to the second requirement, Defendants argue that a reprogramming is "an internal budgeting action utilized by agencies to effectively manage funds" and is not an action that "determines the legal rights and obligations of anyone." Defs.' Mot. at 23.

Defendants' argument fails to recognize that the FBI Reprogramming Decision affects the legal right of FBI personnel by limiting their authority to use the funds at issue to the specific purpose of implementing the Reagan Building Selection Decision. This result is enough to satisfy the second requirement since it determined an agency's own "rights or obligations" or those of its personnel. *See Bennett*, 520 U.S. at 178. This was the case in *Bennett*, in which the Supreme Court found that a Biological Opinion issued by the United States Fish and Wildlife Service, a component agency of the United States Department of the Interior ("Interior"), was a final agency

action because it placed obligations on the Bureau of Reclamation, another Interior component agency, in relation to its operation of an irrigation project. *See id.* at 157, 159, 177–78. Specifically, the Biological Opinion required the Bureau of Reclamation to comply with certain "reasonable and prudent alternatives," consisting of maintaining certain minimum water levels at certain reservoirs, in order to be permitted to "take" fish designated as an endangered species. *Id.* at 158–59, 169–70; *see also Biden v. Texas*, 142 S. Ct. 2528, 2544–45 (2022) (holding that a memorandum terminating the Migrant Protection Protocols was a final agency action because it determined the rights and obligations of DHS staff "by forbidding them to continue the program in any way from that moment on" (internal citations omitted)).

Although the Fourth Circuit has not specifically addressed whether a reprogramming constitutes a final agency action, the United States Court of Appeals for the Ninth Circuit has held that a DOD reprogramming of funds for construction of a border wall constituted a final agency action because it purported "to affect DoD's legal right to use particular funds to build a border barrier instead of the purpose for which they were originally appropriated." *Sierra Club v. Trump*, 929 F.3d 670, 698 n.23 (9th Cir. 2019). Citing *Bennett*, the court stated that "the question we must ask in determining finality is whether the agency action imposes obligations on the agency, not whether it imposes obligations on Plaintiffs." *Id.* This Court agrees with the Ninth Circuit's application of *Bennett* to the context of a reprogramming and finds that because the FBI Reprogramming Decision altered the rights and obligations of FBI personnel in relation to the ability to expend the funds for a particular purpose, it is a final agency action reviewable under the APA. *See id.*; *Bennett*, 520 U.S. at 177–78.

## IV. Reagan Building Selection Decision

In Counts 1 and 2, Plaintiffs allege that the FBI and GSA Reagan Building Selection Decisions violated statutory directives and exceeded the authority of both agencies. Specifically, in their Motion, Plaintiffs argue that by selecting the Reagan Building as the site for the consolidated FBI headquarters, both agencies violated the statutory directives in the 2022 and 2023 Site Selection Provisions, set forth in the 2022 and 2023 Appropriations Acts, which mandated that the GSA, not the FBI, select a site for the consolidated FBI headquarters, and that it select that site from one of the short-list sites: Greenbelt, Maryland; Landover, Maryland; or Springfield, Virginia.

The relevant language from the 2022 Appropriations Act states that:

> SEC. 530. (a) The Administrator of the General Services Administration shall select a site from one of the three listed in the General Services Administration Fiscal Year 2017 PNCR–FBI–NCR17 prospectus for a new fully consolidated Federal Bureau of Investigation[] (FBI) headquarters. Such decision shall be made in as expeditious manner as possible.

2022 Appropriations Act, 136 Stat. at 276. The relevant language from the 2023 Appropriations Act states that:

> SEC. 527. The Administrator of the General Services Administration shall select a site from one of the three listed in the General Services Administration (GSA) Fiscal Year 2017 PNCR–FBI–NCR17 prospectus for a new fully consolidated Federal Bureau of Investigation (FBI) headquarters.
>
> In considering the September 2022 and amended November 2022 GSA Site Selection Plan for the FBI Suburban Headquarters, not later than 90 days after enactment of this Act, prior to any action by the GSA site selection panel for the new Federal FBI headquarters, the GSA Administrator shall conduct separate and detailed consultations with individuals representing the sites from the State of Maryland and Commonwealth of Virginia to further consider perspectives related to mission requirements, sustainable siting and equity, and evaluate the viability of the GSA's Site Selection Criteria for the FBI Headquarters to ensure it is consistent with Congressional intent as expressed in the resolution of the Committee on Environment and Public Works of the Senate (112th Congress), adopted December 8, 2011 and further described in the General Services Administration Fiscal Year

> 2017 PNCR–FBI–NCR17 prospectus. Following those consultations, the Administrator shall proceed with the site selection process.

2023 Appropriations Act, 136 Stat. at 4687.

On their face, these statutory mandates preclude the GSA from choosing a different site, such as the Reagan Building. Moreover, where these provisions authorized only the GSA to make the site selection decision, and Congress more generally has assigned to the GSA the authority to assign space for federal agencies and to provide for the construction and site selection of public buildings, *see* 40 U.S.C. §§ 584, 3302, 3304, 3305, the FBI's decision to select the Reagan Building as the site of the consolidated FBI headquarters exceeded its statutory authority. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (stating that an agency's "power to act and how they are to act are authoritatively prescribed by Congress").

In their Motion and briefs, Defendants notably do not contest Plaintiffs' assertion that the 2022 and 2023 Site Selection Provisions created a geographic restriction on where the consolidated FBI headquarters may be located. They also offer no argument on why the FBI and the GSA did not exceed their statutory authority in selecting the Reagan Building, which was not one of the three sites listed in the 2017 GSA Prospectus. Rather, in their brief, Defendants acknowledge that the 2022 and 2023 Appropriations Acts contained "location restriction provisions," Defs.' Mot. at 24, and the only argument they offer in support of the legality of the Reagan Building Selection Decision is that Congress purportedly ratified it through the language in the 2026 Appropriations Act Provision. At the hearing, Defendants' counsel at one point agreed with the proposition that once GSA "picked one of three" short-list sites, "by law, that had to be the location until it was repealed, or ratified, or a different choice was ratified." Hrg. Tr. at 45.

Also at the hearing, however, Defendants' counsel argued for the first time that the Reagan Building Selection Decision did not violate the statutory directives in the 2022 and 2023

Appropriations Acts on the grounds that the GSA, in fact, discharged its obligations under the statutes by selecting the Greenbelt site in 2023 and submitting the Greenbelt Prospectus to the relevant congressional committees, and that the Site Selection Provisions thus did not preclude the GSA from then changing course and choosing a different site such as the Reagan Building. Because this argument was not raised in Defendants' opening brief, or even its reply brief, but was instead raised for the first time at the hearing on the Motions, the argument is waived and need not be considered by the Court. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) (stating that "[g]enerally, new arguments cannot be raised in a reply brief before the district court" (internal citation omitted)); *Mulvey Constr., Inc. v. BITCO Gen. Life Ins. Corp.*, No. 07-0634, 2015 WL 6394521, at *7 (S.D.W. Va. Oct. 22, 2015) (collecting cases that have held that an argument to the district court is waived when raised for the first time at a hearing on the motion). "A contrary rule runs the risk of depriving a nonmovant an opportunity to respond," as has occurred in this case. *De Simone*, 36 F.4th at 531.

Even if the argument had not been waived, it does not provide a basis to conclude that the Reagan Building Selection Decision did not violate the statutory location restrictions in the 2022 and 2023 Appropriations Acts. These provisions used mandatory language in the form of the word "shall," and by directing that GSA "select" one of the three short-list sites "for a new fully consolidated [FBI] headquarters," 2022 Appropriations Act, 136 Stat. at 276; 2023 Appropriations Act, 136 Stat. at 4687, rather than merely propose or recommend a site, this requirement is properly construed as an action by Congress to place a specific statutory restriction on GSA's general authority over the assignment of space for federal agencies and the construction of and selection of sites for public buildings. *See* 40 U.S.C. §§ 584, 3302, 3304, 3305; *City of Arlington*, 569 U.S. at 297. Notably, the text provides no conditions under which the selection could be unilaterally

rescinded or switched to a nonconforming site. Had Congress sought to make the location restriction associated with the site selection provisional or qualified, it could have done so. *Mont v. United States*, 139 S. Ct. 1826, 1832–33 (2019) ("If Congress intended a narrower interpretation, it could have easily used narrower language.").

Moreover, Defendants' belatedly asserted position is not consistent with the legislative history that led to these provisions, which were enacted after congressional committees had objected to the GSA's earlier decision to cancel the 2017 GSA Prospectus proposing the construction of the consolidated FBI headquarters project at or near the three short-list sites and instead to plan for the FBI headquarters to remain at the Hoover Building. Where the 2022 and 2023 Site Selection Provisions were plainly intended to prevent another such backtracking on the consolidated FBI headquarters project, these provisions cannot be read to have permitted the GSA simply to check a box by temporarily selecting one of the three short-list sites and submitting a report, and then to circumvent Congress's specific directive by unilaterally changing its selection to a different site and project.

Defendants' argument in opposition to Counts 1 and 2 thus rests on their claim that the Reagan Building Selection Decision was ratified by Congress through the 2026 Appropriations Act Provision. The Court will address that ratification argument below, in relation to both the Reagan Building Selection Decision and the FBI Reprogramming Decision. *See infra* part VI.

## V. FBI Reprogramming Decision

In Count 6, Plaintiffs challenge the July 1, 2025 FBI Reprogramming Decision. The Appropriations Clause of the United States Constitution assigns the power of the purse to Congress and states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. In general, appropriations must be

"applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). However, agencies have the authority to reprogram or transfer funds. The United States Government Accountability Office ("GAO") defines a reprogramming as "the shifting of funds within an appropriation to purposes other than those contemplated at the time of appropriation," specifically "the application of appropriations within a particular account to purposes, or in amounts, other than those justified in the budget submissions or otherwise considered or indicated by congressional committees in connection with the enactment of appropriation legislation." Gov't Accountability Off., *Principles of Federal Appropriations Law*, ch. 2, § B.7.b, at 2-44 (4th ed., 2016 rev.). In contrast, "[a] transfer shifts budget authority from one appropriation to another." *Id.* While agencies "generally may transfer funds only with explicit statutory authority," *id.* (citing 31 U.S.C. § 1532), an agency may "reprogram, even if doing so is inconsistent with the budget estimates presented to the Congress, as long as the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation." *Id.* (citing *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)).

Specifically, Plaintiffs assert in Count 6 that the FBI Reprogramming Decision was arbitrary and capricious, in violation of the APA, because the sole reason for that decision was to implement the unlawful Reagan Building Selection Decision. Defendants acknowledge that the reason for the FBI Reprogramming Decision was to implement the Reagan Building Selection Decision and argue only that the FBI Reprogramming Decision complied with all applicable statutory requirements.

Under the APA, a court must "hold unlawful and set aside agency action" that was "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing a challenged action, the Court is "ordinarily limited to evaluating the agency's

contemporaneous explanation." *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019). A "material misapprehension of the baseline conditions existing in advance of an agency action can lay the groundwork for an arbitrary and capricious decision." *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 588 (4th Cir. 2012); *see Am. Fed. of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 106–107 (D. Md. 2025). Thus, an agency action can be deemed arbitrary and capricious if it is based on a misapprehension of the scope of the applicable law. *See Am. Fed. of Tchrs.*, 796 F. Supp. 3d at 106–107 (finding that an agency action in issuing guidance was arbitrary and capricious in part because it was based on a misapprehension of the scope of the applicable law, specifically Title VI of the Civil Rights Act of 1964 and relevant Supreme Court precedent).

Here, the contemporaneous explanation given for the FBI Reprogramming Decision was to implement the Reagan Building Selection Decision, and Defendants do not dispute that stated reason. *See* J.R. 1733 ("[T]he FBI intends to reprogram up to $555 million of existing . . . balances to relocate to, renovate, build-out, and furnish an existing, Federally owned building in Washington, D.C., to serve as the new FBI HQ in the NCR" at "the Ronald Reagan Building Complex."). Where the Reagan Building Selection Decision conflicts with the 2022 and 2023 Site Selection Provisions and thus exceeded the statutory authority of the GSA and the FBI, *see supra* part IV, the Court finds that the FBI Reprogramming Decision was arbitrary and capricious under 5 U.S.C. § 706(2)(A) because it was based on a misapprehension of existing law under which the FBI erroneously concluded that the FBI and the GSA had the authority to select the Reagan Building as the site for the consolidated FBI headquarters. *See Am. Fed. of Tchrs.*, 796 F. Supp. 3d at 106–107; *see also Ohio v. U.S. Army Corps of Eng'rs*, 259 F. Supp. 3d 732, 739–42, 763–64 (N.D. Ohio 2017) (finding that a decision by the U.S. Army Corps of Engineers to reprogram any

excess funds saved by dredging a channel in a manner that did not comply with a state water quality certification required by the Clean Water Act would be arbitrary and capricious, in part because an agency "cannot reprogram funds based on conditions not approved or anticipated by Congress, and certainly cannot do so when those funds are needed for their original purpose in order for the agency to remain in compliance with governing law"). This misapprehension of law is particularly acute in relation to the reprogramming of the $323 million referenced in the 2017 Appropriations Act ("the 2017 Funds"), as part of the broader FBI Reprogramming Decision, because the 2017 Funds were specifically designated for the "new Federal Bureau of Investigation consolidated headquarters facility in the [NCR]," the same project referenced in the 2022 and 2023 Site Selection Provisions requiring that the project be located at one of the three short-list sites which did not include the Reagan Building. 2017 Appropriations Act, 131 Stat. at 197–98; *see* 31 U.S.C. § 1301(a).

Defendants' citation to section 505 of the Consolidated Appropriations Act of 2024, Pub. L. 118-42, 138 Stat. 25, 167 ("the 2024 Appropriations Act"), does not alter this conclusion. This provision provides that:

> None of the funds provided under this Act, or provided under previous appropriations Acts to the agencies funded by this Act that remain available for obligation or expenditure in fiscal year 2024 . . . shall be available for obligation or expenditure through a reprogramming of funds . . . unless the House and Senate Committees on Appropriations are notified 15 days in advance of such reprogramming of funds.

*Id.* Defendants attempt to justify the legality of the FBI Reprogramming Decision by asserting that they fulfilled this statutory requirement. However, compliance with this section of the 2024 Appropriations Act was necessary but not sufficient to render the FBI Reprogramming Decision lawful. Compliance with this particular statutory requirement cannot save the FBI

Reprogramming Decision where it was otherwise based on a misapprehension of relevant law and thus was arbitrary and capricious in violation of the APA.

The Court therefore finds that in relation to Count 6, the FBI Reprogramming Decision is arbitrary and capricious under the APA, subject to the ratification and implied repeal arguments discussed below. *See infra* part VI.

## VI. Ratification and Implied Repeal

In their Motion, Defendants primarily argue that even if the Reagan Building Selection Decision and the FBI Reprogramming Decision violated the APA as not in accordance with law or arbitrary and capricious because they did not comply with the 2022 and 2023 Appropriations Acts, any such violations have been cured by a subsequent ratification of those decisions through the 2026 Appropriations Act Provision. Relatedly, they argue that the language in the 2026 Appropriations Act Provision impliedly repealed the Site Selection Provisions in the 2022 and 2023 Appropriation Acts. Where, as discussed above, the Court has concluded that the Reagan Building Selection Decision and the FBI Reprogramming Decision ran contrary to the Site Selection Provisions, Defendants must demonstrate not just a ratification of the executive actions, but an implied repeal of those restrictive statutory provisions.

### A. Legal Standards

"Congress may, by enactment not otherwise inappropriate, ratify acts which it might have authorized and give the force of law to official action unauthorized when taken." *Swayne & Hoyt, Ltd. v. United States*, 300 U.S. 297, 301–302 (1937) (internal citations omitted). However, a ratification requires a "clear demonstration that Congress intended to ratify" the action. *Utah Div. of State Lands v. United States*, 482 U.S. 193, 207 (1987). "[R]atifying legislation must recognize that the actions involved were unauthorized when taken and must also expressly ratify those

actions in clear and unequivocal language." *EEOC v. CBS, Inc.*, 743 F.2d 969, 974 (2d Cir. 1984). Further, because "the substantive aspects of appropriations bills are subject to much less scrutiny than the substantive programs themselves, an appropriations bill is a particularly unsuitable vehicle for an implied ratification of unauthorized actions." *Id.* at 974–75 (internal citations omitted). Thus, "ratification ordinarily cannot occur in the appropriations context unless the appropriations bill itself expressly allocates funds for a specific agency or activity." *Schism v. United States*, 316 F.3d 1259, 1289–90 (Fed. Cir. 2002).

As for implied repeal, "[t]he cardinal rule is that repeals by implication are not favored," and "the intention of the legislature to repeal must be clear and manifest." *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). Generally, where there are two statutes addressing the same subject, "effect should be given to both if possible." *Id.* A repeal by implication can occur (1) "where provisions in the two acts are in irreconcilable conflict," in which case "the later act to the extent of the conflict constitutes an implied repeal of the earlier one"; or (2) "if the later act covers the whole subject of the earlier one and is clearly intended as a substitute." *Id.* Only the first of these means is relevant here. Further, the "doctrine disfavoring repeals by implication 'applies with full vigor when . . . the subsequent legislation is an *appropriations* measure.'" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) (quoting *Comm. for Nuclear Resp. v. Seaborg*, 463 F.2d 783, 785 (D.C. Cir. 1971)). Thus, in cases in which courts have found Congress to have impliedly repealed a statute through an appropriations act, there has been a clear "irreconcilable conflict" between the old statute and the new language in the appropriations act. *See, e.g.*, *The Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 336, 339 (4th Cir. 2007) (finding that an appropriations act had impliedly repealed a part of the Lanham Act based on an irreconcilable conflict with that statute).

Finally, as Defendants acknowledged at the hearing, in determining whether Congress ratified an action or repealed a prior act, the Court's inquiry is limited to the laws that Congress passed. Defendants agree that congressional ratification of executive action, or repeal of prior congressional action, cannot be accomplished through an action by a congressional committee or an individual member of Congress, such as an approval of a prospectus, a statement by a committee chair, or another such non-statutory action. *Cf. EEOC*, 743 F.2d at 974 (referencing "ratifying legislation" and noting that a "strict interpretation of the principles of bicameralism, presentment, and separation of powers reinforces the need for strong evidence of ratification"). Accordingly, the Court will not consider whether the letter from the House committee chairs, or the approval of the Reagan Building Prospectus by the Senate EPW and House T&I Committees, constituted acts of ratification.

**B. The 2026 Appropriations Act Provision**

Here, in support of their ratification and implied repeal arguments, Defendants point to the following language of the 2026 Appropriations Act Provision:

> Any remaining unobligated balances from amounts originally made available under the heading "Federal Bureau of Investigation—Construction" in the Department of Justice Appropriations Act, 2016 (title II of division B of Public Law 114–113) or in the Department of Justice Appropriations Act, 2017 (title II of division B of Public Law 115–31) for the new Federal Bureau of Investigation consolidated headquarters facility in the National Capital Region that were subsequently reprogrammed pursuant to a notification received by the Committees on Appropriations from the Assistant Attorney General for Administration on July 1, 2025, may not be further obligated until the Federal Bureau of Investigation submits to the Committees on Appropriations of the House of Representatives and the Senate the contracted and completed architectural and engineering plan for the Federal Bureau of Investigation's new headquarters building for review: *Provided*, That classified portions of the architectural and engineering plan shall be submitted through a classified annex.

2026 Appropriations Act, 140 Stat. at 40. Defendants argue that Congress's use of the past-tense phrase "subsequently reprogrammed" demonstrates that Congress ratified the Reagan Building

Selection Decision and the FBI Reprogramming Decision. *Id.* Further, Defendants argue that Congress also ratified these decisions by requiring the submission of architectural and engineering plans for the FBI headquarters building before any of the reprogrammed funds could be "further obligated." *Id.*

Upon review of the language in the 2026 Appropriations Act Provision, the Court cannot conclude that it constitutes congressional ratification because it does not use clear and unequivocal language or provide a clear demonstration that Congress intended to ratify the Reagan Building Selection Decision or the FBI Reprogramming Decision. *See Utah Div. of State Lands*, 482 U.S. at 207; *EEOC*, 743 F.2d at 974. This provision makes no specific reference to the Reagan Building Selection Decision and contains no language approving of it. As to both decisions, the reference to the past act of a reprogramming of funds notably does not endorse or approve of that action but instead immediately imposes a specific restrictive condition to block the use of those funds: the required submission of completed architectural and engineering plans. *See* 2026 Appropriations Act, 140 Stat. at 40. Thus, even recognizing that the resolutions approving of the Reagan Building Prospectus may signal that certain members of Congress now favor that site, the 2026 Appropriations Act Provision is most fairly read not as ratifying and adopting the Reagan Building Selection Decision, but as imposing an obstacle to that decision by requiring more information about the proposal before Congress makes a final decision on whether to take action to lift the location restrictions imposed by the 2022 and 2023 Appropriations Acts and accept the Reagan Building project. Indeed, Congress explicitly required that the plans be submitted "for review" before any further action could be taken. *Id.*

Although clear from the text of the provision alone, this reading is consistent with its legislative history, as it was introduced by Senator Chris Van Hollen of Maryland, who stated that

the provision was included "to address the Trump administration's ongoing efforts to set aside and ignore the decades-long site selection process for a new FBI headquarters." 172 Cong. Rec. S202. Where Senator Van Hollen effectively expressed opposition to the Reagan Building Selection Decision and had previously expressed support for the construction of the consolidated FBI headquarters project in his home state of Maryland, *see* 167 Cong. Rec. S7796, and where Defendants have offered no evidence of any member of Congress characterizing this provision as either a ratification of the Reagan Building Selection Decision and FBI Reprogramming Decision or an implied repeal of the 2022 and 2023 Site Selection Provisions, the Court will not conclude that Congress intentionally sought to use the 2026 Appropriations Act Provision to ratify the Reagan Building Selection Decision and the FBI Reprogramming Decision.

Notably, Defendants have cited no case in which a court actually found that Congress ratified an Executive Branch action, and certainly not under circumstances similar to those presented here. Defendants rely primarily on *Ex parte Endo*, 323 U.S. 283 (1944), an 80-year-old case in which the Court found that Congress had not ratified the Executive Branch policy of detaining loyal Japanese Americans as part of the infamous internment of Japanese Americans during World War II by providing an appropriation for such activities, because such a lump-sum appropriation did not "plainly show a purpose to bestow the precise authority" the government claimed. *Id.* at 303 n.24. Defendants' other cited cases likewise included no finding of ratification. *See Schism*, 316 F.3d at 1289–93 (holding that Congress had not ratified promises made by military recruiters of free lifetime medical care for military retirees after 20 years of active duty service through various appropriations, where the appropriation provisions lacked statements specifically authorizing payment for such free care); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 & n.7 (D.C. Cir. 2006) (finding that appropriations providing the U.S. Bureau of

Land Management with requested funds to fix systemic issues with the Wild Horse and Burro Program should not be read as a ratification of that program, where the program was not identified as a specific line item in the appropriations).

Indeed, to the extent that *Endo* identifies a successful congressional ratification, it does so by discussing Executive Order 9066, the notorious executive action that initiated the internment of Japanese Americans during World War II, which the Supreme Court found to have been ratified by a 1942 Act of Congress in *Hirabayashi v. United States*, 320 U.S. 81 (1943), in which the Court rejected an equal protection challenge to a conviction for violating restrictions on Japanese Americans imposed under the authority of Executive Order 9066. *See id.* at 83, 100–02; *Endo*, 323 U.S. at 287–88, 298. Where reliance on one of the most discredited executive actions and one of the most discredited Supreme Court cases in American history would be unbecoming of the United States government, the Court assumes that Defendants do not seek to rely on this example in support of their ratification argument. *See Hirabayashi v. United States*, 627 F. Supp. 1445, 1447, 1456–57 (W.D. Wash. 1986) (granting a petition for a writ of error *coram nobis* vacating Hirabayashi's conviction after finding that DOJ had committed "an error of the most fundamental character" when it failed to disclose information both to Hirabayashi and the Supreme Court that contradicted the Government's representations about the reason why the restrictions were warranted by military necessity); *Korematsu v. United States*, 323 U.S. 214, 217–18 (1944) (relying on "the principles we announced in" *Hirabayashi v. United States*, 320 U.S. 81 (1943), in rejecting an equal protection challenge to a conviction for violating the order excluding Japanese Americans from the "West Coast war area" during World War II); *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in

the court of history, and—to be clear—'has no place in law under the Constitution.'" (quoting *Korematsu*, 323 U.S. at 248 (Jackson J., dissenting))).

As for implied repeal, based on the same reading of the 2026 Appropriations Act Provision discussed above, the Court finds that it presents no irreconcilable conflict with the 2022 and 2023 Site Selection Provisions, as the 2026 Appropriations Act Provision is best read to prevent spending on the Reagan Building project, and to require additional information for review, before Congress decides whether to take formal action to repeal the location restrictions.

Finally, although Defendants argue that the absence of specific language overturning or disapproving of the Reagan Building Selection Decision or the FBI Reprogramming Decision signals a ratification or implied repeal, this argument turns the standard on its head. Where a ratification requires a clear demonstration of congressional intent to ratify through clear and unequivocal language, it is incumbent on Congress to clearly express an intent to ratify executive actions. *See Utah Div. of State Lands*, 482 U.S. at 207; *EEOC*, 743 F.2d at 974. It did not do so here. Even under the standard articulated in *Endo*, as cited by Defendants, the 2026 Appropriations Act Provision does not "plainly show a purpose to bestow the precise authority which is claimed." *Endo*, 323 U.S. at 303 n.24. Likewise, where an implied repeal requires an "irreconcilable conflict" with the prior statute, it is not enough to show that the statutory language could be read in favor of an implied repeal when there is an alternative reading that does not require such a repeal. Because the 2026 Appropriations Act Provision can be fairly read as not having ratified the executive actions or impliedly repealed the prior statutes, the Court cannot find that it effected these results. The Court therefore does not find that Congress has ratified either the Reagan Building Selection Decision or the FBI Reprogramming Decision, or that it has impliedly repealed

the relevant provisions of the 2022 and 2023 Appropriations Acts with which those decisions conflict.

## VII. Remedy

In summary, for the reasons stated above, the Court finds that, as to Counts 1 and 2, the FBI and GSA Reagan Building Selection Decisions were not in accordance with law and exceeded statutory authority, in violation of the APA, and that in relation to Count 6, the FBI Reprogramming Decision was arbitrary and capricious, also in violation of the APA. Where Plaintiffs have stated that upon a ruling in their favor on Count 6, the Court need not address Count 3, it will not do so.

The Court therefore finds that Plaintiffs are entitled to judgment on Counts 1, 2, and 6 of the Complaint. Based on these rulings, pursuant to the APA, the Court will "hold unlawful and set aside" the FBI and GSA Reagan Building Selection Decisions and the FBI Reprogramming Decision. 5 U.S.C. § 706(2); *Sierra Club*, 899 F.3d at 295. In addition to vacating these challenged actions, the Court will also issue a declaratory judgment holding these actions unlawful pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

Plaintiffs also request a permanent injunction preventing the implementation of the challenged actions. Defendants, for their part, have offered no argument on why Plaintiffs are not entitled to a permanent injunction should the Court find that they have succeeded on the merits.

A party seeking a permanent injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see*

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."). Upon a showing that these elements have been satisfied, courts have granted permanent injunctions in cases in which the APA was found to be violated. *See, e.g.*, *Mayor & City Council of Baltimore v. Azar*, 973 F.3d 258, 273, 275–76 (4th Cir. 2020) (en banc).

Plaintiffs have established these factors. First, irreparable injury is harm that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)). Here, Plaintiffs have shown that the Reagan Building Selection Decision and the FBI Reprogramming Decision will cause Plaintiffs irreparable harm by depriving them of the long-term economic benefits associated with the consolidated FBI headquarters project if constructed at the Greenbelt site. A loss of economic benefits can constitute irreparable harm when, as here, such benefits would be very difficult or impossible to calculate. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) ("Generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973))); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (concluding that an action by the U.S. Department of the Interior to stop current and future oil and gas leases would cause irreparable economic harm to States, including through lost jobs, higher prices, financial losses to local governments, and damage to the States' economies).

Moreover, Plaintiffs also face irreparable harm because they cannot obtain such monetary relief even with a final judgment, because the federal government's waiver of sovereign immunity

for APA claims does not extend to claims for monetary damages arising from such claims. *See City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief 'other than money damages.'" (quoting 5 U.S.C. § 702)); *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) ("[E]conomic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation."); *Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 618 (D. Md. 2019) (finding irreparable harm based in part on the fact that the federal agency defendant had sovereign immunity that precluded monetary recovery), *aff'd*, 973 F.3d 258 (4th Cir. 2020) (en banc); *Louisiana*, 622 F. Supp. 3d at 297 (same). For the same reasons, the Court finds that Plaintiffs have satisfied the second element, that remedies available at law, such as monetary damages, would be inadequate to compensate them. *See eBay Inc.*, 547 U.S. at 391.

Considering the last two elements, the Court finds that the balance of the equities and the public interest both favor Plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (finding that these two factors "merge when the Government is the opposing party"). Here, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Defense*, 947 F.3d 207, 230–31 (4th Cir. 2020) (internal citations omitted). Further, if the Reagan Building project moves forward, Plaintiffs will lose the opportunity to have the substantial economic benefits that would have a positive impact not just on individual private parties, but on the community in Prince George's County. As for Defendants, they are still at the beginning stages of moving the FBI to the Reagan Building, and Congress has stopped any obligation of the funds that Defendants attempted to reprogram pending the submission of architectural and engineering

plans, so the immediate impact of an injunction on Defendants would be limited. Thus, the Court finds that the balance of the hardships and public interest presently favor Plaintiffs. Accordingly, the Court will issue a permanent injunction, the details of which will be set forth in a separate Order, enjoining Defendants from implementing the FBI and GSA Reagan Building Selection Decisions and the FBI Reprogramming Decision. The injunction may be revisited in the event that Congress takes statutory action to rescind or alter the Site Selection Provisions.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Pleadings will be GRANTED, Defendants' Motion for Judgment on the Pleadings will be DENIED, and judgment will be entered in favor of Plaintiffs on Counts 1, 2, and 6. A separate Order shall be issued.

Date: August 17, 2026

THEODORE D. CHUANG
United States District Judge